**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **TIEL JENKINS,** | § § | |
| **PLAINTIFF,** | § § | |
| **V.** | § § | **CIVIL ACTION NO. 4:22-CV-01021-P** |
| **AMEDISYS HOLDING, L.L.C. D/B/A ASANA HOSPICE, AN AMEDISYS CO.,** | § § § § | |
| **DEFENDANT.** | § § | |

<u>**APPENDIX IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

In accordance with FED. R. CIV. P. 56 and LOCAL RULE 56.6, Defendant Amedisys Holding, LLC ("Defendant" or "Amedisys") submits this *Appendix in Support of Defendant's Motion for Summary Judgment* as set forth in the *Brief in Support of Defendant's Motion for Summary Judgment* accompanying *Defendant's Motion for Summary Judgment* ("Motion").

| Exhibit | Description | Citation |
|---|---|---|
| **Exhibit A** | *Plaintiff's Deposition Transcript* ("Jenkins Dep.") | App. 001-161 |
| **Exhibit A-1** | Dep. Ex. 1 – Amedisys Policy Manual (Excerpts) | App. 162-169 |
| **Exhibit A-2** | Dep. Ex. 2 -Business Office Manager Job Description | App. 170-178 |
| **Exhibit A-3** | Dep. Ex. 7 – Email Exchange Between Plaintiff and Kellie Brady Dated December 7, 2020 | App. 179-183 |
| **Exhibit A-4** | Dep. Ex. 10 - ADA Medical Inquiry Form Completed by Provider | App. 184-187 |
| **Exhibit A-5** | Dep. Ex. 11 - Email Exchange Between Plaintiff and Kellie Brady Dated December 31, 2020 | App. 188-189 |

| Exhibit | Description | Citation |
|---|---|---|
| **Exhibit A-6** | Dep. Ex. 12 – Altered Election of Benefit Statement | App. 190 |
| **Exhibit A-7** | Dep. Ex 17 – Separation Notice | App. 191 |
| **Exhibit B** | *Plaintiff's Responses to Defendant's Request To Admit* | App. 192-196 |
| **Exhibit B-1** | RTA Ex. A – Charge of Discrimination | App. 197-200 |
| **Exhibit B-2** | RTA Ex. B – EEOC Determination | App. 201-203 |
| **Exhibit B-3** | RTA Ex. C – ADA Medical Inquiry Form Completed by Provider | App. 204-208 |
| **Exhibit C** | *Declaration of Kellie Brady in Support of Defendant's Motion for Partial Summary Judgment* ("Brady Decl.") | App. 209-212 |
| **Exhibit D** | *Declaration of Pam Kinard in Support of Defendant's Motion for Partial Summary Judgment* ("Kinard Decl.") | App. 213-216 |
| **Exhibit D-1** | Amedisys Corporate Compliance Plan | App. 217-268 |
| **Exhibit D-2** | Policy AA-004 – Election of Hospice Benefit | App. 269-275 |
| **Exhibit D-3** | CMS Manual System, Pub. 100-02 Medicare Benefit Policy | App. 276-288 |

Respectfully Submitted,

 /s/ Jason D Keck
Arthur V. Lambert
ATTORNEY-IN-CHARGE
Texas State Bar No. 11841250
500 N. Akard Street, Suite 3550
Dallas, TX 75201
Tel: (214) 220-9100
Fax: (214) 220-9122
FISHER & PHILLIPS LLP

*alambert@fisherphillips.com*

Jason D Keck (*pro hac vice*)
Scott C Fanning (*pro hac vice*)
FISHER & PHILLIPS LLP
10 S. Wacker Dr., Ste. 3450
Chicago, IL 60606
Tel:  (312) 346-8061
Fax:  (312) 346-3179
*jkeck@fisherphillips.com*
*sfanning@fisherphillips.com*

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I certify that I filed this *Appendix in Support of Defendant's Motion for Summary Judgment* on March 6, 2023, using the Court's Electronic Filing System which will send notification of this filing upon all registered users, including the following parties:

W.D. MASTERSON
3141 Hood Street, Suite 500
Dallas, TX 75219
(214) 969-9099 - Telephone
(214) 953-0133 - Fax
wdm@kilgorelaw.com

**ATTORNEYS FOR PLAINTIFF**

/s/ Jason D Keck
Jason D Keck

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF TEXAS

2               FORT WORTH DIVISION

3  TIEL JENKINS,            )

                      )

4          Plaintiff,    )

                      )

5  VS.                ) CIVIL ACTION

                      )

6  AMEDISYS HOLDING, L.L.C.  ) NO.: 4:22-CV-01021-P

  D/B/A ASANA HOSPICE, AN    )

7  AMEDISYS CO.,          )

                      )

8          Defendant.    )

9

10

11      -----------------------------------

12            ORAL DEPOSITION OF

             TIEL ARMON JENKINS

13            FEBRUARY 9, 2023

14      -----------------------------------

15

16     ORAL DEPOSITION OF TIEL ARMON JENKINS, produced as

17  a witness at the instance of the DEFENDANT, and duly

18  sworn, was taken in the above-styled and numbered cause

19  on February 9, 2023, from 10:54 a.m. to 3:28 p.m.,

20  before Lisa M. Durham, CSR, reported by machine

21  shorthand, at the offices of Kilgore & Kilgore, PLLC,

22  located at 3141 Hood Street, Suite 500, City of Dallas,

23  County of Dallas, State of Texas, pursuant to the

24  Federal Rules of Civil Procedure and the provisions

25  stated on the record or attached hereto.

EXHIBIT
A

1                    A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4        Mr. W.D. Masterson
         KILGORE & KILGORE, PLLC

5        3141 Hood Street
         Suite 500

6        Dallas, Texas  75219
         (214) 969-9099

7        wdm@kilgorelaw.com

8

    FOR THE DEFENDANT:

9

         Mr. Jason D. Keck

10       FISHER & PHILLIPS, LLP
         10 South Wacker Drive

11       Suite 3450
         Chicago, Illinois  60606

12       (312) 346-8061
         jkeck@fisherphillips.com

13

14   ALSO PRESENT:

15       Ms. Ashton Clabo  (Appearing Via Zoom)
         Amedisys

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX
 2                                               PAGE
 3   Appearances........................................ 2
 4   TIEL ARMON JENKINS
          Examination by Mr. Keck........................ 4
 5
     Reporter's Certificate............................160
 6
 7                      EXHIBITS
 8   NO.            DESCRIPTION                 MARKED/ID'D
 9   Exhibit 1      Amedisys Policy Manual          4/39
     Exhibit 2      HSP Business Office Manager     4/33
10                  Job Description
     Exhibit 3      (exhibit not used)              --
11   Exhibit 4      Policy AA-004                    4/106
     Exhibit 5      (exhibit not used)              --
12   Exhibit 6      (exhibit not used)              --
     Exhibit 7      Email from Tiel Jenkins,        4/63
13                  12/7/20
     Exhibit 8      Email from Kellie Brady,        4/70
14                  12/3/20
     Exhibit 9      Request for an ADA              4/89
15                  Accommodation, Form A
     Exhibit 10     Medical Inquiry Form,           4/91
16                  Form B
     Exhibit 11     Email from Tiel Jenkins,        4/95
17                  1/13/21
     Exhibit 12     Election of Benefit Statement   4/116
18   Exhibit 13     Election of Benefit Statement   4/118
     Exhibit 14     Email from Jacqueline Williams, 4/107
19                  1/5/21
     Exhibit 15     Email from Tiel Jenkins,        4/113
20                  1/8/21
     Exhibit 16     Email from Tiel Jenkins,        4/127
21                  1/22/21
     Exhibit 17     Separation Form                 4/133
22   Exhibit 18     (exhibit not used)              --
     Exhibit 19     EEOC Charge of Discrimination   4/138
23   Exhibit 20     (exhibit not used)              --
     Exhibit 21     (exhibit not used)              --
24   Exhibit 22     (exhibit not used)              --
     Exhibit 23     (exhibit not used)              --
25   Exhibit 24     Plf's Original Complaint        4/137
```

1    (February 9, 2023, 10:54 a.m.)

2    (All deposition exhibits were premarked.)

3    TIEL ARMON JENKINS,

4    having been first duly sworn, testified as follows:

5    EXAMINATION

6    BY MR. KECK:

7    Q.  Good morning.  Can you state and spell your

8    name for us?

9    A.  Oh.

10   Q.  You're the star of the show today.

11   A.  Sorry.  Tiel Jenkins.  Oh, you said spell it.

12   T-i-e-l, J-e-n-k-i-n-s.

13   Q.  Is it okay if I call you Ms. Jenkins?

14   A.  Yes.

15   Q.  Ms. Jenkins, just for the record, while we're

16   on here, I also have my client, Ashton Clabo, C-l-a-b-o,

17   who's listening today.  So she's also in attendance.

18           Have you ever had your deposition taken

19   before?

20   A.  No.

21   Q.  What I want to do before we get started today

22   is just go over some ground rules, so that way, we're

23   all familiar with kind of how the process is supposed to

24   work.

25           When I ask a question today, I'm going to

1  ask you to give me a verbal answer.  So that way, the

2  court reporter can take down exactly what you say.  No

3  head nods, things like uh-huh or huh-uhs.  Things like

4  that can't be picked up on the transcript.  Okay?

5      A.  Okay.

6      Q.  If at any point today I ask a question that's

7  confusing or you don't understand, just ask me to

8  rephrase it, and I'll do the best that I can.

9          If you need to take a break at any point,

10  just let me know.  We'll do that.  The only thing I

11  would ask is that you answer any pending questions

12  before we take that break.  Okay?

13          The final thing I'll say is do your best

14  not to interrupt me, and I'll do my best not to

15  interrupt you.  Sometimes in conversation, you know

16  where I'm going and try to get out in front of that, and

17  it's bound to happen today, but just do your best to try

18  to remember that, too.  Okay?  Any questions about those

19  ground rules?

20      A.  No.

21      Q.  Okay.  Are you taking any medication that would

22  impair your ability to recall events and testify

23  truthfully today?

24      A.  Yes.

25      Q.  Okay.  What would that be?

1      A.  Gabapentin, Baclofen, Paroxetine -- Paroxetine.

2      Q.  Anything else?

3      A.  Not that could impair -- not that could impair

4  memory, so --

5      Q.  Okay.  Gabapentin, is that a seizure drug?

6      A.  It's for pain.

7      Q.  For pain.

8      A.  I don't know if it's a seizure drug, but for

9  me, it's for pain.

10      Q.  The second one that you had mentioned, is it

11  Baclofen?

12      A.  Baclofen, B-a-c-l-o-f-e-n.

13      Q.  And what is that drug for?

14      A.  Muscle spasms.

15      Q.  Okay.  And, then, the final one was what?

16      A.  Paroxetine.

17      Q.  Paroxetine.  What is that for?

18      A.  Anxiety and depression.

19      Q.  Okay.  Have you, before today, noticed any of

20  those drugs causing you issues with memory?

21      A.  Yes.

22      Q.  Have you, at any point since you began taking

23  these drugs, stopped taking them?

24      A.  Yes.

25      Q.  Did you notice in those situations your memory

1    improve?

2         A.   No.

3         Q.   Do you have any understanding as to whether or

4    not your memory issues are impacting long-term,

5    short-term memory or both?

6         A.   Say the question again.

7         Q.   Sure.  Do you have any understanding as to

8    whether or not these medications might be impacting your

9    long-term or your short-term memory or both?

10        A.   I don't.  I don't.

11        Q.   Okay.  Do me a favor today.  If we're talking

12   about anything relevant to your case that you believe

13   that you once had recollection of, but no longer do,

14   just notify me of that.  Okay?

15        A.   Okay.

16        Q.   Okay.  I don't want to know about anything that

17   you spoke with your lawyer about or anyone from

18   Mr. Masterson's office, but what did you do to prepare

19   for today?

20        A.   I just reviewed emails that I had.

21        Q.   Okay.  Do you recall specifically any emails

22   which you reviewed?

23        A.   No.

24        Q.   Are these emails that you've provided to your

25   attorney?

1      A.  Yes.

2      Q.  And these are emails that you would have

3  received or sent during your employment with Amedisys?

4      A.  Yes.

5      Q.  Any other documents that you reviewed in

6  preparation for today?

7      A.  Nothing -- nothing outside of what's already

8  been provided.

9      Q.  Okay.  And I appreciate that, but do you recall

10 specifically whether or not anything, other than emails

11 that you reviewed?

12     A.  Say it again.

13     Q.  Sure.  I said, is there anything besides the

14 emails that you specifically recall reviewing in

15 preparation for today?

16     A.  The ADA forms that I sent over.

17     Q.  Okay.  Anything else?

18     A.  No.

19     Q.  Okay.  And when did you review these documents?

20     A.  Within the past three days.

21     Q.  Okay.  Do you currently maintain any type of

22 journal or diary?

23     A.  No.

24     Q.  At any point since your employment with

25 Amedisys ended, have you maintained a journal or a

1  diary?

2      A.  No.

3      Q.  Where do you currently live?

4      A.  In Fort Worth.

5      Q.  Do you currently live in a home or an

6  apartment?

7      A.  I live in a home.

8      Q.  And how long have you lived at that house?

9      A.  Sixteen, seventeen years.

10     Q.  Do you have any plans in the immediate future

11 to move?

12     A.  I don't.

13     Q.  That's a good thing.  Do you live at that house

14 with anyone?

15     A.  Yes.

16     Q.  Who?

17     A.  My family.

18     Q.  Tell me their names.

19     A.  Tracy Jenkins, T-r-a-c-y, and then Treci

20 Jenkins, T-r-e-c-i.  Kalani Jenkins, K-a-l-a-n-i.

21     Q.  Is Tracy, the c-y, husband?

22     A.  Yes.

23     Q.  And, then, the other two are children?

24     A.  Yes.

25     Q.  Are either of the children over 18?

1    A.   Yes, one.

2    Q.   Who?

3    A.   Treci.

4    Q.   Okay.  Were you married to Mr. Jenkins during

5    the time in which you were employed by Amedisys?

6    A.   Yes.

7    Q.   Have you had any discussions with him about the

8    incidents at Amedisys?

9    A.   Yes.

10   Q.   Was Treci a witness to any conversations you

11   would have had with anyone while working at Amedisys?

12   A.   No.

13   Q.   Where did you attend high school?

14   A.   Everman High School.

15   Q.   E-v-e-l-y-n?

16   A.   Everman, E-v-e-r-m-a-n.

17   Q.   Okay.  Is that in Fort Worth?

18   A.   It's in Everman.

19   Q.   I'm from Illinois.  I have no familiarity with

20   where I'm even at.  Did you graduate?

21   A.   Yes.

22   Q.   What year?

23   A.   '99.

24   Q.   Okay.  Following Everman, did you attend any

25   secondary schooling -- or postsecondary schooling, I

1    should say?

2         A.   Yes.

3         Q.   Where was the first college or university that

4    you attended?

5         A.   I don't know which one was the first, but TCC,

6    Tarrant County College.

7         Q.   Did you graduate from TCC?

8         A.   I did.

9         Q.   Do you know what year?

10        A.   No.

11        Q.   And TCC is a community college?

12        A.   Uh-huh.

13        Q.   Is that a yes?

14        A.   Yes.

15        Q.   See, I told you you'd do it today.  Did you

16   have a focus or a degree of study?

17        A.   Yes.  It was associate's of science.

18        Q.   Other than TCC, have there been any other

19   postsecondary schools that you've attended?

20        A.   Dallas County College.

21        Q.   How do you spell that?

22        A.   It's Dallas, Dallas County College.

23        Q.   Dallas.  Do you know what years you were at

24   Dallas County College?

25        A.   No.

1     Q.  Did you graduate from Dallas County College?

2     A.  No, no.

3     Q.  What is the reason that you didn't graduate

4  from there?

5     A.  I just took some classes there in --

6     Q.  You weren't pursuing a degree, in other words?

7     A.  Well, yes, but I didn't complete it.  So that

8  was for nursing.

9     Q.  Gotcha.

10     A.  So I didn't -- it was between Tarrant County

11  and Dallas College, but I wanted to graduate from TCC.

12     Q.  Other than TCC and Dallas County College, any

13  other postsecondary schools you've attended?

14     A.  UNT, University of North Texas.

15     Q.  Did you graduate from UNT?

16     A.  Yes.

17     Q.  What year?

18     A.  2010.

19     Q.  And what was the degree you obtained?

20     A.  It was a bachelor's of applied arts and

21  science.

22     Q.  That was for nonprofit?

23     A.  Yes.

24     Q.  And following UNT, any other colleges?

25     A.  Texas Woman's University.

1      Q.   Okay.  Did you graduate from TWU?

2      A.   Yes.

3      Q.   What year?

4      A.   2012.

5      Q.   And what was the degree you obtained?

6      A.   A master's in family studies.

7      Q.   Any other postsecondary schools?

8      A.   No.

9      Q.   At any of the colleges or universities that you

10   attended, were you ever disciplined or suspended or

11   expelled?

12     A.   No.

13     Q.   Okay.  What we're going to do, Ms. Jenkins, is

14   we're going to talk just briefly about what you did

15   prior to coming to work for Amedisys, and then we're

16   going to skip over what happened at Amedisys and talk

17   about what you've been doing since.  And, then, we'll

18   spend the bulk of the day talking about what happened

19   while at Amedisys.  Okay?

20     A.   Okay.

21     Q.   So first thing I want to talk about and just so

22   we have a foundation point, do you recall the date that

23   you began working for Amedisys?

24     A.   It was in -- so when you say Amedisys, are we

25   talking about before they took over the company I was

1  hired for or when they took over?

2      Q.  Right.  So I appreciate that.  Let's talk about

3  the time when Amedisys acquired your predecessor

4  employer, which I believe was January 1st of 2020.  Is

5  that correct?

6      A.  Yes.

7      Q.  Okay.  So you became an Amedisys employee as of

8  January 1 of 2020?

9      A.  Yes.

10      Q.  And who was the predecessor employer?

11      A.  Asana Hospice.

12      Q.  And that's A-s-a-n-a?

13      A.  Yes.

14      Q.  Okay.  How long were you working for Asana

15  Hospice?

16      A.  I started there in July 2018.  July 2018, I

17  believe.

18      Q.  Okay.  And what was the job that you performed

19  while working just for Asana?

20      A.  Manager of volunteer services.

21      Q.  Tell me just briefly, in your own words, what

22  that job entailed.

23      A.  That job entailed recruiting volunteers to work

24  with our clients.

25      Q.  "Clients" being patients?

1      A.  Being patients, yes.  And managing their

2   day-to-day what they were doing.

3      Q.  Is that the position you held for the entire

4   time that you were at Asana?

5      A.  Yes.

6      Q.  During your employment with Asana, were you

7   ever disciplined?

8      A.  No.

9      Q.  At any point during your employment with Asana,

10  so prior to Amedisys, did you make any internal or

11  external legal claims or threats?

12     A.  No.

13     Q.  At the time that Amedisys took over or acquired

14  Asana and you became an Amedisys employee, who was the

15  individual that you reported to?

16     A.  Melissa Heiss was the director of operations.

17     Q.  Okay.  H-e-i-s-t?

18     A.  No T, H-e-i-s-s.

19     Q.  Okay.  Heiss.

20         Okay.  Prior to Asana, do you recall who

21  you worked for?

22     A.  Kindred Hospice.

23     Q.  Do you know what dates you were employed at

24  Kindred Hospice?

25     A.  Not off the top of my head, I don't recall.

1    Q.  Does July 2017 through June 2018 sound about

2  right?

3    A.  Yes.

4    Q.  During your time at Kindred, did you work with

5  anybody who you ultimately worked with at Asana?

6    A.  Yes.

7    Q.  Any supervisory employees?

8    A.  Not my direct supervisor.

9    Q.  Okay.  During your employment with Kindred,

10  were you ever disciplined in any fashion?

11    A.  No.

12    Q.  Did you ever, during your employment with

13  Kindred, make any internal or external legal claims --

14    A.  No.

15    Q.  -- or threats against the company?

16    A.  No.

17    Q.  That includes work comp claims, anything,

18  right?

19    A.  Correct.

20    Q.  And I've got a list here that your attorney's

21  graciously provided with the other entities that you had

22  worked for during your life, but I'll try to

23  short-circuit this.  At any point during any of those

24  other jobs, were you ever disciplined?

25    A.  No.

1     Q.  Were you ever fired from any jobs?

2     A.  No.

3     Q.  During any other positions prior to Kindred --

4 do you want to say something?  Sorry.

5     A.  Yes.

6     Q.  Go ahead.

7     A.  So you said was I ever fired from a job?

8     Q.  Correct.

9     A.  So with Kindred, I don't know if you want to

10 say fired or let go, but I wasn't -- there was several

11 of us who were let go due to an acquisition.  So I just

12 wanted to clarify.

13     Q.  I appreciate that.  Thank you.

14         So you were essentially laid off through no

15 fault of your own?

16     A.  Yes.

17     Q.  Okay.  At any point prior to Kindred, at any

18 other employers, did you ever make any internal or

19 external legal claims or threats --

20     A.  No.

21     Q.  -- against any of those companies?

22     A.  No.

23     Q.  Never filed a charge against any other

24 employer?

25     A.  No.

1      Q.   Okay.  So as I said, we'd talk about what
2   happened before.  Now we're going to skip over Amedisys,
3   and we're going to talk about what you've been doing
4   since.
5             As I understand it, your employment with
6   Amedisys ended on January 29th of 2021.  Is that right?
7      A.   28th or 29th.
8      Q.   Okay.
9      A.   Yes.
10     Q.   So following that date, what was the first job
11  that you held?
12     A.   Teacher at Weatherford ISD.
13     Q.   Teacher at -- what was it?
14     A.   Weatherford, W-e-a-t-h-e-r-f-o-r-d.
15     Q.   What is Weatherford?
16     A.   It's the district.  I mean, like, it's the -- a
17  city.
18     Q.   It's a city?
19     A.   Yeah.  Weatherford is a city.
20     Q.   Okay.  Are you a teacher at a high school, a
21  middle school?
22     A.   High school.
23     Q.   High school.  What do you teach?
24     A.   Food science and PALS, P-A-L-S.
25     Q.   What is that?

1    A.  Peer assistance and leadership.

2    Q.  Explain to us what PALS does or is intended

3 to do.

4    A.  PALS is intended to train young individuals to

5 be leaders in the community and servicing their peers.

6    Q.  Do students register to do that, or are they

7 selected?

8    A.  They have to apply.  It's an application

9 process.

10    Q.  Gotcha.  It has no relevance to the claim.  I'm

11 just curious.

12         Okay.  And how many classes per day do you

13 teach?

14    A.  Seven.

15    Q.  That's a combination between food science and

16 PALS?

17    A.  Yes.

18    Q.  Do you teach classes Monday through Friday?

19    A.  Yes.

20    Q.  You seem unsure.

21    A.  Because PALS is -- although it's a class, the

22 students are off campus, so I don't have that hour.  So

23 when school first starts, the first six weeks, they are

24 with me.  The rest of the year, they are out on their

25 own, and then they report back to me, basically, once a

1  week, on Friday.

2      Q.  Okay.

3      A.  So I don't -- I'm not physically with them --

4      Q.  Understood.

5      A.  -- during that time.

6      Q.  When you say they're out on their own, what are

7  they doing?

8      A.  They go to the elementary schools and the

9  middle schools and mentor younger students.

10      Q.  Understood.  Okay.  And I should ask -- I

11  believe I know the answer, but you're still employed

12  with Weatherford, right?

13      A.  Yes.

14      Q.  When did you become employed with Weatherford?

15      A.  '21, August -- or I guess the contract started

16  in June maybe.  School didn't start until August.  I

17  didn't have to start working till August 2021.

18      Q.  Okay.  But your contract, you believe, may have

19  began in June of 2021?

20      A.  No.  I think -- I think it's August because

21  school would have been out.  I think it's August.

22      Q.  Do you have a copy of your contract with

23  Weatherford?

24      A.  I don't have it with me.

25      Q.  Right.

1     A.  I mean, I can -- yes, I'm quite for sure I do.

2     Q.  Okay.  Was your contract renewed for the

3  2022/2023 school year?

4     A.  Yes.

5     Q.  When did you know that you would be offered a

6  contract for Weatherford?

7     A.  Maybe late May, early June.  I don't recall the

8  specifics.

9     Q.  Once you were notified that you would be

10  offered a contract for the 2021 school year, did you

11  stop looking for jobs?

12     A.  No.

13     Q.  Assuming that you were aware that you would be

14  offered a contract for Weatherford in May or June of

15  2021 and using those dates as a benchmark, do you know

16  when you began interviewing with Weatherford?

17     A.  It was in May.

18     Q.  Do you know when you would have applied to work

19  for Weatherford?

20     A.  I don't recall.

21     Q.  Do you have an approximation of how soon before

22  May?

23     A.  Between March and April possibly.

24     Q.  Since you've been employed with Weatherford,

25  have you been disciplined?

1      A.   No.

2      Q.   Have you made any internal or external legal

3   claims or threats against Weatherford?

4      A.   No.

5      Q.   And what is your typical -- I know you told us

6   you teach about seven classes per day on average.  What

7   is your hours?

8      A.   Eight to four.

9      Q.   When you're teaching, are you physically at the

10  building?

11     A.   Yes.

12     Q.   Since you've been employed with Weatherford,

13  have you made any requests for any types of

14  accommodations?

15     A.   No.

16     Q.   When you began working for Weatherford in

17  August of 2021, what was your rate of pay?

18     A.   I believe it was fifty-two nine maybe, plus a

19  thousand for a master's degree stipend.

20     Q.   So 53,900 per year?

21     A.   Yes.

22     Q.   Did that increase for the 2022 school year?

23     A.   It did.

24     Q.   What did it increase to?

25     A.   That's a good question.

1    Q.  Thank you.

2    A.  I don't recall specifically.

3    Q.  Have you received a W-2 for the 2022 year yet?

4    A.  Yes.

5    Q.  Do you receive benefits while working for

6  Weatherford?

7    A.  Yes.

8    Q.  What types of benefits?

9    A.  Health, dental, eye.  I believe short-term,

10  long-term, life insurance.

11    Q.  Are you pension eligible?

12    A.  Yes, yes.  Yes, they take that out of my check.

13    Q.  I don't know what they do in Weatherford, but

14  are you a member of a union?

15    A.  I'm not.

16    Q.  Do you have any understanding as to how the

17  benefits that you're provided through Weatherford

18  compare to those you would have been provided by

19  Amedisys?

20    A.  Can you be more specific?

21    Q.  Yeah.  Are they better?  Are they worse?  Are

22  they more expensive?  Are they less expensive?

23    A.  I believe they -- no, I don't recall.

24    Q.  As you sit here, you don't know one way or

25  another?

1       A.   No.   I can't remember the specifics from

2   Amedisys.   I don't want to --

3       Q.   And since we're talking about it, we'll just do

4   it now.   Did you have benefits while you were with

5   Amedisys?

6       A.   Yes.

7       Q.   Did you elect the same types of benefits?

8       A.   I don't remember.

9       Q.   Assuming your job with Amedisys ended on -- or

10  January 28th or 29th of 2021, how soon thereafter did

11  you begin looking for work?

12      A.   Shortly, February.

13      Q.   Okay.   What did you do to begin looking for

14  jobs?

15      A.   Online searches.

16      Q.   Did you use any type of website or service,

17  CareerBuilder, Indeed, anything like that?

18      A.   All that were available, yes.   I did, yes.

19      Q.   Did you maintain any type of log or the record

20  of the jobs that you were applying for?

21      A.   No.

22      Q.   You were on Indeed, correct?

23      A.   Uh-huh.

24      Q.   Okay.   Is that a yes?

25      A.   Yes.

1    Q.  So we'll use that as an example.  When you
2  apply for a job on Indeed, correct me if I'm wrong, you
3  receive an email confirming that application, right?
4    A.  Yes.
5    Q.  Did you maintain or do you have access to those
6  emails?
7    A.  I did not maintain those.
8    Q.  Okay.  What did you do with them?
9    A.  I delete them.  I don't --
10   Q.  And that would be true for any email you would
11 have received confirming a job application?
12   A.  Yes.
13   Q.  Before you interviewed with Weatherford, did
14 you have any interviews with any employer?
15   A.  No.
16   Q.  Were you focusing your job search efforts on
17 any type of industry or specific job?
18   A.  No, not specifically.
19   Q.  How did you find the job at Weatherford?
20   A.  Through the -- I think it was through the
21 Region 11 website.  Region 11 is an education website.
22   Q.  Okay.  Region 11 oversees Weatherford -- or
23 includes Weatherford may be a better way to describe it?
24   A.  Yes, includes Weatherford.
25   Q.  And they post jobs on that website?

1      A.  Yes.

2      Q.  Did you apply to that website?

3      A.  It's not through the -- it's not to the

4 website.  It's directly to the district.  They just post

5 the job.

6      Q.  So what was the application process?  What did

7 you physically have to do to submit an application to

8 work for Weatherford?

9      A.  Apply -- I think it was just apply on their

10 site, you know, submit whatever documents that they

11 requested, a résumé.

12     Q.  Okay.  From the period of time in which your

13 employment with Amedisys ended until you began receiving

14 compensation from Weatherford, did you do anything to

15 obtain an income during that time period?

16     A.  I applied for unemployment.

17     Q.  Okay.  Other than unemployment, did you have

18 any other sources of income during that time?

19     A.  No.

20     Q.  Does your husband work?

21     A.  Oh, yes.

22     Q.  Did he work during the time in which you were

23 employed by Amedisys?

24     A.  Yes.

25     Q.  From the January 28th or 29th date until you

1  became employed with Weatherford, were there any other

2  periods of time during that in which you did not look

3  for work?

4      A.  No.

5      Q.  Were there any periods of time within that

6  window that you were unable to work?

7      A.  No.

8      Q.  Did you, during that time period, turn down any

9  job offers?

10     A.  No, no.

11     Q.  I assume during that time period, you were not

12  working odd jobs, driving for Uber, anything like that?

13     A.  No, no.

14     Q.  Since you became employed with Weatherford,

15  have you continued to look for work?

16     A.  No.

17     Q.  Okay.  Other than this lawsuit, have you at any

18  point in your life been a party to a lawsuit, either as

19  a plaintiff or a defendant?

20     A.  No.

21     Q.  Have you ever filed for bankruptcy?

22     A.  No.

23     Q.  Have you disclosed to anyone at Weatherford

24  that you have this lawsuit pending?

25     A.  No.

1    Q.   Were you ever asked?

2    A.   No, but I don't recall.  I don't recall.

3    Q.   Okay.  Are you doing good?  Do you need a

4    break, doing fine?

5    A.   I'm okay.

6    Q.   Okay.  So what I'm going to do now is shift

7    gears to the bulk of what we're going to talk about

8    today, and that's your employment with Amedisys.  During

9    this part, I'm going to show you some documents, and

10   we'll talk about those.  If you have any questions or

11   need clearer copies, just let me know.

12              So just by way of background and to repeat,

13   you became an Amedisys employee on January 1st of 2020,

14   right?

15   A.   Yes.

16   Q.   And the position that you began working for

17   with Amedisys was a hospice coordinator or a volunteer

18   coordinator?

19   A.   Volunteer, yes.

20   Q.   And for all intents and purposes, the volunteer

21   coordinator for Amedisys was the same thing you were

22   doing for Asana?

23   A.   Yes.

24   Q.   When you became an Amedisys employee, who did

25   you report to, so as of January 1st of 2020?

1     A.  Melissa Heiss.

2     Q.  Okay.  On September 12, 2020, you became the

3 business office manager, correct?

4     A.  Yes.

5     Q.  A business office manager is commonly called a

6 BOM (pronunciation) or a B-O-M?

7     A.  Yes.

8     Q.  What care center were you located at?

9     A.  The Fort Worth office.

10    Q.  And correct me if I'm wrong, but a care center

11 is essentially an administrative office, right?  There's

12 no hands-on patient care done at the care center?

13    A.  Correct.

14    Q.  It's where the director sits, business office

15 manager and maybe a clinical manager.  Is that correct?

16    A.  And others.

17    Q.  And others.  But in terms of the actual

18 clinicians, they're out visiting patients in their homes

19 for the most part?

20    A.  Correct.

21    Q.  Who made the decision to offer you the business

22 office manager role?

23    A.  What do you mean by "offer"?

24    Q.  Do you know who the person is that made the

25 decision to provide you that job?

1       A.  Do you mean who hired me, who said, yes, we'll

2    hire, accept her or --

3       Q.  Sure, sure.

4       A.  I'm just trying to get a clarification on your

5    question.

6       Q.  Yeah.  We'll do that.

7       A.  I think it was a combination of people.

8       Q.  Okay.  Who are those people?

9       A.  Carol Hardwick and Gary -- I cannot remember

10   Gary's last name.  I drew a blank.

11      Q.  Do you know what Gary's title was?

12      A.  I think he was like vice president of

13   operations, something.

14      Q.  Was he perhaps an area vice president of

15   operations?

16      A.  Possibly.

17      Q.  Okay.  And Carol Hardwick?

18      A.  Yes.

19      Q.  What was her title?

20      A.  She was the director of operations.

21      Q.  Okay.  You said DOO, which is D-O-O, and is an

22   acronym for director of operations?

23      A.  Correct.

24      Q.  Carol Hardwick is sometimes referred to as CJ?

25      A.  Correct.

1     Q.  Amedisys, by the way, provides home health,

2  hospice and personal care, correct?

3     A.  Maybe.

4     Q.  You don't know?

5     A.  Ours was just hospice.

6     Q.  Okay.  So whether or not they do or don't, you

7  don't know, but your care center provided only hospice

8  services?

9     A.  Correct.

10    Q.  Okay.  The director of operations, there's --

11 again, correct me if I'm wrong or tell me if you don't

12 know, but a director of operations is located at every

13 care center, right?

14    A.  Yes.  Each care center has their own director

15 of operations.

16    Q.  And that person is the highest ranking Amedisys

17 employee that's at the care center on a day-to-day

18 basis?

19    A.  Yes.

20    Q.  From the time that you became the business

21 office manager on September 12, 2020 until your

22 employment ended, who were your directors in addition to

23 Ms. Hardwick, if anyone?

24    A.  Jackie Williams.  And I don't know this person.

25 She was the -- never mind.  I don't remember her title,

1    but -- I can't speak on it because I don't remember

2    her title.

3        Q.   Okay.  Who was the director on the date your

4    employment with Amedisys ended?

5        A.   Jackie Williams.

6        Q.   Okay.  You had referenced a third individual

7    besides Ms. Hardwick and Ms. Williams.  Did that

8    individual initially replace Ms. Hardwick?

9        A.   I'm not privy to that, so I don't know what

10   that looks like from a company standpoint.

11       Q.   Okay.

12       A.   But she was at the office.  But she was also at

13   the office when CJ -- when Carol was there.

14       Q.   Okay.

15       A.   I don't remember exactly her -- Cheri.  It

16   would have been Cheri Knight-Dettori.  I just don't

17   remember what her exact title was.

18       Q.   For how long was Ms. Williams the director of

19   operations at the Fort Worth care center before you were

20   terminated?

21       A.   I guess I would say two months because she

22   started in December.

23       Q.   Okay.  Did you know her before she became the

24   director?

25       A.   No.

1      Q.  Explain to me in your own words what the
2  business office manager is responsible for doing on a
3  day-to-day basis.
4      A.  The business office manager was responsible for
5  payroll, the time and travel of employees, as well as
6  ordering supplies and billing, making sure that the --
7  billing.  That was my understanding.
8      Q.  Okay.  Was it your understanding that each care
9  center maintained their own business office manager?
10     A.  Yes.
11     Q.  Okay.  So you would have been responsible for
12  those tasks as it relates to the Fort Worth care center?
13     A.  Yes.
14     Q.  Okay.  Ms. Jenkins, I'm showing you what I've
15  previously marked as Exhibit 2.  Providing a copy to
16  your counsel.
17            Let me start by asking -- and take as much
18  time as you need -- whether or not you recognize this
19  document.
20     A.  Yes.
21     Q.  Can you tell me what this document is?
22     A.  This is the -- what do you call it?  Job
23  description.
24     Q.  So you believe that this is the business office
25  manager job description, correct?

1    A.  Yes.

2    Q.  Okay.  If you could do me a quick favor and

3  just turn to the second to last page of this Exhibit

4  Number 2.  You were on it right there.  There you go.

5         There's a signature at the bottom of this

6  document.  Do you recognize that?

7    A.  Yes.

8    Q.  Whose is that?

9    A.  Mine.

10   Q.  Okay.  And you signed this document on or about

11 January 7th of 2021?

12   A.  Yes.  That's what it shows.

13   Q.  Take as much time as you would like, but I want

14 you to look at this job description and tell me if

15 there's anything on here that you believe is inaccurate

16 in terms of explaining what the business office manager

17 is expected to do.

18   A.  Can you say the question again?

19   Q.  Sure.  After having taken the opportunity to

20 review Exhibit Number 2, my question was whether or not

21 there's anything on that document that you believe is

22 inaccurate.

23   A.  On Page 2?

24   Q.  Uh-huh.

25   A.  Oh, Page 2, Number 6 at the bottom, "The

1  supervisor evaluates and analyzes overall operations of

2  medical records, data entry and claims reviewed by

3  reviewing patient charts for compliance, accuracy with

4  telephone orders, POC," which is plan of care,

5  "frequencies order and checking patient information for

6  absent data before submission."  That is not something

7  that was being done or done in that position.

8       Q.  Okay.  We'll take them one at a time.  What

9  leads you to that conclusion?

10      A.  That was like the business office specialist's

11 role and clinical manager role.

12      Q.  Okay.  Did someone ever sit down and tell you

13 that that was not a requirement of the business office

14 manager job?

15      A.  No, but that was -- that was how -- that's what

16 was done.  That was the operations --

17      Q.  Okay.

18      A.  -- in the office.

19      Q.  So you signed this document, Exhibit Number 2,

20 on January 7th of 2021, right?

21      A.  It appears so.

22      Q.  You would have been in the business office

23 manager role for about four months by that point, right?

24      A.  Yes.

25      Q.  And you understood by initialing each of these

 1    duties, that you were acknowledging that they were a
 2    responsibility and a requirement of the job, right?
 3        A.  Yes.
 4        Q.  And those are -- the annotation that sort of
 5    looks like a J, kind of looks like a T beside each of
 6    these numbers is your initial, correct?
 7        A.  Yes.
 8        Q.  Anything else on this document, Exhibit
 9    Number 2, that you believe is inaccurate other than
10    that?
11        A.  It would have been on Page 4, Number 1,
12    "Responsible for the reconciliation of petty cash for
13    care center."  We didn't have petty cash at the care
14    center, so --
15        Q.  Okay.  Anything else on this document,
16    Exhibit 2, that you believe is inaccurate?
17        A.  No, just those two.
18        Q.  Okay.  At any point, did you ever -- after
19    signing and reviewing Exhibit Number 2 on January 7th of
20    2021, ever email anyone or provide any written
21    correspondence to anyone that says that it did not
22    accurately reflect the components of your position?
23        A.  I don't recall.
24        Q.  I understand at some point, you were also
25    asked -- let me strike that, because while I think of

1    it, the guy's last name, Gary Walker?

2         A.   Walker, yes.

3         Q.   Thank you.  At some point, I understand that

4    you were also requested to perform certain

5    administrative functions that were previously done by a

6    business office specialist.  Is that right?

7         A.   Yes.

8         Q.   Okay.  And because there's acronyms for

9    everything, a business office specialist is also

10   referred to as a BOS, right?

11        A.   Yes.

12        Q.   What was your understanding of what the

13   business office specialist was supposed to do?

14        A.   I was still trying to figure that out.

15        Q.   Okay.  So is it fair that you didn't know at

16   the time that your employment ended?

17        A.   I asked for training several times.  So, yes,

18   that's fair.

19        Q.   Okay.  Is it your understanding that typically,

20   a business office specialist reports to, at least

21   indirectly, the business office manager?

22        A.   On paper, yes.

23        Q.   You can continue to consult Exhibit Number 2 if

24   you need to, but would you agree that most of the jobs

25   listed on here require in-person attendance to perform?

1      A.   No.

2      Q.   Do you recall the time period in which you were

3  asked to perform some of the business office specialist

4  duties?

5      A.   I believe it was in November when the BOS

6  resigned.

7      Q.   Okay.  So the Fort Worth care center had a

8  business office specialist who resigned in approximately

9  November of 2020?

10     A.   Yes.  Yes, 2020.

11     Q.   And after that, who asked you to step in and

12  assume certain of those duties that were no longer being

13  performed at that time?

14     A.   It would have been indirectly CJ.  There was

15  just CJ.

16     Q.   Okay.  Do you have any understanding that most

17  care centers don't have a business office specialist at

18  all?

19     A.   No.

20     Q.   Did you ever communicate with any other

21  business office manager regarding what the business

22  office specialist was supposed to be doing?

23     A.   No.  We had a BOS at the time, so no.

24     Q.   Well, after the BOS left in November, up until

25  the point that your employment with Amedisys ended, did

1   you speak with anyone else about what the business

2   office specialist should be doing?

3       A.  I don't recall specifics.

4       Q.  You agree that Amedisys maintained during your

5   employment an employee policy manual?

6       A.  Yes, I'm sure.

7       Q.  Okay.  I'm showing you what I've previously

8   marked as Exhibit Number 1.  Providing a copy to your

9   counsel.

10              This is a large document, and I will

11  represent to you that I believe this is the policy

12  manual that was in place during the time in which you

13  were employed, at least at the time that your employment

14  with Amedisys ended.

15              But what I'd like you to do is just look at

16  this.  Take as much time, again, as you'd like, and let

17  me know whether or not you agree or disagree with that.

18      A.  That this is the document?

19      Q.  Correct, that this is, in fact, the policy

20  manual.

21      A.  Yes.

22      Q.  And again, I'm not trying to trick you.

23      A.  No.  Yes.

24      Q.  We'll talk about this in more detail today, but

25  there were occasions during your employment with

1  Amedisys where you were required to undergo training on

2  the computer.  Is that fair to say?

3      A.  What do you mean specifically by training on

4  the computer?

5      Q.  Anything.  I mean, Amedisys has a program

6  called Amedisys Academy.  Are you familiar with that?

7      A.  Yeah.  I think I did that probably as a

8  volunteer coordinator.

9      Q.  Okay.

10     A.  Yes.

11     Q.  You also agree that through that program, there

12  were occasions in which you were required to acknowledge

13  receipt of policies or procedures, things like that?

14     A.  Yes.  That was when Amedisys first acquired

15  Asana.

16     Q.  Okay.  Well, there was also occasions, even up

17  until January of 2021, that you were logging onto the

18  computer and acknowledging different policies or

19  procedures, correct?

20     A.  I don't recall.

21     Q.  Okay.  According to Amedisys's records, you

22  received this policy manual electronically on March 17th

23  of 2020.  Do you have any reason to dispute that?

24     A.  No.

25     Q.  According to Amedisys's records, you

1  electronically acknowledged receipt of this policy

2  manual again on September 20th of 2020.  Any reason to

3  dispute that?

4      A.  New hire paperwork, no.

5      Q.  By acknowledging receipt and understanding of

6  the policy, do you agree that you had read it?

7      A.  I signed it.

8      Q.  Did you read it?

9      A.  It was electronically, so probably not fully.

10     Q.  Okay.  You would agree that you had access to

11 the policy manual at all times during your employment if

12 you needed it, right?

13     A.  Yes.

14     Q.  So in other words, even if you didn't read it

15 when it was provided to you, you could have read it at

16 any point if you needed to?

17     A.  Possibly, yes.

18     Q.  Okay.  Would you agree with the statement that

19 you had the ability to go to any manager or supervisory

20 employee of Amedisys if you had a concern?

21     A.  Concern regarding?

22     Q.  Anything.

23     A.  It would depend on what the concern was.

24     Q.  Okay.

25     A.  That would depend on who I would go to.

1      Q.  Right.  But who you would go to might differ,

2  but you understood you could go to somebody, right?

3      A.  If I had a concern, yes.

4      Q.  For example, if you had a concern regarding

5  discrimination, for example, you could go to a member of

6  management to air those concerns, right?

7      A.  Yes.

8      Q.  Amedisys also maintains a human resources

9  department, correct?

10      A.  Yes.

11      Q.  And if you had those types of concerns, for

12  example, discrimination, you could have aired those to

13  human resources as well, correct?

14      A.  Yes.

15      Q.  Were you aware that Amedisys maintained a

16  hotline that you could call?

17      A.  For compliance?

18      Q.  For compliance or for HR related issues.

19      A.  I knew for compliance issues.

20      Q.  And you were aware that you could, in fact,

21  remain anonymous on that hotline, right?

22      A.  Compliance, yes.

23      Q.  What I want to do is just talk about a few of

24  the policies that are contained in this policy manual,

25  and I'm going to go a little bit out of order just

1  because I think it makes sense to do that.

2              But if you could initially turn to Page 10,

3  and for the record, we're looking at Page 10 of

4  Exhibit 1.  Are you there?

5      A.  Yes.

6      Q.  Okay.  Section 1.9 is entitled "At-Will

7  Employment."  Do you see that?

8      A.  Yes.

9      Q.  Correct me or let me know if you don't

10  understand this question, but you would agree that you

11  were employed with Amedisys on an at-will basis, right?

12      A.  Yes.

13      Q.  Meaning they could terminate your employment,

14  or you could quit at any point, should you choose to do

15  so, right?

16      A.  Yes.

17      Q.  Okay.  Let's turn to Page 9 of Exhibit 1, and I

18  specifically want to look at Sections 1.6 and 1.7.  Do

19  you see those?

20      A.  Yes.

21      Q.  And I will represent to you that this is

22  Amedisys's policies as it relates to individuals with

23  disabilities or requests for accommodation.  Okay?

24      A.  Okay.

25      Q.  At least as it was at the time your employment

1    with Amedisys ended.

2              Let me first start by asking whether or not

3    you've ever consulted either of these two policies?

4         A.   Yes.

5         Q.   Okay.   And when?

6         A.   Sometime after I requested an accommodation.

7         Q.   Okay.   And we'll talk more about that, but it

8    was sometime after you had began that process?

9         A.   Yes.

10        Q.   Okay.  Since we're talking about it, my

11   records -- and again, we'll talk more in detail about

12   it, but you initiated the accommodation request on

13   December 2nd of 2020.  Does that sound right?

14        A.   I believe it was in November when I reached out

15   to HR about it, who then told me to contact the

16   employment assistance -- yeah, the employee assistance

17   program.  And, then, that conversation started in

18   December.

19        Q.   Okay.  In November, do you know who you reached

20   out to?

21        A.   Thang, N-g-o.  I don't know how to spell his

22   name.

23        Q.   Okay.  Thang, N-g-o?

24        A.   Yeah.

25        Q.   Okay.  So assuming that that is, in fact, what

1   happened and you consulted these two policies

2   thereafter, what was the reason for doing so?

3        A.  The reason for doing what?

4        Q.  For consulting these policies.  I appreciate

5   that.  That was a bad question.

6        A.  I don't recall specifically.

7        Q.  Nonetheless, you would agree that this policy

8   is in place to provide accommodations for individuals

9   who may be eligible for such accommodations, provided

10  the employee's entitled to it, it doesn't impose an

11  undue hardship, things like that, correct?

12       A.  Yes.

13       Q.  Okay.  The final policy that I want to look at,

14  at least for now, is on Page 7 of Exhibit 1, and

15  specifically, Section 1.4 is referred to as the "Equal

16  Employment Opportunity and Affirmative Action Program."

17  Do you see that?

18       A.  Yes.

19       Q.  Have you ever had an occasion to consult

20  Section 1.4 before today?

21       A.  Not that I recall.

22       Q.  Nonetheless, you would agree that this policy,

23  in addition to the disability policy that we just looked

24  at, prohibits discrimination based on any one or more

25  protective classes, correct?

1      A.   Correct, yes.

2      Q.   This policy, in addition to the disability

3   policy that we just looked at, also provides employees

4   with avenues or mechanisms by which to make reports in

5   the event they believe that they're suffering or

6   experiencing discrimination or not being accommodated,

7   for example, correct?

8      A.   Repeat that, please.

9      Q.   You're going to test me.

10          You would agree that this policy,

11  Section 1.4, in addition to the disability policy that

12  we just looked at, provides avenues for employees to

13  make reports of discrimination or in the event that they

14  believe that they're not being accommodated, meaning it

15  provides you with information on how to make such

16  reports?

17     A.   On who to contact, yes, yes.

18     Q.   Okay.  We can put that away.

19          Now, in hopes of shortening today, you told

20  us that you initially reached out to Thang, T-h-a-n-g --

21     A.   Uh-huh.

22     Q.   -- in late November, is that correct, of 2020?

23     A.   Yes.

24     Q.   Okay.  So assuming, again, that happened in

25  late November of 2020, the question I have is, is there

1   anything that happened prior to that date that comprises

2   anything in your lawsuit?

3      A.  Yes.  I was told that I could, yes.

4      Q.  Okay.  So maybe we won't be here as short as I

5   thought.

6          All right.  So tell me, going back from

7   that date, what the first thing is that you believe is

8   somehow evidence of any of the claims in your lawsuit.

9      A.  Prior to me reaching out to HR to request the

10  information on requesting an accommodation, my schedule

11  was flexible.  I was not in the office every day all

12  day.

13          After -- well, in November -- I don't

14  recall the date.  I think you may have access to it.

15  Someone from regional was in the office.  CJ was not in

16  the office that day.  It was Cheri, Cheri

17  Knight-Dettori.  And when I came in to work that day,

18  she told me that I could no longer work from home, no

19  other offices were doing it.  There was no question as

20  to why I was working from home.  It was just can't --

21  can't do it.

22          And that's what led us here.  So I reached

23  out so I could make sure that it is in writing and no

24  longer a "you and I" conversation.

25      Q.  Okay.  And that's when you reached out to

1   Thang?

2       A.  Yes.  She was our -- my HR person for our area.

3       Q.  Okay.  What was the name of the regional that

4   was in the office?

5       A.  Cheri.

6       Q.  And can you spell her last name?

7       A.  I cannot.

8               THE REPORTER:  Can you say it again?

9               THE WITNESS:  Dettori, I think it was.  I

10  don't know if it's Knight-Dettori, if they're both

11  together, if it's a hyphen, but it's Cheri

12  Knight-Dettori, I believe.

13      Q.  (BY MR. KECK)  Okay.  And she told you -- and

14  this was in November of 2020?

15      A.  Uh-huh.

16      Q.  Yes?

17      A.  Yes.

18      Q.  She told you at that point that all of the

19  offices, the business office manager specifically was

20  returning full-time to the care centers?

21      A.  No.  That is not what she said.

22      Q.  And what did she say specifically?

23      A.  Specifically, she said you can no longer work

24  from home, no other care centers are working from home.

25  And I excused myself, my presence.

1    Q.  Okay.  Up until today, do you have any reason

2  to dispute that that was accurate?

3    A.  Yes.

4    Q.  Okay.  Tell me what -- what you know.

5    A.  I know that the business office manager in

6  Dallas would work from home occasially.  I knew that

7  to be true.  I knew that other care centers were working

8  from home when I would be on calls, when we had our BOM

9  calls.

10    Q.  Do you know what the business office manager's

11  name in Dallas was?

12    A.  Jessie Lopez.

13    Q.  Is Jessie a male or a female?

14    A.  Female.

15    Q.  To your knowledge -- and Jessie worked in a

16  hospice care center as well?

17    A.  Yes.

18    Q.  Did Jessie report to Cheri?

19    A.  No.  Cheri was, like, regional.  Dallas had

20  a -- their own, too.  I don't remember.

21    Q.  Let me ask a better question.  Did Cheri

22  oversee the Dallas care center as well?

23    A.  I don't know.

24    Q.  And how did you know that Jessie was allegedly

25  working from home?

1     A.  We would be on calls, like, when we would have

2   our meeting with our regional BOM, and it would be all

3   the care centers in that region on Teams.  And then I

4   communicated with her, different stuff in the office,

5   so --

6     Q.  So what --

7     A.  From time to time.

8     Q.  What was it about the Teams calls that led you

9   to the conclusion that Jessie was working from home?

10     A.  Background.

11     Q.  Okay.  Anything else?

12     A.  Not that I can recall specifically off the top

13   of my head.

14     Q.  And what was it about Jessie's background that

15   indicated he was -- or she was working from home?

16     A.  I don't remember specifically.

17     Q.  Okay.  You also understand that on Teams, you

18   can have virtual backgrounds, right?

19     A.  It wasn't a virtual background.

20     Q.  How do you know?

21     A.  Because they were different.  Like, you can get

22   up and go.  I don't know exactly what was going on.

23     Q.  Have you ever been to Jessie's house?

24     A.  No.

25     Q.  Okay.  So it's fair to say you don't have any

1   idea what Jessie's house looks like, right?

2        A.   No.   And I think maybe at one time, she could

3   have had a dog in there.   She could have had a dog at

4   work.

5        Q.   So she could have been in the office?

6        A.   She could have, but we -- okay.   So we've had

7   specific conversations that she worked from home.

8        Q.   Okay.   So that's a separate issue from what the

9   background may have showed, right?

10       A.   Uh-huh.

11       Q.   Do you agree with that?

12       A.   Yes.

13       Q.   So now you're telling me that there were

14  occasions in which you and Jessie spoke that she told

15  you she worked from home?

16       A.   Yes.   She worked from home, and the DOO would

17  rotate their schedule and work -- like, rotate who was

18  in the office.

19       Q.   Do you know what the rotation schedule was?

20       A.   That, I don't know.

21       Q.   And when did you have these conversations with

22  Jessie, what dates?

23       A.   I don't recall.

24       Q.   How many conversations did you have with

25  Jessie?

1      A.  I don't recall.

2      Q.  And when I say how many questions [sic], just

3  let me finish.

4           How many conversations did you have with

5  Jessie in which her working from home was discussed?

6      A.  I don't recall.

7      Q.  You said there were also other care centers

8  where individuals would be working from home?

9      A.  Yes.

10     Q.  Okay.  What care centers specifically are you

11  referring to?

12     A.  That, I don't recall, but it would be in our

13  region.

14     Q.  Okay.  Do you recall who the business office

15  manager would have been within that region that you

16  believe was working from home?

17     A.  No.  The only person I know who can attest to

18  that is Dot, Dorothy Sherrod, who was our regional

19  business office manager at the time.

20     Q.  And when you say that she can attest to that,

21  what is she going to attest to?

22     A.  She would have been privy to more information

23  than I would have had, whether or not that person was in

24  the office, like, in the office working.

25     Q.  Right.  But you told us that there were other

1    care centers in which business office managers would

2    work from home, and what I'm trying to find out is --

3         A.   How do I know that?

4         Q.   -- who are these people and how do you know

5    that?

6         A.   Dot told me.

7         Q.   Okay.  So who did Dot tell you was working from

8    home?

9         A.   I don't remember names specifically.

10        Q.   When did Dot tell you that these people were

11   working from home?

12        A.   I don't remember that specifically.

13        Q.   Do you remember it generally?

14        A.   No.  It would have been sometime when I was --

15   September and December.

16        Q.   Sometime between September and December?

17        A.   Uh-huh.

18        Q.   So in theory, it could have preceded the date

19   in which you had the conversation with Cheri, right?

20        A.   Yes, yes.

21        Q.   Okay.  All right.  So that took us up and to

22   the point where you reached out to Thang.  Okay?

23        A.   Uh-huh.

24        Q.   Is there anything else besides that, prior to

25   when you spoke with Thang, that you believe is important

1    or provides context to any of the claims in this case,

2    other than what we've already talked about?

3         A.   I mentioned that I was already working that

4    rotating schedule already.

5         Q.   Correct.

6         A.   Not that I can think of.

7         Q.   And was it your understanding that rotating

8    schedule was put in place due to COVID?

9         A.   There's a two part -- yes to your -- yes to

10   your -- yes, to answer what you just asked me.

11        Q.   Okay.

12        A.   Yes.  There was a rotating schedule put in

13   place for that.  Prior to me applying for the job --

14        Q.   Uh-huh.

15        A.   -- I asked about a different rotating schedule

16   between me and the BOS --

17        Q.   Okay.

18        A.   -- and what that's going to look like, and CJ

19   agreed to.  So we had that schedule in place as well.

20        Q.   Okay.  So when you say before you applied, you

21   mean before you applied for the business office manager

22   position?

23        A.   Yes.

24        Q.   You said that you had a conversation with CJ

25   about what the rotation going forward would look like?

1     A.  Yes.

2     Q.  And what did CJ tell you?

3     A.  To talk with Stephanie, who was the BOS at the

4 time; if she agreed, then we could do that, which would

5 be a half day.

6     Q.  Okay.  And that conversation, obviously, was

7 before the conversation you had with Cheri?

8     A.  Yes.

9     Q.  Okay.  After you became the business office

10 manager, did the care center hire anyone to replace you

11 in a volunteer coordinator role?

12     A.  No.

13     Q.  After Cheri had that conversation with you in

14 which she indicated that individuals were returning to

15 the office, did the company stop the rotational schedule

16 that you alluded to?  And when I say the company, I mean

17 your care center.

18     A.  Cheri made that decision.

19     Q.  Right.  But at that point, then, everyone

20 returned to the office, including you.  Is that fair?

21     A.  No.  They didn't return to the office.

22     Q.  Okay.  Who didn't?

23     A.  The chaplain, the -- the chaplain, the

24 bereavement coordinator, the social worker.

25     Q.  The chaplain and social worker are out seeing

1    patients as well, right?

2        A.   Sometimes, yes.

3        Q.   Right.   And they had direct access to patients,

4    right?

5        A.   Yes.

6        Q.   Okay.   So specifically referring to office

7    staff, so those that do not have hands-on patient care,

8    was there anyone that did not return to the office?

9        A.   No.

10       Q.   Okay.   And you understand that Amedisys may

11   have had different rules for clinicians and people that

12   were hands on with patients, right, about interacting,

13   social distancing, returning to the office, things like

14   that?

15       A.   Yes.

16       Q.   And that would make sense to you in the hospice

17   role, right, meaning that we don't want the clinicians

18   being overly exposed to people and then perhaps

19   infecting or getting patients sick, right?

20       A.   Right, which means they would be working at

21   home instead of coming to the office --

22       Q.   For sure.

23       A.   -- because they wasn't going out seeing

24   patients.

25       Q.   Okay.   We had alluded to the training that you

1   had taken online and the different things that you would

2   acknowledge online, and I just want to ask you a couple

3   questions about the different types of training that you

4   would have had.  Okay?  And again, these are all

5   according to Amedisys records that were logged at the

6   time that you completed training using your secure

7   log-in information.

8                     Do you have any reason to dispute that you

9   completed ADA training on September 18th of 2020?

10       A.  No.

11       Q.  Do you have any reason to dispute that you

12  completed FMLA training on September 19th of 2020?

13       A.  No.

14       Q.  Any reason to dispute that you completed leaves

15  training or leave of absence training on September 19th

16  of 2020?

17       A.  No.

18       Q.  Any reason to dispute that you completed the

19  patient rights and responsibilities for hospice training

20  on March 15th of 2020?

21       A.  No.

22       Q.  Any dispute that you completed compliance

23  basics training on March 17th of 2020?

24       A.  No.

25       Q.  Following your promotion to the business office

1    manager, you agree that you completed election of

2    benefit training on October 1, 2020, correct, or in

3    other words, have no reason to dispute that you

4    completed that training?

5         A.   Correct.

6         Q.   You completed hospice conditions of

7    participation training on April 23, 2020, correct?

8         A.   Correct.

9         Q.   Okay.  And you would have no reason to dispute

10   that you completed corporate compliance plan training on

11   March 17th of 2020?

12        A.   Correct.

13             THE REPORTER:  If you're changing topics,

14   can we do a little break?

15             MR. KECK:  I'm ready for a break.  This is

16   great.  We can go off the record.

17             (A recess was taken.)

18             MR. KECK:  Let's go back on the record.

19        Q.   (BY MR. KECK)  Ms. Jenkins, you understand that

20   you're still under oath?

21        A.   Yes.

22        Q.   Okay.  Before we let this Exhibit Number 1 go,

23   I want to draw your attention back to it real quick.

24        A.   Okay.

25        Q.   And I want to specifically refer you to Page 12

1  of Exhibit 1.  Let me know when you're there.

2      A.  I'm there.

3      Q.  Okay.  Section 1.13 is entitled "Rules of

4  Conduct."  Do you see that?

5      A.  Yes.

6      Q.  And this section lays out a nonexhaustive list

7  of potential violations that could subject employees to

8  potential discipline, up to and including termination,

9  right?

10      A.  Yes.

11      Q.  Okay.  Number 16 on that list outlines that a

12  failure to follow Amedisys' written policies and

13  procedures would be, in theory, a violation of that

14  policy, correct?

15      A.  Yes.

16      Q.  Okay.  We can be done with that exhibit.  All

17  right.

18          So going back to where we left off and

19  trying to pick up on the timeline, you said you

20  initially reached out to Thang N-g-o -- I don't know how

21  to say that.

22      A.  I don't either.

23      Q.  We'll call him Thang.  Okay?  Fair enough?

24      A.  Yes.

25      Q.  You reached out to Thang towards the end of

1  November of 2020, right?

2      A.  Yes.

3      Q.  And that would have been after the conversation

4  you had with Cheri in which she indicated that people

5  were going to be returning to the office full-time?

6      A.  Yes.

7      Q.  Thang -- correct me if I'm wrong -- directed

8  you to what I think you referred to as the EAP?

9      A.  Yes.

10     Q.  Okay.  Regardless of whether or not this person

11  is with the EAP or not, but correct me if I'm wrong.

12  You spoke with an individual by the name of Nicole Rome

13  on December 2nd of 2020?

14     A.  I don't recall.

15     Q.  Okay.  Would you have any reason to dispute

16  that you spoke to an individual by the name of

17  Nicole Rome?

18     A.  No.

19     Q.  Okay.  And I believe that same day, at the

20  instruction of Ms. Rome, you also emailed Kellie Brady?

21     A.  Yes.  That's who I was working -- yes, Kellie

22  Brady.

23     Q.  And Kellie Brady is an Amedisys HR employee,

24  correct?

25     A.  Employee -- the EAP, employee assistance

1  program.

2       Q.  What leads you to believe that she's -- well,

3  let me strike that.

4              Was Kellie employed by Amedisys, to your

5  understanding?

6       A.  Yes.

7       Q.  Okay.  What leads you to believe that she is

8  somehow involved with EAP?

9       A.  I believe that's in her title.

10      Q.  Okay.

11      A.  I believe.

12      Q.  Would there be any other reason why you believe

13 Kellie's affiliated with EAP?

14      A.  Only because that's who I was in contact with.

15      Q.  Okay.  I can show you this before we look at it

16 later, but her title indicates "employee relations

17 consultant."

18      A.  Right.

19      Q.  Okay.

20      A.  Okay.

21      Q.  So with that information, do you believe she

22 was still part of EAP?

23      A.  I do.

24      Q.  Okay.  Nonetheless, Kellie's employed by

25 Amedisys.  You reached out to her via email on or about

1    December 2nd, correct?

2        A.  Yes.

3        Q.  Okay.  Nicole Rome, I assume you don't recall

4    who that is, right?

5        A.  I don't.

6        Q.  Okay.  And Thang worked for Amedisys as well,

7    correct?

8        A.  Yes.

9        Q.  Okay.  At some point between December 2nd and

10   December 4th, did you also speak with Kellie Brady?

11       A.  Yes.  I believe she called -- she called me,

12   and, then, that's when the emails -- there was a --

13   after that.

14       Q.  Okay.  Do you recall what you said to Kellie

15   and what she said to you during the first call you would

16   have had with her?

17       A.  I don't.

18       Q.  Correct me if I'm wrong, but she was asking

19   questions as it relates to the issues with the rotation,

20   what you needed and what you were requesting.  Is that

21   essentially what you guys discussed?

22       A.  Possibly.

23       Q.  Okay.  You would have no reason to dispute that

24   if that's what Kellie recalls?

25       A.  Correct.

1     Q.  Okay.  I'm showing you what I've previously

2  marked as Deposition Exhibit 7.  Let me first start by

3  asking you generally whether or not you recognize this

4  email string.

5     A.  Yes.

6     Q.  Okay.  Would this have been one of the emails

7  that you reviewed in preparation for today?

8     A.  Yes.

9     Q.  Okay.  We're going to start at the back of

10  Exhibit 7, just because that's how emails work.  So

11  we'll start with the earliest email within this exhibit.

12         So on the second to last page of Exhibit

13  Number 7 indicates that Kellie had emailed you on

14  December 4, 2020, correct?

15     A.  Yes.

16     Q.  And as part of that email, she had follow-up

17  questions that stemmed from the call that you would have

18  had with her, correct?

19     A.  Correct.

20     Q.  Okay.  So she sent you this email on

21  December 4th after you would have spoken to her?

22     A.  Correct.

23     Q.  And at this point, correct me if I'm wrong, but

24  Kellie was trying to obtain additional information as to

25  what the rotational schedule was and how that had worked

1   previously, correct?

2       A.  Correct.

3       Q.  On December 4th, that same day, you responded

4   to her and indicated here's what essentially the

5   rotation schedule was and the assignments were within

6   that?

7       A.  Correct.

8       Q.  The next two emails, the email that she sent to

9   you on December 7th and your response, which appear on

10  Pages 2 and 3 of Exhibit 7, are correspondence between

11  you and her to clarify exactly what that rotational

12  schedule was?

13      A.  Correct.

14      Q.  Okay.  In that email that you sent on

15  December 7, 2020, you indicated that on November 18th of

16  2020 is when leadership had asked that you be back in

17  the office full-time?

18      A.  Yes.

19      Q.  Okay.  And that would have been the

20  conversation you had with Cheri?

21      A.  Yes.

22      Q.  The following email on December 7th and your

23  response that same day, which appear on the first page

24  of Exhibit 7, you were confirming to Kellie that your

25  supervisors at the time had no knowledge of any need for

1    an accommodation, right?

2         A.   Correct.

3         Q.   Who specifically were you referring to in terms

4    of your current leadership in responding to this email?

5         A.   At this time, it would have been Jackie

6    Williams.

7         Q.   The director?

8         A.   Correct.

9         Q.   Okay.  And at that point, did Jackie -- well, I

10   think I know the answer to this.  Strike this.

11              At that point, you had not discussed,

12   correct, with Jackie your condition or your need for an

13   accommodation or your desire to work from home because

14   of that medical condition, right?

15        A.   Correct.

16        Q.   Okay.  We can be done with that.

17              While we're talking about it, what was the

18   medical condition that you possessed that required you

19   to reach out to Amedisys in early December?

20        A.   I have multiple sclerosis.

21        Q.   When were you diagnosed -- and I'm going to say

22   MS for short.  When were you diagnosed with MS?

23        A.   It was in 2011, I believe.  Let me see.  It was

24   in 2011.

25        Q.   Okay.  So long before you became an Asana

1    employee?

2         A.   Correct, yes.

3         Q.   Do you know who diagnosed you?

4         A.   Yes.  Dr. Ambika, A-m-b-i-k-a, Nair, N-a-i-r.

5         Q.   Okay.  Is Dr. Nair a male or a female?

6         A.   Female.

7         Q.   Do you still see Dr. Nair?

8         A.   I see the nurse practitioner more, her nurse

9    practitioner, Princy Varghese.  I don't know how to

10   spell that.

11        Q.   I think it's P-r-i-n-c-e-y [sic].

12        A.   Yeah.  And the last name I know is V-a-r, maybe

13   g-u-e-s-s-e or maybe one S.  I'm not sure.  I can't

14   recall.

15        Q.   V-a-r-g-e-s-e [sic]?

16        A.   Yes.

17        Q.   Okay.  And you would agree that MS is a chronic

18   immune deficiency disease?

19        A.   Yes.

20        Q.   Is it your understanding that MS is progressive

21   in nature?

22        A.   Yes.

23        Q.   So you would agree that, at any given time

24   within an individual's diagnosis of MS, it may impact

25   them differently?

1     A.  Yes.

2     Q.  I don't know the answer to this, and I'm

3 generally curious.  Does MS typically progress at the

4 same rate within individuals?

5     A.  No.

6     Q.  Is there any --

7     A.  Not that I'm aware of.

8     Q.  Yeah.  Okay.  Is there any medication, to your

9 knowledge, that tends or is intended to slow the

10 progression of MS?

11     A.  Intentions, yes.

12     Q.  Okay.  Are you on any of those drugs?

13     A.  Yes.

14     Q.  And were you taking those drugs as early as

15 2011?

16     A.  It would have been after, after the diagnosis.

17     Q.  For sure.

18     A.  So I don't remember exactly when I started

19 because I don't think I -- late, yeah.  So, yes, it

20 would have been, like, late 2011 because I got the

21 diagnosis later in the year, but I don't remember the

22 exact dates.

23     Q.  Prior to the discussion that you had with

24 Thang --

25     A.  Uh-huh.

1     Q.  -- in late November of 2020, had you disclosed

2   your MS diagnosis to any managers or supervisors within

3   Amedisys?

4     A.  Yes.

5     Q.  Who?

6     A.  Carol Hardwick.

7     Q.  Okay.  And --

8     A.  And --

9     Q.  Go ahead.  I'm sorry.

10    A.  I would say Melissa, so Asana/Amedisys since

11  she was still technically employed when Amedisys took

12  over.

13    Q.  Specific to Carol, what was the context in

14  which you disclosed your diagnosis to her?

15    A.  I don't recall.

16    Q.  Okay.  Did you ever work with Carol on any type

17  of accommodation that you needed, or was it just more

18  like an FYI?

19    A.  I would say yes, and it was more of a, hey,

20  FYI.  And the -- again, going back to the -- going back

21  to the ask of the splitting the schedule, you know, I'm

22  very protective over my disability because I know how it

23  can be perceived, especially when you can't see.  So I

24  only disclose what I need to disclose.

25            And so the ask of that schedule was an ask,

1   and if that's something that we can do, then I'll apply,

2   and if it wasn't, then I wasn't going to apply for it.

3   But that was a general discussion.

4       Q.   Gotcha.  Did you tell Carol at that point that

5   the need for the schedule agreement was somehow related

6   to the MS, or was it just something that you were asking

7   generally?

8       A.   It was something I was asking generally.

9       Q.   Okay.  Okay.

10      A.   Because we had been rotating, and I just wanted

11  to know.

12      Q.   Okay.  I forgot some names here for a second.

13  Do you know the name of -- by the name of Crystal

14  Nering, N-e-r-i-n-g?

15      A.   I know the name.

16      Q.   Do you know who she is?

17      A.   Not specifically.  Like, I heard -- her name

18  would come up --

19      Q.   Okay.

20      A.   -- different deals.  I never met her.

21      Q.   Okay.  So you never spoke to her, to your

22  knowledge?

23      A.   No, not to my knowledge.

24      Q.   Okay.  We talked about Gary Walker, correct?

25      A.   Yes.

1    Q.   Did you ever discuss MS or your MS diagnosis

2    with Mr. Walker?

3    A.   No.

4    Q.   And do you know the name Pam Kinard,

5    K-i-n-a-r-d?

6    A.   No.

7    Q.   Okay.   Do you know an individual by the name of

8    Sally Russo?

9    A.   No.

10    Q.   Fair to say that you have never had any

11   conversations or communications, to your knowledge, with

12   Ms. Kinard or Ms. Russo?

13    A.   Correct.

14    Q.   Are you familiar with the name Stephanie

15   Nevelski, N-e-v-e-l-s-k-i?

16    A.   Yes.

17    Q.   Who is she?

18    A.   That's a good question.   I don't recall what

19   her position was, but she was kind of higher up.

20    Q.   Okay.   Fair to say you never had any

21   conversations or communications with Ms. Nevelski

22   regarding your MS diagnosis?

23    A.   Not my diagnosis, correct.

24    Q.   All right.   Following the -- well, let's just

25   do this.   I'm showing you now what I've marked

1    previously as Exhibit Number 8.  Providing a copy to

2    your counsel.

3              Let me start by asking, Ms. Jenkins,

4    whether or not you recognize this document?

5         A.  Yes.

6         Q.  Correct me if I'm wrong, but this is an email

7    sent from Kellie Brady to you on December 3, 2020,

8    correct?

9         A.  Yes.

10        Q.  Is this one of the emails that you reviewed in

11   preparation for today?

12        A.  No, I didn't review this.

13        Q.  Okay.  The first line of Ms. Brady's email

14   says, "Thanks so much for taking the time to speak with

15   me today."  Do you see that?

16        A.  Yes.

17        Q.  Does that help refresh your recollection on

18   when you would have initially spoken with Ms. Brady?

19        A.  Yes.

20        Q.  Which would have been December 3rd?

21        A.  3rd, yes.

22        Q.  As part of this email -- and it's not included

23   on this email, but you would agree that you were

24   provided with two forms, correct?

25        A.  Correct.

1      Q.  And ultimately, you returned those forms to the
2  company, which we'll talk about, right?
3      A.  Yes.
4      Q.  But nonetheless, you do acknowledge that you
5  received those forms on December 3rd and were asked to
6  provide a response by December 17th?
7      A.  Yes.
8      Q.  Okay.  And you understood that of the two
9  forms, the one referred to as Form A was to be completed
10  by you, and Form B was to be completed by your health
11  care professional?
12      A.  Yes.
13      Q.  Okay.  We're done with that.
14          So you would agree that -- and we've looked
15  at various emails, but within a week or so of you
16  initially reaching out to Thang, you had communicated
17  with Thang, with Ms. Rome, with Ms. Brady, been provided
18  forms and various emails asking for clarification on the
19  rotational schedule and what you were requesting?
20      A.  Yes.
21      Q.  Okay.  You ultimately returned the forms that
22  you were provided on December 17th, right?
23      A.  Yes.
24      Q.  Okay.  So between December 3rd and when you
25  returned the forms on December 17th, what were you doing

1  in terms of day-to-day work?  Were you at home?  Were

2  you still rotating?  Were you in the office?

3     A.  No.  I was told in November to stop, so I

4  complied with that request.

5     Q.  Okay.

6     A.  So, no, I was at work.

7     Q.  And what were your hours?

8     A.  Seven to five.  I was coming in at seven.

9     Q.  When you became the business office manager,

10  you were paid hourly?

11     A.  Yes.

12     Q.  And your base rate was $31.73 per hour?

13     A.  Yes.

14     Q.  And that was true up until the time your

15  employment ended?

16     A.  Yes.

17     Q.  Did you ever work overtime?

18     A.  Yes.

19     Q.  How often?

20     A.  I don't recall specifics.

21     Q.  Is there anything between December 3rd, when

22  you were provided the forms, until December 17th in

23  which you provided the completed forms to Amedisys,

24  anything during that time period that was done to you,

25  that was said to you or anything else that happened that

1  you believe is important to discuss, other than the fact

2  that you were continuing to come into the office every

3  day?

4       A.  I don't remember the date.  I think you

5  probably have a timeline.  The only thing that -- it

6  could have been before this date, but it could have been

7  in between that time.  I just -- I just do not recall

8  the specific date right now.

9            It was when Cheri asked me how I was doing

10  and I told her.  I was, you know, stressed and needed

11  training, and then she said, do I need to ask Dr. Azar

12  (phonetic) for some Xanax for you, and that did not help

13  the situation.

14       Q.  Okay.

15       A.  And Dr. Azar being our medical director at the

16  time.

17       Q.  Okay.  Was it your understanding that Cheri was

18  trying to be funny?

19       A.  I didn't take it funny.  It wasn't funny to me.

20       Q.  Yeah.  I get that, but my question is whether

21  or not you believe she was trying to be funny.

22       A.  Oh, I don't know what she believed.

23       Q.  Okay.  According to the lawsuit you filed, that

24  conversation happened on November 13th of 2020?

25       A.  Yes.

1    Q.   Is that fair?

2    A.   Yes.

3    Q.   You have no reason to dispute that?

4    A.   Correct.

5    Q.   So going back, then, to my question, between

6    December 3, 2020 and December 17th of 2020, is there

7    anything else that happened during that time frame that

8    you believe is important to discuss?

9    A.   I don't think so.

10   Q.   Okay.  If you remember something that happened

11   during that time frame as we go, let me know.  Okay?

12   A.   Okay.

13   Q.   All right.

14   A.   Besides me having, like, a doctor's

15   appointment?  I know -- I believe it was during that

16   time when I started the anxiety/depression medicine.

17   That was -- that happened during that time.  I don't

18   remember the exact date.

19   Q.   Is that the --

20   A.   Paroxetine.

21   Q.   Paroxetine?

22   A.   Yes.

23   Q.   Okay.  And again, we'll probably talk about

24   this later, but was that the first time you were

25   prescribed antianxiety or depression medicine in your

1  tenure with Amedisys?

2      A.  With Amedisys, yes.

3      Q.  How about with Asana?

4      A.  No.  I mean, I've had medicine before, but no.

5      Q.  No depression or anxiety medicine?

6      A.  No.

7      Q.  Okay.

8      A.  I mean, yes, I've had anxiety/depression

9  medicine before.  Not while I was working with this

10  company, Asana or Amedisys.

11      Q.  Okay.

12      A.  Yes.

13      Q.  So during the entire time you were employed

14  with Asana and up until the point you were prescribed

15  this medication, you were not taking anything for

16  depression or anxiety?

17      A.  Correct, correct, correct.

18      Q.  What was the dosage you were prescribed?

19      A.  I don't recall.

20      Q.  Did that ever increase before your employment

21  with Amedisys ended?

22      A.  No.

23      Q.  Did it ever decrease?

24      A.  No.

25      Q.  Did it help?

1     A.   I can't say specifically between the times.   I

2     believe that was in December.   I don't recall it.

3          Q.   Okay.   Has it since helped?

4          A.   Yes.

5          Q.   I mean, still taking it three years later,

6     right?

7          A.   Yes.

8          Q.   Okay.   So on December 17th is when you returned

9     the completed forms, right?

10         A.   Yes.

11         Q.   What was the mechanism by which you returned

12    those?

13         A.   Email.

14         Q.   Who did you email them to?

15         A.   Kellie Brady.

16         Q.   At that time that you submitted the forms, what

17    accommodation were you seeking?

18         A.   My ask was to work from home part of the day.

19         Q.   Which part of the day?

20         A.   The end, the evening hours, afternoon hours.

21         Q.   What --

22         A.   I don't remember specifically.   I think it was,

23    like, one to four maybe.   It's on the document.

24         Q.   Okay.   You believe you were -- and I'm just --

25    correct me if I'm wrong, but I believe that the

1    document -- and we'll look at it.  It says flexible

2    schedule to work from 1 to 4 p.m. at home?

3        A.  Yes.

4        Q.  What were you going to do for that additional

5    hour, from four to five?  Because I believe you told me

6    earlier you worked from seven to five.

7        A.  Seven to five, yeah.  I came in early.

8        Q.  Okay.

9        A.  The schedule was eight to five, but I came in

10   at seven to get things done that I needed to do.  And I

11   think in my ask, it was still the seven to -- the seven

12   to 12 or 1 or whatever it was in the office.  So the

13   time frame was still going to be the eight-hour shift.

14       Q.  I see.  So you would be done working at 4 p.m.?

15       A.  Correct.

16       Q.  Okay.  If you were --

17       A.  If I was going in at seven.

18       Q.  And allowed to work from home?

19       A.  And allowed to work, yes.

20       Q.  And tell me why you believed that that -- I'll

21   call it an accommodation -- would suffice for you.

22       A.  Because partly energy level for me, it's higher

23   in the morning hours, and as the day progresses, it gets

24   worse.  Symptoms, back spasms, everything that I

25   experience gets worse as the day goes on.  So that

1  accommodation would have allowed me to rest in a

2  different position and, I guess, focus a little bit more

3  because I had the energy level and what I need to

4  accomplish could done in the morning hours of the day.

5      Q.  There's a lot to unpack there, I think.

6      A.  Yes.

7      Q.  The first part being you said you were

8  experiencing back spasms as the day would go on, and I

9  think you alluded to fatigue?

10      A.  Yes.

11      Q.  What other symptoms, if any, did you experience

12  as the day would go on that you believed would be

13  alleviated if you were allowed to work from home or at

14  least addressed?

15      A.  Concentration, being able to use the bathroom

16  when I needed to use the bathroom, in a more private

17  setting than what was available, and focus.  So the

18  fatigue, the spasms, the restlessness, concentration.

19      Q.  Okay.  The care center in Fort Worth had a

20  bathroom, right?

21      A.  There was a bathroom in the office building

22  where our care center was located.

23      Q.  Okay.  And you had equal and unbridled access

24  to that, right?

25      A.  Yes.

1    Q.   Okay.  So you could go to the bathroom whenever
2  you wanted to?

3    A.   That's not what you said.  You asked me did I
4  have access to it.  I have access to the bathroom.
5  Whether or not I can just up and leave what I'm doing
6  and go to the bathroom is a different question.

7    Q.   Okay.  Is there anything that prevented you
8  from getting up and going to the bathroom when you
9  needed to?

10   A.   Uh-huh, having to answer phones and be there
11  for that, being in the -- during a short time, the only
12  person in the office.

13   Q.   Okay.  You would agree that at the care center,
14  you had the ability to roll the phones over to an
15  answering service, correct?

16   A.   I did not know that.

17   Q.   You didn't know that?

18   A.   No.

19   Q.   What would you do when you left at the end of
20  the day?

21   A.   Well, at the end of the day, but not during the
22  daytime.

23   Q.   Okay.  You didn't know you could roll it over
24  during the day to someone else?

25   A.   I could -- not to an answering service.

1    Sometimes we would roll it over to -- I rolled it over

2    to the other BOM who was working, yes.

3         Q.   Okay.

4         A.   But that --

5         Q.   No.  Go ahead.

6         A.   Yes.

7         Q.   So you could roll the phone over to someone

8    else if you had to get up and go somewhere or go to the

9    restroom?

10        A.   I could.  My need to go to the bathroom is not

11   that -- it's very sporadic.  So taking that time to roll

12   the phone over is not -- it's not always an option.

13             Is it an option?  I guess I could have

14   rolled the phone over if I needed to, but me getting

15   there -- and the bathroom was down the hallway.  It

16   wasn't, I guess, like, in a suite or a suite thing.  It

17   was a shared bathroom.

18        Q.   How far would it have been?  Maybe a better

19   question is, how long did it take you to get there?

20        A.   Like, a minute or two.

21        Q.   A minute or two?

22        A.   Yeah.

23        Q.   Okay.  Prior to Cheri telling you that she

24   wanted individuals to come back to the office full-time,

25   who was answering the phones on days that you were at

1    home?

2         A.   Whoever worked in the office.

3         Q.   Okay.  So on the occasions that you had to go

4    to the bathroom, is there anything that prevented

5    someone else in the office from answering the phone when

6    it would ring?

7         A.   If they were in the office, they could answer

8    the phone.

9         Q.   And on the occasions -- well, let me ask you

10   this.  Did you ever answer the phone while you were

11   working from home?

12        A.   I believe so, yes.

13        Q.   There was the ability to do that remotely, to

14   your knowledge, or not?

15        A.   Someone in the office would have to, you know,

16   roll the phone over to me, yes.

17        Q.   Right, right.

18        A.   I want to say, yes, I've taken -- I took a call

19   or two when I was working from home.

20        Q.   Do you know the mechanics in which someone

21   would roll that call over to -- would it be your cell

22   phone?

23        A.   Yeah.  I'm trying to -- let me think.  You

24   asked me if I -- if I received phone calls from home,

25   and I'm trying to remember specifically.

1          Q.  Yeah.  No problem.

2          A.  I know that there are times when someone would

3    call me, like, the other employee would call me.

4          Q.  Sure.

5          A.  I've rolled the phones over to, like, the BOM

6    before or, you know, to someone else before, but I think

7    when I -- the days that I worked from home, if there was

8    a need, they would just call me.  Whoever was answering

9    the phone, if there was something -- if it wasn't

10   through email, then they would call me, and I would call

11   whoever back.

12         Q.  Understood.  Okay.  What was it about working

13   from home during the hours of 1 to 4 p.m. that would

14   address the issues you were having, the back spasms, the

15   concentration, the bathroom issue and fatigue?

16         A.  Privacy and then the ability to be able to lay

17   down.  I could still be on the computer doing the work

18   if I was, like, laying down and not having to, like,

19   just sit up and be up in a chair the whole time.

20         Q.  Okay.  Anything else?

21         A.  Also not -- you know, not answering the phones,

22   per se, if I was working from home.  I don't know

23   because I don't know -- it never happened.

24              So I don't know what that would have looked

25   like, but in my mind, I wouldn't have been answering the

1   phone.  So I could focus on whatever the job duties were

2   at that time to focus on.  You know, I guess, quiet, you

3   know, uninterrupted setting versus being in the office

4   with the phone and having to do those multiple things at

5   the same time.

6       Q.  You would agree that, for all intents and

7   purposes, the business office manager at your care

8   center was responsible for taking the calls, correct,

9   that would come in unsolicited, for example?

10      A.  Partly, yes.

11      Q.  Explain to me how you would lay down at your

12  home and work.

13      A.  I mean, it didn't happen, so --

14      Q.  Well, what was your idea?  I mean, you were

15  requesting to work from home.  Clearly, you had a plan,

16  right?

17      A.  Yeah.  If I needed to lay down, then I could

18  lay in my bed, you know, with a pillow, propped up, or

19  sit on the couch, lay with my feet up, propped up, and

20  still be on the computer and do what I needed to do.

21      Q.  Okay.  And, then, you indicated that the other

22  issue was privacy?

23      A.  In the bathroom, yes.

24      Q.  In the bathroom?

25      A.  Yes.

1     Q.  So that's specific to the bathroom?

2     A.  Specifically to the bathroom.

3     Q.  Was the bathroom at the Amedisys care center in

4  Fort Worth that you had access to a shared bathroom?

5     A.  Yes.  With multiple stalls, yes.

6     Q.  Was the privacy just a personal preference, or

7  was it something that assisted you in the MS?

8     A.  It's assistance with needing to clean myself

9  up, needing -- so, like, a bathroom that has a sink --

10  more that has a sink with it.  If I, you know, need to

11  take care of myself, clean myself up, I could.

12     Q.  Okay.

13     A.  I couldn't do that there.

14     Q.  Because the sink was in a communal area?

15     A.  Yes.

16     Q.  When did you first start to notice these

17  symptoms that would require you to work from home?

18     A.  They -- they were always present.

19     Q.  Okay.  When you were working as the --

20  essentially the volunteer coordinator for Asana, were

21  you in the office?

22     A.  Sometimes.

23     Q.  Do you work from home other times?

24     A.  Uh-huh.

25     Q.  Is that a yes?

1       A.  Yes.  Sorry.

2       Q.  On the days that you were in the office as a

3    volunteer coordinator, were you there the whole day?

4       A.  It varied.

5       Q.  There were occasions?

6       A.  Yes.

7       Q.  During the time in which you were employed with

8    Amedisys, was there ever a time in which you had to

9    clean yourself up as you've described?

10      A.  Yes.

11      Q.  How many times?

12      A.  I don't recall specifically.

13      Q.  And I don't mean to pry, but unfortunately,

14   it's sort of part of the case.

15      A.  I understand.

16      Q.  Is it something that is potentially

17   uncontrollable?

18      A.  Yes.  It is bowel and bladder uncontrollable.

19      Q.  Okay.

20      A.  I don't have control over that.

21      Q.  Is that always true?

22      A.  Is it always true?  It's uncontrollable.  It's

23   unpredictable.  So, yes, it's -- the word "always" kind

24   of gets you.  Is it always true?

25      Q.  Right.

1       A.   Like, I just went to the bathroom.

2       Q.   Sure.

3       A.   But can it happen where I don't -- yes, I'm not

4    in control of it.

5       Q.   But I guess what I'm trying to get at is that

6    potential emergent situation is not limited to the hours

7    of 1 to 4 p.m., right?

8       A.   No, it's not.  Correct, correct.

9       Q.   So other than having privacy in the restroom,

10   having the ability in the event you needed to lay down

11   and then a presumption that you wouldn't be required to

12   answer the phone during those hours, is there anything

13   else that working from home permitted you to do that

14   working in the office did not?

15      A.   I think it's covered, just the focus.

16      Q.   Yeah.  Okay.  Do you have any of the same

17   issues while working for Weatherford?

18      A.   Issues or symptoms?

19      Q.   Symptoms.

20      A.   Yes.

21      Q.   Okay.  And you've told us earlier you have not

22   requested any accommodation from them?

23      A.   Correct.

24      Q.   So how are you able -- or what differentiates

25   the job at Weatherford versus what you did at Amedisys

1    that allows you to be there full time?

2         A.   The bathroom is right next door to my room, and

3    it's a private bathroom.  So as far as that is related,

4    I have access to a private bathroom with -- the sink and

5    the toilet area is right there.

6         Q.   Okay.

7         A.   And I can walk out of my classroom anytime and

8    go to the bathroom.

9         Q.   Okay.

10        A.   So memory and concentration, those are still an

11   issue.  That -- that hasn't changed.

12        Q.   Okay.  Fatigue as well still an issue?

13        A.   Yes, still an issue.

14        Q.   So the only difference is that the bathroom is

15   private and closer?

16        A.   It is.

17        Q.   But everything else remains essentially equal?

18        A.   Uh-huh.

19        Q.   Is that a yes?

20        A.   Yes.

21        Q.   Okay.  Did you ask Weatherford to be put in the

22   location that you're at?

23        A.   No.

24        Q.   Just happenstance?

25        A.   It did happen when I went to go and tour where

1   the classroom was that was already there, so I didn't

2   have to ask for it.

3       Q.  Okay.  Did you ever inquire with Amedisys as to

4   whether or not there was the ability to provide you

5   access with a private bathroom within the building?

6       A.  No.

7       Q.  Did you ever specifically request that?

8       A.  No.

9       Q.  All right.  Let's look at this.  I'm showing

10  you what I've previously marked as Exhibit Number 9.

11  Copy to your counsel.  Ms. Jenkins, do you recognize

12  this document?

13      A.  Yes.

14      Q.  What is this document?

15      A.  It's the Form A or the form that I had to fill

16  out for my request for accommodation.

17      Q.  So in the December 3rd email, which we had

18  marked as Exhibit 8, this would have been the document,

19  uncompleted at the time, referred to as Form A --

20      A.  Yes.

21      Q.  -- right?  Okay.

22          So you took that document.  You completed

23  it out.  Is that fair?

24      A.  Yes.

25      Q.  And, then, this is the document, Exhibit 9,

1    that you returned to Kellie Brady on December 17th, or

2    at least one of them?

3         A.   Yeah.   I'm just going to stand.

4         Q.   Yeah.   No problem.   Did you have any assistance

5    in completing this document?

6         A.   No.

7         Q.   Okay.   And where did you complete this

8    document?

9         A.   What do you mean "where"?

10        Q.   Let me back up a little bit and lay a

11   foundation.   If you go to the third page of this Exhibit

12   Number 9, there's a signature.   Do you recognize that?

13        A.   Yes.

14        Q.   And that's your signature?

15        A.   Yes.

16        Q.   Okay.   And you signed that document after you

17   had completed it on December 17th?

18        A.   Yes.

19        Q.   Of 2020?

20        A.   On December -- yes.

21        Q.   Okay.   And so I assume -- and correct me if I'm

22   wrong -- that you filled out this document using some

23   type of computer?

24        A.   Yes.

25        Q.   Was that your work computer or a personal

1  computer?

2      A.  I don't recall.

3      Q.  Okay.  On the second page of this document, you

4  identify Dr. Nair and then Princy, correct, as your

5  health care providers?

6      A.  Yes.

7      Q.  Okay.  And you indicated on this same document,

8  above their names, that a physician or other

9  professional had recommended the specific accommodations

10 that you allude to in this document, correct?

11     A.  Recommend a specific accommodation, yes.

12     Q.  And was that Dr. Nair or Princy or both that

13 had recommended that?

14     A.  That was Princy who filled out the form.

15     Q.  Okay.  So let's put that aside and look at the

16 next one.  I'm showing you what's been marked as

17 Exhibit 10.  Providing a copy to your lawyer.

18         Let me ask you, Ms. Jenkins, if you

19 recognize this document?

20     A.  Yes.

21     Q.  And tell me what this document is.

22     A.  This is the request for accommodation Form B

23 from the doctor.

24     Q.  Okay.  So this document was blank at the time

25 it was provided to you as an attachment on that

 1    December 3rd email, which was Exhibit 8?

 2        A.  Yes.

 3        Q.  And this is the document that Princy had

 4    completed on your behalf?

 5        A.  Yes.

 6        Q.  And you returned this exact document to

 7    Kellie Brady on December 17th, along with Form A,

 8    correct?

 9        A.  Yes, yes.

10        Q.  Form A being the one we just looked at,

11    Exhibit 9, right?

12        A.  Yes.

13        Q.  Okay.  Did you work with Princy or discuss this

14    form with her in any fashion other than just say,

15    perhaps can you fill this out?

16        A.  Yes.  I believe -- I don't recall.

17        Q.  How did it get to Princy?

18        A.  I dropped it off at the doctor's office.

19        Q.  Okay.  Do you remember when you dropped it off

20    and --

21        A.  I don't remember the date that I dropped it

22    off.

23        Q.  Okay.  After Princy had completed it, how did

24    it come back into your possession?

25        A.  I went and picked it up.

**App. 092**

1      Q.  Did you speak to her when you picked it up?

2  Princy's a girl, right?

3      A.  Yes.

4      Q.  Did you speak to Princy when you picked it up?

5      A.  I don't recall.

6      Q.  How long -- and correct me if I'm wrong, but

7  Princy dated this document December 15, 2020 --

8      A.  Uh-huh.

9      Q.  -- to your knowledge?

10     A.  Yes.

11     Q.  How long, prior to that date, had you been

12  visiting Princy as a health care professional?

13     A.  Oh, I don't know when she became -- I don't

14  recall specifically.

15     Q.  Several years?

16     A.  Could be.  I don't recall specifically how long

17  she's been the nurse practitioner.

18     Q.  Okay.  Did you review Exhibit 10 in its

19  completed form prior to submitting it to Kellie?

20     A.  I'm quite sure I looked at it, yes, sir.

21     Q.  Okay.  Did you have any questions or concerns

22  that you addressed with either Kellie or when you

23  provided it to -- strike that.

24            Did you have any questions or concerns,

25  after you reviewed it, that you discussed with Princy?

1    A.  No.

2    Q.  Did you have any questions or concerns or

3    context in which you provided when you provided the form

4    to Kellie?

5    A.  No.

6    Q.  Okay.  After this form was provided to Amedisys

7    on December 17th --

8    A.  Uh-huh.

9    Q.  -- did you ever provide any supplemental forms?

10   A.  I don't think so, no.

11   Q.  Have you ever had any discussions, that you

12   recall, with Princy regarding this form, Exhibit 10?

13   A.  I know after I was let go.

14   Q.  Okay.  What did you say to Princy and what did

15   she say to you as it relates to this form after you were

16   let go?

17   A.  I don't recall word for word exactly.  She was

18   just like, I'm sorry you got let go from the job.  I

19   mean, I remember that part, but I don't remember

20   specifics.

21   Q.  On the first page of Exhibit Number 10, there

22   is some checked boxes.  Do you see those?

23   A.  Yes.

24   Q.  And you would agree that on the second checked

25   box, she indicated "no" in response to the question of

1  whether or not your impairment substantially limits a

2  major life activity?

3      A.  Yes.

4      Q.  On the second page of Exhibit 10, she also, you

5  would agree, about halfway down, indicated that your job

6  functions were not impeded by your impairment, correct?

7  She checked the box for "no"?

8      A.  She did, yes.

9      Q.  And on the bottom of the second page, Princy

10  had indicated that the accommodations that you could

11  potentially receive are working from home, as needed,

12  and being able to take leave if you're feeling sick,

13  correct?

14      A.  Yes.

15      Q.  Okay.  Now, let's see.  You can put that one

16  aside.

17          On December 31st, you received an email

18  from Kellie Brady denying the requested accommodation,

19  correct?

20      A.  Correct.

21      Q.  I'm showing you what I've marked as Deposition

22  Exhibit 11.  A copy to counsel.  Do you recognize

23  Exhibit 11?

24      A.  Yes.

25      Q.  And this is the email that you received from

1  Kellie on December 31, 2020?

2       A.  Yes.

3       Q.  Okay.  From December 17th, on the day in which

4  you provided the forms, until December 31st in which you

5  received this email, were you still working full-time in

6  the office?

7       A.  I was.

8       Q.  Okay.  And during that time frame, did you have

9  any other conversations with anyone, or did anything

10  happen during that time frame that you believe is

11  somehow relevant or related to your claims?

12       A.  Not that I can recall.

13       Q.  Okay.  Going back to Exhibit Number 11, I

14  notice at the top of this document, which was, I

15  believe, provided by the EEOC, you had forwarded this

16  document to yourself on January 13th?

17       A.  Yes.

18       Q.  Why did you do that?

19       A.  Because I was off of work, and I was put on

20  leave, and I needed documentation that was sent that I

21  wouldn't have access to otherwise.

22       Q.  Okay.  You were placed on leave, and we'll talk

23  about that.  But what was it about being placed on leave

24  that prompted you to send yourself this email?

25       A.  I needed information, proof of any information,

1  conversations that I wouldn't have access to otherwise

2  because it was work email versus -- it wasn't -- it was

3  a work conversation.

4      Q.  Did you suspect at that point that you were

5  being fired?

6      A.  I didn't suspect it, but to be proactive.

7      Q.  Thought it was a possibility?

8      A.  Thought it was a possibility.

9      Q.  Okay.  Proactive for what?

10      A.  If I needed to recall a conversation.

11      Q.  Okay.  Were you planning at that point, if you

12  were going to be fired, to file some type of lawsuit or

13  a claim?

14      A.  Yes.  I was looking into the EEOC claim.

15      Q.  Okay.  When did you begin looking into that?

16      A.  I don't recall the date exactly.

17      Q.  Okay.  And I received your discovery responses

18  yesterday, which we'll talk about in a little bit, and

19  as part of that, there were numerous documents that I

20  think you sent yourself.  Is that correct?

21      A.  Uh-huh.

22      Q.  Is that a yes?

23      A.  Yes.

24      Q.  Okay.  Some of those include patient

25  information and patient names and identifiers.  And so

1  my question is, other than the ones that your lawyers

2  produced in the case, do you have any other Amedisys

3  documents with patient identifiers on it?

4      A.  No.

5      Q.  Okay.  Do you have physical copies of those, or

6  are they electronically stored somewhere?

7      A.  Of what?

8      Q.  Of anything with a patient identifier on it.

9      A.  That would have been -- I think it's just

10 electronic copy.

11     Q.  Okay.  We'll formalize this with the Court, but

12 I'm just going to request that you and your counsel

13 treat those as confidential for now --

14     A.  Oh, yes.

15     Q.  -- given the patient identifiers.

16     A.  Yes.

17     Q.  Did you ever ask permission from anyone to

18 obtain or take with you Amedisys documents with patient

19 identifiers on them?

20     A.  Not that I can recall.

21     Q.  What was the purpose for taking the documents

22 with patient identifiers?

23     A.  That was the document that was -- the question

24 in hand of why I was terminated or let go.

25     Q.  Okay.  And I understand that, but my -- I guess

1  my question is why.  What was the purpose for taking

2  that document?

3      A.  Because I felt like I was wrongfully let go.

4      Q.  Okay.  The email on Exhibit 11, that you

5  received on December 31, 2020, informed you that

6  following the interactions that Kellie and Amedisys

7  specifically had with you, that the company was denying

8  your request for an accommodation, correct?

9      A.  Correct.

10      Q.  And in this email, she says to you that they

11  have determined that you are not a qualified individual

12  with a disability.  Do you see that?

13      A.  I do.

14      Q.  Okay.  Did you ever ask Kellie or talk with her

15  about what that meant?

16      A.  No, I did not.

17      Q.  And you never spoke with her or responded to

18  this email to indicate that you had questions or

19  disagreed or anything like that, correct?

20      A.  Correct.  I don't recall that I did.

21      Q.  She indicates here that there are leave options

22  that might be available to you and that, in the event

23  that you needed a leave, you could contact Met Life,

24  correct?

25      A.  Correct.

1      Q.  Did you ever reach out to Met Life at any point

2  after receiving this email?

3      A.  No.

4      Q.  Okay.  After receiving this email on

5  December 31st of 2020, did you speak with anyone at

6  Amedisys, up until the point that you were suspended, to

7  question it or to disagree with it or anything?

8      A.  Not that I can recall.

9      Q.  And apart from perhaps the holidays over the

10  new year, for all intents and purposes, you were in the

11  office working full-time?

12      A.  From when?

13      Q.  From December 31st up until the point you were

14  suspended.  That's a good question.

15      A.  I came back to work on the 5th, I believe,

16  because I was off that Monday, yes.  So I came -- yes.

17      Q.  We had looked earlier at Exhibit 10, which was

18  Form B, and you told us and agreed that Princy had

19  recommended one of the potential accommodations you

20  could receive would be to take leave when you felt sick,

21  right?

22      A.  Yes.

23      Q.  And Kellie, in this email, was advising you on

24  the ways in which you could achieve that leave, correct,

25  if you needed it?

1      A.   Yes.

2      Q.   Okay.  As you sit here today, do you know who

3  made the decision to deny your request for an

4  accommodation?

5      A.   I don't know.

6      Q.   As you sit here today, and other than the

7  emails that you would have exchanged or conversations

8  you had with Kellie, do you know what process Amedisys

9  engaged in to analyze your request?

10     A.   I believe it was just the emails and these

11  forms.

12     Q.   Okay.  What leads you to that conclusion?

13     A.   Because that was the only conversation, was --

14     Q.   Right.  You know what you know, right?

15     A.   Right.

16     Q.   But behind the scenes, you don't know what they

17  were doing?

18     A.   Correct, correct.

19     Q.   Okay.  So December 31st, you received this

20  email?

21     A.   Uh-huh.

22     Q.   Right?

23     A.   Yes.

24     Q.   Is there anything else that happened prior to

25  that date that we haven't discussed that you think is

1  important or somehow relevant or related to your claims

2  in this lawsuit?

3      A.  Not that I can think of.

4          MR. KECK:  Okay.  Why don't we take another

5  five or ten-minute break, if you guys are good with

6  that, and then we'll hopefully be on the downhill for

7  some of this.

8          THE REPORTER:  Off the record, right?

9          MR. MASTERSON:  Oh, yeah.

10          (A recess was taken.)

11          MR. KECK:  Okay.  Let's go back on the

12  record.

13      Q.  (BY MR. KECK)  You understand that you're still

14  under oath?

15      A.  Yes.

16      Q.  Okay.  So as a hospice provider, you would

17  agree that Amedisys receives funding from the

18  government.  Is that correct?

19      A.  Yes.

20      Q.  Reimbursement through Medicare and Medicaid,

21  for example?

22      A.  Yes.

23      Q.  As part of that and as a condition of

24  participation in Medicare, you would generally agree

25  that there's rules and requirements that Amedisys has to

1    follow, right?

2        A.   Yes.

3        Q.   Are you familiar with the acronym EOB?

4        A.   Yes.

5        Q.   Can you tell me what that means?

6        A.   Election of benefits.

7        Q.   Okay.   And what is your understanding of an

8    election of benefits?

9        A.   That is the form that the patient signs when

10   they come onto -- or start hospice.

11       Q.   Okay.   So let's break it down a little bit.

12   It's a form that is presented to the patient that he or

13   she -- a hospice patient specifically, right?

14       A.   Yes.

15       Q.   -- that he or she needs to sign in order to not

16   only begin hospice, but more specifically, for Amedisys

17   to bill for that service, right?

18       A.   Yes.

19       Q.   Okay.   You understand that the election of

20   benefits form is a requirement of the federal

21   government?

22       A.   Yes.

23       Q.   Okay.   And you understand that it is a legal

24   document for all intents and purposes?

25       A.   Yes.

1     Q.  Do you have any reason to dispute that there's

2  specific regulations published by the federal government

3  that apply to election of benefits forms?

4     A.  No.

5     Q.  Have you ever read those?

6     A.  Not that I can recall.

7     <u>Q.  Okay.  Are you generally familiar with the</u>

8  <u>notion that Amedisys's failure in this case to comply</u>

9  <u>with the election of benefits requirements would</u>

10  <u>potentially render the company ineligible for certain</u>

11  <u>hospice services?</u>

12     <u>A.  Yes.</u>

13     <u>Q.  And ineligible for payment specifically?</u>

14     <u>A.  Yes.</u>

15     Q.  Okay.  Do you recall, as you sit here today,

16  what is on an election of benefits form?

17     A.  Not in its entirety.

18     Q.  Do you recall anything?

19     A.  Yes.

20     Q.  What do you recall?

21     A.  I know that there's, like, the doctor -- the

22  doctor's name.  I know that the patient or their

23  representative's signature.  I believe the nurse signs

24  it as well.  The patient's name is on there.

25     Q.  Okay.  Also, does it indicate the condition

1    that the -- or conditions that the patient may have?

2        A.  I don't -- I don't recall.

3        Q.  Okay.  You're aware that an election of

4    benefits form must be signed by the patient after it's

5    completed, right?

6        A.  Say that again.

7        Q.  Sure.  You're aware that the election of

8    benefits form must be signed by the patient or his or

9    her designee, caregiver perhaps or a family member,

10   after it's completed, meaning after it's filled out?

11       A.  Yeah.  When they fill it out, then they need to

12   sign it, yes.

13       Q.  Okay.  Did you have any understanding that the

14   elections of benefits form is -- its purpose, at least

15   in part, is to prevent fraud?

16       A.  No.  I'm not aware of that.

17       Q.  One of the requirements -- and we'll look at an

18   election of benefits form, but one of the requirements

19   of that form is that the patient gets to decide who his

20   or her caregiver is, right?

21       A.  Yes.

22       Q.  And that form is intended, at least in part, to

23   document that decision --

24       A.  Yes.

25       Q.  -- right?

1          And the idea behind it -- correct me if I'm

2   wrong or if this is not your understanding -- is that it

3   would add an additional layer preventing a health care

4   provider or anesthetist, for example, a company from

5   imposing health care on that patient, right, telling

6   them they have to go use someone?

7        A.  Correct.

8        Q.  Okay.  Maybe the easiest thing to do -- we're

9   not going to go through all those.  Don't worry about

10  it.

11          Before I show you this, let me ask you, do

12  you recall specifically ever being provided with any

13  policies that relate to election of benefits?

14       A.  I don't recall.

15       Q.  Okay.  You told us earlier -- and I don't think

16  we need to go back, but you recalled or didn't have a

17  reason to dispute that you had undergone an election of

18  benefits training, correct?

19       A.  Yes, correct.

20       Q.  So maybe this will go quick.  I'm showing you

21  what I've marked as Exhibit Number 4.  For the record,

22  this is entitled Election of Hospice Benefit.  It's an

23  Amedisys policy that is earmarked at Policy AA-004.

24          Let me just ask you generally, have you

25  ever seen this document before?

1    A.  Not that I can recall.

2    Q.  Do you have any reason to dispute that it would

3  have been presented to you as part of the training that

4  you undertook with respect to election of benefits?

5    A.  No reason to dispute.  I just can't recall.

6    Q.  Okay.  All right.  That's all I need.  Let's

7  look at -- all right.

8            I'm showing you what I have marked as

9  Exhibit 14.  Again, this is a document that has several

10  emails back and forth on it.  Okay?  And we're going

11  to -- well, let me first stop and say, take a look at

12  this and let me know if you recognize this email string,

13  at least insofar as the ones that you're a party to.

14    A.  Yes.  I'm aware of it.

15    Q.  Okay.  You're familiar with those?

16    A.  Yeah.  Familiar with it, yes.

17    Q.  And we'll talk about them more in detail.

18  Before we do that -- and at the heart of all of this

19  relates to an election of benefits form for a patient

20  that we're going to talk about.  Okay?

21            I will tell you that I think those

22  patient's initials are WC.  Do you have any reason to

23  dispute that?

24    A.  No.

25    Q.  That is, in fact, correct, right?

1     A.   Yes.

2     Q.   Okay.  So what I'm going to ask you to do today

3  is refer to that person as WC versus his entire name.

4  Okay?

5     A.   Yes.

6     Q.   So let's turn to the very back of this exhibit,

7  at least the second to last page, which reflects an

8  email on January 4th from Tina Kolb, K-o-l-b, in which

9  you were a party, indicating that a manual bill hold had

10 been placed on an individual with the initials WC,

11 right?

12    A.   Yes.

13    Q.   The purpose for that manual bill hold was

14 because the elections of benefits form, at least

15 according to Ms. Kolb, was not completed correctly.  Is

16 that fair?

17    A.   Not that it wasn't completed correctly.  It

18 wasn't -- they didn't have it.

19    Q.   They didn't have it?

20    A.   Huh-uh.

21    Q.   Okay.  On January 5th is the date that you

22 returned to the office, correct?

23    A.   Yes.

24    Q.   And you uploaded the form that was missing for

25 WC?

1       A.  All forms.

2       Q.  All forms, including that one?

3       A.  Yes.

4       Q.  Okay.  Later that morning, which appears on

5  Page 9, Tina sent another email in which you were also

6  copied on, indicating that the form had been received,

7  but the manual bill hold remained in place because there

8  were certain parts of the election of benefits that was

9  incomplete?

10      A.  Correct.

11      Q.  And the manual bill hold is -- do you have any

12  understanding of what that is?

13      A.  Yeah, I -- yes.

14      Q.  It's essentially that we're not going to bill

15  for services until we know that the documents are in

16  order?

17      A.  Correct.

18      Q.  Okay.  At that point, Tina, on the January 5,

19  2021 email, indicated that the attending physician area

20  of the form was incomplete and that the start of care

21  date was not entered --

22      A.  Correct.

23      Q.  -- correct?

24            Less than an hour later, you respond to

25  that email and say, "error corrected, forms uploaded,"

1  correct?

2       A.  Yes, correct.

3       Q.  Okay.  And we'll talk about what happened in

4  that time period, but essentially, you had uploaded an

5  updated form?

6       A.  Correct.

7       Q.  Okay.  Thereafter, that same day, at 11:39,

8  Tina responds to you asking -- or indicating that the

9  bill hold had been released at that point and indicating

10 there may have been other issues that she thought

11 existed with the form --

12      A.  Uh-huh.

13      Q.  -- correct?

14      A.  Correct.

15      Q.  Okay.  And at that point, you informed her in

16 response that "it's the exact form.  I just located the

17 attending and entered the start of care date"?

18      A.  Start of care, yes.

19      Q.  Okay.  Thereafter, on January 5th at

20 11:59 a.m., Tina responds, including you and an

21 individual by the name of Tricia Thumann, T-h-u-m-a-n-n,

22 asking whether or not the corrections to the election of

23 benefits form that you uploaded were done correctly.  Is

24 that correct?

25      A.  Correct.

1      Q.  On the first page of this document, later that

2  same day, on January 5th, you email Crystal Nering,

3  N-e-r-i-n-g, indicating "Crystal, quote, let me first

4  admit that I made a huge mistake.  I take ownership in

5  that, but my thinking is, either way, we will need to

6  readmit this patient and get the consents re-signed, end

7  quote."  And it does continue thereafter.  You wrote

8  that email, correct?

9      A.  I did.

10     Q.  Okay.  Who is Crystal Nering?

11     A.  Here, it says she is the regional director of

12  clinical operations.

13     Q.  Okay.  Do you have any reason to dispute that's

14  who it is?

15     A.  No.

16     Q.  Okay.  And who is Evangeline Ozurigbo,

17  O-z-u-r-i-g-b-o?

18     A.  She was the clinical manager.

19     Q.  At the --

20     A.  At Fort Worth.

21     Q.  At the Fort Worth care center?

22     A.  Care center, yes.

23     Q.  Okay.  In your January 5th email to Crystal

24  Nering on the first page of Exhibit 14 where you

25  indicate that you admit that you made a huge mistake,

1  what was the mistake that you made?

2      A.  After having the phone conversation with Tina

3  earlier, I had wrote in the doctor's name -- not

4  signature -- name and the date, the start care date,

5  which was December 31st.  And so, after having a

6  conversation with her, she was like, you can't do that.

7  I was like, oh, well, I didn't know that.

8      Q.  Okay.

9      A.  So that is what the mistake was, me writing the

10  doctor's name and the start of care date on that form.

11      Q.  Okay.  So it's your testimony that you were

12  unaware that you had made a mistake until after you had

13  made the revisions to the election of benefits form for

14  WC?

15      A.  Correct.

16      Q.  Okay.  And after you were made aware of that,

17  that's when you reached out to Crystal, Jacqueline and

18  Evangeline to let them know that?

19      A.  Correct.  Well, I think there's something

20  missing.  There's something missing in here.  I don't

21  know what it is, but there was -- there's like another

22  conversation that happened in order for me to get to

23  just Crystal.  And I don't -- we don't have it, so I

24  don't know what that conversation is.

25      Q.  We may not have it yet.

1     A.  Okay.

2     Q.  Hold on.  Let's look at it.  So I'm showing

3  what I have previously marked as Exhibit 15.  Providing

4  a copy to your counsel.

5           This is essentially the same email string

6  that we were just looking at except that there is an

7  email on the second page in which Tricia emails Tina and

8  indicates that Crystal Nering is involved.  Is that

9  right?

10     A.  Yes.

11     Q.  Following that, on the first page, Tina

12  responds to Tricia and copies Ms. Nering as well as

13  other individuals, correct?

14     A.  Correct.

15     Q.  At that point, is that how you obtained

16  Crystal's information?

17     A.  I still don't think so.  I know that there was

18  a conversation.  After I got off the phone with Tina,

19  Jackie was in the office by then, and I went to her, and

20  I was like, look, I apparently just made a big mistake.

21  And she's like, what, what happened.  I was like, well,

22  these papers were here on my desk, I uploaded, I did,

23  blah, blah, blah, blah.  And I'm just responding to

24  what's going on, and so then she got involved.

25           But there's something missing, but -- I

1  mean, yeah, I contacted Crystal, but there's -- there's

2  another conversation that happened.

3     Q.  Okay.

4     A.  But at the end of the day, essentially, yes,

5  I'm letting her know, yes, I made a mistake.  After I

6  found out, I took ownership of that.

7     Q.  Uh-huh.

8     A.  Because on that document, I put my initials by

9  it because I was the one who put that information there.

10     Q.  Okay.  And, then, since we have it in front of

11  us, Exhibit 15, that separate email string continues,

12  and you emailed Jacqueline on January 8th to explain

13  what happened.  Is that correct?

14     A.  Yes, because I believe she asked me what my

15  thinking was, if I'm not mistaken.

16     Q.  Okay.

17     <u>A.  There's another conversation.</u>  <u>So this was the</u>

18  <u>5th when I came back.</u>  <u>The 6th, I still went to work.</u>  <u>I</u>

19  <u>think the next day is when they let me -- put me on</u>

20  <u>leave.</u>

21         But, yes.  So someone asked Jackie, I

22  guess, what -- if she sent it to me.  She was like what

23  was your process, what was your thinking process.  So

24  this is my response, part of the response to that, and I

25  did that on two different occasions.

1    Q.  Provided your response to Jacqueline, you mean?

2    A.  Yes.

3    Q.  Because I believe you also wrote an email on

4    January 22nd that also outlined what you --

5    A.  Right.

6    Q.  -- were thinking, correct?

7    A.  Correct.

8    Q.  So insofar as this January 8th email is

9    confirmed, as reflected on Exhibit 15, on that final

10   sentence of your -- or second to final sentence on your

11   email, you indicated that, "quote, after a phone call

12   with Tina and looking at my mistake, I recognized that

13   what I did was not the correct plan of action.  I took

14   and take ownership of that."

15   A.  Yes.

16   Q.  Right?

17   A.  Yeah, after I -- yes.

18   Q.  At any point before -- and again, we'll talk

19   about the actual election of benefits form that's at

20   issue here.  But at any point before you made the

21   revisions to the election of benefits form did you

22   consult any policies or procedures or prior trainings as

23   to what should or could be done in that situation?

24   A.  No.  I don't recall, no.

25   Q.  Did you talk to anyone to ask?

1     A.  I don't recall.

2     Q.  Did you consult the election of benefits

3  training that you had told us you had no reason to

4  dispute, completing on October 1st of 2020, to determine

5  whether or not that addressed the situation?

6     A.  No.

7     Q.  Okay.  So in your explanation, you made what

8  you believe to be an innocent mistake, that it wasn't

9  intentional, but it was a mistake?

10     A.  Yes.

11     Q.  Is that fair?

12     A.  Yes.

13     Q.  Okay.  I want to look at two documents.  First,

14  we are going to look at what I have marked as

15  Exhibit 12.

16     A.  Uh-huh.

17     Q.  This document has been redacted in black with

18  respect to any patient identifier.  But the question I

19  have for you is, do you recognize this document,

20  notwithstanding the redactions?

21     A.  Yes.

22     Q.  And this is the election of benefits form at

23  issue related to the patient, WC, correct?

24     A.  Correct.

25     Q.  Okay.  The highlighted portions of this

1  document, which I understand you may not have ever seen
2  before, but those were the parts of the document that
3  you completed, right, when you attempted to fix it?
4       A.  The name, yes, and the address of the document,
5  yes.  Yes.
6       Q.  Everything that's highlighted, right?
7       A.  I don't recall checking that box, but the name,
8  that's my handwriting and signature --
9       Q.  Okay.
10       A.  -- next to it, and the date.
11       Q.  Do you have any reason to dispute that you
12  checked the box, or you just don't remember doing it?
13       A.  No reason to dispute it, I guess.
14       Q.  And next to the changes, you signed your name,
15  correct?
16       A.  Correct.
17       Q.  And you completed the revisions that are in
18  highlight on Exhibit 12 on January 5th, right?
19       A.  Yes.
20       Q.  Okay.  And you dated the part that's in the
21  date for December 31st of 2020, correct?
22       A.  Correct.
23       Q.  Okay.  So at the time that you, I want to say,
24  altered the election of benefits form that we see in
25  highlight on Exhibit 12, those parts were actually

1  blank, right?

2      A.  Yes.

3      Q.  Okay.  Now, I'm going to show you what I've

4  marked as Exhibit 13, and my only question for you is,

5  is Exhibit 13 the election of benefits document for

6  patient WC that you ultimately uploaded after you had

7  made the corrections without the highlights?

8      A.  Yes.

9      Q.  So this is actually how the document looked

10 when you uploaded it, correct?  In other words, it

11 didn't have the highlights on it or the redactions?

12     A.  Yes.

13     Q.  Okay.  You said you spoke with Tina that

14 informed you that you shouldn't have done this?

15     A.  Yes.

16     Q.  And that was on January 5th, right?

17     A.  Yes.

18     Q.  After you spoke with her, did you go back and

19 review any documents to determine whether or not what

20 she was telling you was correct?

21     A.  Yes, yes.  Looking at the documents, the

22 physical forms in hand, yes.

23     Q.  My question was, did you go back and look at

24 any policies or procedures to determine what she was

25 telling you was correct?

1      A.  No.

2      Q.  You just took her word for it?

3      A.  Yes.

4      Q.  Okay.  I'm not saying you shouldn't have.  I'm

5  just asking.  Okay.

6           The email that you sent to Jacqueline

7  Williams on January 8, 2020, which is Exhibit 15, up

8  until the point that you sent that email, have you told

9  me everything that relates to your claims in this

10  lawsuit?

11           And again, we'll talk about what happened

12  after, but up until that point.  In other words, is

13  there anything that happened between December 31st, when

14  you received that accommodation denial, up through

15  January 8th that you believe is relevant or related to

16  your claims that we haven't talked about?

17      A.  Oh, besides -- no, no.

18      Q.  Okay.

19      A.  I'm sorry.

20      Q.  Go ahead.

21      A.  We haven't talked about training and my ask --

22  and my request for training.

23      Q.  Okay.  Tell me about that.

24      A.  So in taking the business office manager

25  position, I was going through training, so to say, with

1    Dr. Sherrod, who was regional business office manager.

2    Training was sporadic, and when she would come in,

3    sometimes she would be in the conference room.

4    Sometimes she would be sitting with me and kind of going

5    through some things, but it wasn't like a constant

6    training.

7              And so I did ask for training several

8    times.  She had given me, like, a phone a friend.  I do

9    not recall the lady's name.  It was another care center,

10   not the Dallas office.

11             And I did reach out one time to -- it was

12   like, hey, I need some help on this.  That person

13   specifically emailed me back a 781-page manual on where

14   to find the answer.  I was like, okay, I will not reach

15   out to you again.  That is not what I was asking for.

16             And I let Gary know.  I let Cheri know.  I

17   let Stephanie Nevelski know I needed training.  And I

18   had asked for training for not only the BOM position,

19   but also the BOS position, once that role was dropped

20   into my lap.  So I just want that to be --

21        Q.  I appreciate that.  But prior to January 8th,

22   do you know about how many times you reached out to a

23   leader to ask for additional training?

24        A.  I don't recall.

25        Q.  Okay.  Was it more than twice?

1       A.  Yes.

2       Q.  Okay.  Was it more than five times?  Just

3   trying to get an idea.

4       A.  Let's just say five.  We could say five.

5       Q.  About five, give or take?

6       A.  About five times, give or take, yes.

7       Q.  The BOM, the phone a friend that I think you

8   referred to, did you reach out to her to ask questions

9   about the election of benefits?

10      A.  No.

11      Q.  Did you consult the manual about the election

12  of benefits?

13      A.  No.

14      Q.  What types of questions were you asking Gary

15  and others in terms of specific training that you

16  thought you needed?

17      A.  I can't recall it being very specific.  I just

18  asked for general, day-to-day what does this process

19  look like.

20          I know that there was several times that I

21  had to reach out to Dot through text or email or phone

22  call, hey, how do you do this, how do you do this.  And

23  I know she's not -- she didn't just work for my care

24  center.  She was regional.

25      Q.  Right.

1        A.   So that was all of the time, like --

2        Q.   And I believe you've produced some text

3   messages in this case that reflect that, right?

4        A.   That I had, yes, yes.

5        Q.   Did you reach out to her to discuss the

6   election of benefits form and what can be done or should

7   be done?

8        A.   No, not that morning, I didn't.

9        Q.   You could have, right?

10       A.   Could I reach -- I probably could have reached

11   out.

12       Q.   Did you ever specifically request from any of

13   your superiors to redo or obtain additional training as

14   it relates to the election of benefits form?

15       A.   No, because generally, this -- this had never

16   been an issue, never -- this was a one-time thing.

17       Q.   It was an outlier, right?

18       A.   A what?

19       Q.   An outlier, not something that was typical.

20       A.   Yes, correct.

21       Q.   Okay.  All right.  I appreciate that additional

22   clarification and context.  Anything else prior to

23   January 8th that you want to discuss, January 8th of

24   2021?

25       A.   I would like to say that, you know, this email

1    was sent on the 4th.

2         Q.   What email are you talking about?

3         A.   I'm sorry.  The email requesting the election

4    of benefits and the start of care for the patient.

5                   MR. MASTERSON:  What number?

6                   THE WITNESS:  I'm sorry.  Exhibit 15.

7         Q.  (BY MR. KECK)  Okay.

8         A.   15 or 14, both.  You can look at either -- you

9    can look at 15.

10        Q.   You're talking about the initial email from

11   Ms. Kolb --

12        A.   Yes.

13        Q.   -- indicating about the manual bill hold?

14        A.   Yes.  So the initial email dated Monday,

15   January the 4th, 9:01 a.m., included myself, Gary,

16   Cheri, Dot.  And, then, later on that day, it included

17   Jackie.  Jackie and Eva both were in the office that

18   day.

19        Q.  Uh-huh.

20        A.   I was not.  And so to go back to your

21   Exhibit 4 --

22        Q.  Uh-huh.

23        A.   -- under the policy --

24        Q.  Uh-huh.

25        A.   -- it says -- second paragraph.

1     Q.  Okay.

2     A.  It says, "It is the responsibility of the

3  hospice registered nurse, social worker, licensed

4  practical nurse, administrator or DOO, clinical manager,

5  chaplain, volunteer coordinator or bereavement

6  coordinator to review the election of benefit with the

7  patient and/or patient's representatives and obtain

8  necessary signatures at the initiation visit and prior

9  to rendering care.  A verbal election of benefit is not

10  allowed."

11     Q.  Yeah.

12     A.  I'm saying that to say that document should

13  have never been put on my desk uncompleted, and I -- I

14  came in.  I just did my job.  My job was to upload it,

15  put it in the patient chart.  And then I got the email

16  of it's not right.  I'm like, I just had a conversation

17  with the nurse.

18     Q.  Uh-huh.

19     A.  Because she was a travel nurse, but she was our

20  permanent travel nurse, about this patient being

21  admitted and who the doctor was.  And that's the only

22  reason why I put that information, because I knew the

23  information.  We talked about it.  Why it wasn't filled

24  out, I don't know.

25     Q.  Right.

1    A.  But it should not have come to me incomplete.

2    I just wanted to point that out.

3    Q.  No.  And I tend to agree with you, and I also

4    think that, based on that language that you just read,

5    it would seem to indicate that it shouldn't be completed

6    by anyone else after the fact either, right?

7    A.  That's true.  But there are people who were in

8    the office that could have admitted -- took care of

9    whatever needs to be taken care of --

10   Q.  Right.

11   A.  -- before -- the patient was already on service

12   technically, but not legally, I guess.

13   Q.  Well, there was a manual bill hold in place,

14   right?

15   A.  Right.

16   Q.  Following January 8th at some point, you were

17   suspended?

18   A.  Yes.

19   Q.  Is that what you had told me earlier?

20   A.  Yes.

21   Q.  What was the date that you were suspended?

22   A.  I think it was on the 11th.

23   Q.  Okay.  Who informed you of the suspension?

24   A.  Jackie and Dot.

25   Q.  And did they tell you why you were being

1  suspended?

2      A.  Yes.  Well, yes, put on leave with pay as

3  they -- "they" being the company, Amedisys --

4  investigate this form and everything and, I guess,

5  decide what they're going to do.

6      Q.  Okay.  What had happened with respect to the

7  alterations that were made, you mean?

8      A.  Correct.

9      Q.  Do you know who made the decision to suspend

10 you?

11     A.  No.

12     Q.  When you were suspended, were you suspended

13 with or without pay?

14     A.  With.

15     Q.  With pay.  Was it your understanding at that

16 point that the company was going to be doing an

17 investigation?

18     A.  Yes.

19     Q.  Following that point, do you have any specific

20 understanding as to what investigation was done?

21     A.  No.

22     Q.  Do you know who was involved in the

23 investigation?

24     A.  No.

25     Q.  Two days after your suspension is when you

1  began to forward yourself the emails?

2      A.  Yes.

3      Q.  So I take it when you were suspended, you still

4  had access to your emails?

5      A.  Yes.

6      Q.  On or about January 22nd, I believe you were

7  asked again by Jackie to provide a written statement,

8  right?

9      A.  Yes.

10      Q.  So from the time that you were suspended on

11  January 11th up until the time that you provided your

12  statement on January 22nd, did you have any interactions

13  with anyone from the company?

14      A.  No, not that I can recall.

15      Q.  Okay.  You were at home receiving your pay, but

16  on suspension pending the investigation?

17      A.  Correct.

18      Q.  And I didn't ask you, but I should tie the

19  timeline up.  Between January 8th and January 11th when

20  you were suspended, did anything happen to you, or did

21  you witness or have any conversations with anyone that

22  you recall that you believe is applicable in this case?

23      A.  Not that I can recall.

24      Q.  Okay.  All right.  I'm showing you what I've

25  marked as Exhibit 16, and you can put those all in a

1  pile.  She'll need to get those when you're done.

2           A copy to your counsel.  Again, just so

3  you're aware and so the record is clear, I have taken

4  liberty to redact any patient identifiers in Exhibit 16.

5  But notwithstanding that, do you recognize this exhibit?

6       A.  Yes.

7       Q.  Can you tell me what it is?

8       A.  It is my response to a request from Jackie.

9       Q.  Okay.  And this email was specifically provided

10 to Jackie in response to her request that you do so,

11 right?

12      A.  Yes.

13      Q.  Okay.  And correct me if I'm wrong, but this

14 was intended to -- for you to provide your thought

15 process on January 5th.

16      A.  Yes.

17      Q.  Okay.  Prior to providing this statement or

18 speaking to Jackie in which she requested that you

19 provide this statement, had you been made aware of any

20 decisions the company was going to make or had made with

21 respect to your employment?

22      A.  No.

23      Q.  And at the time you provided this statement,

24 you don't know one way or another whether or not a

25 decision had already been made, right?

1    A.   Correct.

2    Q.   In this statement, again, you admitted to

3    altering the form, the election of benefits form for WC,

4    correct?

5    A.   Yes.

6    Q.   In this statement, you claim that you, quote,

7    do not recall going over the dos and don'ts of the EOB,

8    end quote, correct?

9    A.   Correct.

10   Q.   We've established today that you have no reason

11   to dispute that you did, in fact, have elections of

12   benefits training just a few months prior, though,

13   correct?

14   A.   Correct.

15   Q.   In this email, you also tell Jackie that you

16   were diagnosed with MS, correct?

17   A.   Correct.

18   Q.   Prior to this email, had you informed

19   Ms. Williams of your diagnosis?

20   A.   No.

21   Q.   And as you sit here today, are you aware of

22   whether or not Ms. Williams relayed that information to

23   anyone?

24   A.   Not that I'm aware.

25   Q.   So in terms of current employees as of --

1    current Amedisys employees as of January 22nd, the only

2    people that knew you had MS were Jackie, Thang,

3    Nicole Rome and Kellie Brady, insofar as you're aware?

4         A.  Yes.

5         Q.  Okay.  Up until January 22nd, anything else

6    happen in that time frame that you want to add, clarify

7    or discuss?

8         A.  Not that I can think of at the moment.

9         Q.  Okay.  After you provided the statement on

10   January 22nd, as reflected in Exhibit 16, when was the

11   next time you communicated with anyone from Amedisys?

12        A.  That I can recall, I believe it was the 27th or

13   the 28th, the day that she asked me to come to the

14   office.

15        Q.  Okay.  And that would have been the date that

16   you were notified of --

17        A.  Yes.

18        Q.  -- your termination?

19        A.  I apologize.  Yes.

20        Q.  You've done well.  Okay.

21            So when you were asked to come to the

22   office, I think we established earlier that was

23   January 28th of 2021.  Does that sound right?

24        A.  Yes.  It's on one of the documents that I

25   signed.  I think it was the 28th.

1    Q.   The termination form?

2    A.   Yes.

3    Q.   Who was present for that meeting?

4    A.   In person, it was just me and Jackie, and Gary

5    was on Teams, or on the phone call.

6    Q.   Could you see him or --

7    A.   No.

8    Q.   You said phone call, so you could --

9    A.   Just like a --

10   Q.   -- hear him?

11   A.   Yes, I could hear him.

12   Q.   I know you know where I'm going.  Just try to

13   hold off before you interrupt me.  Okay?

14           Can you tell me what you recall was said

15   during that meeting?

16   A.   Not word for word.  I just know it was about

17   the paperwork, so --

18   Q.   But you were told at that point that the

19   company had decided to terminate you, correct?

20   A.   Yes.

21   Q.   And you were told that it was because you had

22   altered the election of benefits form for WC, correct?

23   A.   Yes, yes.

24   Q.   Prior to that date, had you consulted with any

25   attorneys?

1      A.  No.

2      Q.  Prior to that date, had you researched how to

3  file a charge or go to the EEOC, for example?

4      A.  I don't recall.

5      Q.  Okay.  Do you recall saying anything in

6  response to the company telling you at that meeting that

7  your employment was going to be terminated?

8      A.  Say that again.

9      Q.  Sure.  Do you recall saying anything during the

10  meeting in which you were informed that the company was

11  going to terminate your employment?

12      A.  What do you mean?  Did I say something, like --

13      Q.  Yeah.  They told you they were firing you?

14      A.  Yeah.

15      Q.  What did you say?

16      A.  Oh, I don't recall.

17      Q.  Okay.  I assume that after that, you gathered

18  your things and that was it?

19      A.  Yes.  Well, I made a copy of the form that I

20  signed so they could have a copy of my point of view.

21      Q.  Okay.  So let's back up.  At the meeting, you

22  were presented with a termination form, correct?

23      A.  Yes.

24      Q.  Did anyone walk through that form with you?

25      A.  Jackie.

1    Q.  All right.  I'm showing you what I've

2   previously marked as Exhibit Number 17.  Copy to your

3   lawyer.  Do you recognize this document?

4    A.  Yes.

5    Q.  And is this the termination document that you

6   were presented on January 28th of 2021?

7    A.  Yes.

8    Q.  The part that is in blue above the signature

9   lines, that's completed in your handwriting, correct?

10    A.  Correct.

11    Q.  And the signature on the bottom left portion of

12   this is your signature, correct?

13    A.  Correct.

14    Q.  And you dated this January 28th of 2021, which

15   was the date you were presented with it?

16    A.  Correct.

17    Q.  Okay.  On the first line here, you had written,

18   "This was not backdating.  The date was the" --

19    A.  "Same."

20    Q.  -- "same date.  The nurse" --

21    A.  I don't even know what I wrote.

22    Q.  "And" -- do you know that word?

23    A.  Oh, "and failed to enter."

24    Q.  Okay.  You had completed the election of

25   benefits form for WC on January 5th, right?

1     A.  I entered in the two pieces of information that

2  was missing, yes.

3     Q.  Okay.  And you had indicated that the date in

4  which the nurse had seen the patient was December 31st,

5  correct?

6     A.  Correct.

7     Q.  Which was six days prior to the date that you

8  had changed the form?

9     A.  Correct.

10    Q.  Okay.  The second handwritten portion, which

11  you've marked with an asterisk, can you read that slowly

12  for us?

13    A.  "Email was sent asking for me to take action."

14    Q.  Okay.  What email are you referring to?

15    A.  Exhibit 15.

16    Q.  Okay.  Where in Exhibit 15 does it tell you to

17  take action?

18    A.  Page 5, from Tina Kolb, it says, "The records

19  had been placed on manual bill hold.  Please locate" --

20         THE REPORTER:  Okay.  Start over and slow

21  down.

22         THE WITNESS:  Oh, I'm sorry.

23    A.  On Page 5, Exhibit 15, the bottom, from Tina

24  Kolb, Monday, January 4, 2021, 9:01 a.m.  The email

25  states, "These records have been placed on manual bill

1    hold.  Please locate and upload the election of benefits

2    and informed consent paperwork for WC."  And then it

3    says, "Please advise when the admission variance is

4    addressed."

5                  Then I responded -- well, I uploaded the

6    forms.  And, then, on Page 4, from Tina Kolb, "Good

7    morning.  The EOB, slash, consent forms were uploaded

8    this morning.  However, the manual bill hold remains in

9    place for the following EOB.  Attending physician area

10   is incomplete.  Unknown if the patient caregiver is

11   election, their own attending or not."

12                  "Number 2, EOB start of care date is not

13   entered.  Please review, confirm and advise me when

14   these variances are addressed."

15       Q.  (BY MR. KECK)  So where in those two emails

16   does Tina or anyone else tell you to take action?

17       A.  That was my understanding.

18       Q.  Okay.  What action were you -- did you

19   understand you were being instructed to take?

20       A.  The start of care date, which was

21   December 31st, and the physician.

22       Q.  Uh-huh.  Well, she asked you to review, confirm

23   and advise her when the variances are addressed?

24       A.  Uh-huh.

25       Q.  Right?

1     A.  Uh-huh.  That was my interpretation.

2     Q.  Just bear with me.  She tells you to review,

3 confirm and advise her when the variants are addressed,

4 correct?

5     A.  Correct.

6     Q.  Nowhere in here does she say alter the election

7 of benefits form, does she?

8     A.  That was not her words, correct.

9     Q.  Nowhere on here does she say to fill in missing

10 information on the election of benefits form, correct?

11     A.  Correct.

12     Q.  Okay.  So she wants the variances addressed,

13 but there's nowhere on here in which she indicates

14 essentially how to do that, right?

15     A.  Correct.

16     Q.  Okay.  The final handwritten portion on

17 Exhibit 17, can you read that to us slowly?

18     A.  "After having a conversation with Tina Kolb

19 that what I did was wrong, dot, dot, dot, not before."

20     Q.  Okay.  And that's what you talked about

21 earlier, right?

22     A.  Correct.

23     Q.  Okay.  After you wrote those responses or

24 rebuttals on Exhibit 17, you were given a copy, and that

25 was the end of the conversation?

1     A.  Yes.

2     Q.  Okay.  After that date, did you have any

3 discussions with anyone from Amedisys at all?

4     A.  Not that I can recall.

5     Q.  Up until January 28, 2021, when you signed this

6 document, have you told us everything insofar as you're

7 aware that refers or relates to your lawsuit?

8     A.  Yes.

9     Q.  Okay.  Just a couple more.  Some of these are

10 going to go quickly.

11           All right.  I'm showing you what has been

12 marked as Exhibit 24, which is the complaint filed on

13 your behalf in this case.  Just a few questions, the

14 first being, have you seen this document before?

15     A.  Yes.

16     Q.  Okay.  Do you recall whether or not you

17 reviewed it before it was filed?

18     A.  Yes.

19     Q.  And at that time and to the present, insofar as

20 you're aware, everything contained in Exhibit 24 is true

21 and accurate?

22     A.  Yes.

23     Q.  My first question is on Paragraph 4.24 of this

24 document, which appears on Page 5 --

25     A.  Okay.

1     Q.  And I'm paraphrasing here, but you were advised

2  by someone to file a compliance complaint that resulted

3  in another employee being terminated?

4     A.  Yes.

5     Q.  And as I understand it, that employee was

6  alleged or thought to have altered documents?

7     A.  Yes.

8     Q.  Okay.  Who was that employee?

9     A.  Cheri.

10     Q.  Cheri was the employee that was terminated?

11     A.  Yes.

12     Q.  Are you aware of any medical conditions that

13  Cheri has?

14     A.  Not that I'm aware of.

15     Q.  As you sit here today, do you know who made the

16  decision to terminate your employment?

17     A.  No.

18     Q.  And you told us earlier, correct, that you

19  don't know who was even involved with the investigation?

20     A.  Correct.

21     Q.  I am showing you what I have marked as

22  Exhibit 19.  Providing a copy to your counsel.

23           Ms. Jenkins, I will represent to you that

24  this is the charge of discrimination that I believe you

25  filed in this case.  Do you recognize this document?

1    A.  Yes.

2    Q.  And according to this document which we

3  obtained from the EEOC, you digitally signed this

4  document on March 5th of 2021.  Is that correct?

5    A.  Correct.

6    Q.  Using that date as a benchmark, does that help

7  or does that somehow indicate to you on when you would

8  have first reached out to the EEOC?

9    A.  No.  I think -- well, it was way before March.

10  I will say that.

11    Q.  Okay.

12    A.  Because I had to, like, do it online, and then

13  you had to wait for an opening.  You have to wait and

14  wait and wait until you get an appointment.  So it was

15  before this date of me reaching out to them.

16        Exact date, I don't know, but it was before

17  March, sometime between January and February.  I just

18  don't know.  But by the time I actually got an

19  appointment with them and was able to speak with someone

20  and actually get this written up, then this is -- yes,

21  this is March.

22    Q.  Understood.  Okay.  Do you have any

23  communications with the EEOC prior to this March 5, 2021

24  date?

25    A.  I don't.

1     Q.  Is that how they would have communicated with

2  you to set that appointment?

3     A.  Is what how they would have communicated?

4     Q.  The email.

5     A.  I don't recall that.  I don't recall.

6     Q.  Okay.  All right.  I'm not probably as familiar

7  with the charge filing process as your attorney is, but

8  do they send you a draft of this before you sign it?

9     A.  This?

10     Q.  Yes.

11     A.  Yes.

12     Q.  Okay.  And that happened on this case, and you

13  reviewed it and signed it?

14     A.  Yes.

15     Q.  Okay.  And you signed that under the penalty of

16  perjury, correct?

17     A.  Yes.

18     Q.  Okay.  In this charge, you -- and about halfway

19  through, if you look at it, you checked the box for

20  disability, correct?

21     A.  Correct.

22     Q.  Okay.  And you were intending to assert a claim

23  for disability discrimination.  Is that correct?

24     A.  Correct.

25     Q.  Okay.  And that disability relates to the MS?

1      A.   Correct.

2      Q.   Okay.  You would agree that nowhere on this

3  document is there any reference to the termination of

4  your employment, right?

5      A.   Correct.

6      Q.   Rather, what this document refers to is the

7  decision to not allow you to work from home that we

8  talked about earlier today, correct?

9      A.   Correct.

10     Q.   Okay.  As of March 5, 2021, when you digitally

11  signed this charge, you had already been terminated by

12  that point, correct?

13     A.   Correct.

14     Q.   Okay.  And this is the only charge that you

15  filed, right?

16     A.   Correct.

17     Q.   Okay.  When you filed that charge, did you have

18  an attorney?

19     A.   No.

20     Q.   I lost my train of thought.

21     A.   Welcome to my world.

22     Q.   My wife says that happens all the time.  She

23  told me a story the other day -- this is completely

24  irrelevant, but she told me a story the other day

25  that -- she's like, you know, I understand that you work

1    for our family, but you wouldn't be able to get to work

2    if I didn't know where your keys were.  That's true.

3              Okay.  We talked earlier about what

4    benefits you may have received at Amedisys, but again, I

5    want to make sure.  You don't recall what those were,

6    what the value were, what they entailed?

7    A.  I don't.

8    Q.  Okay.  Have you ever been convicted of any

9    felonies?

10   A.  No.

11   Q.  Couple of names that I want to talk about.

12   Does the name Kenneth Hunter ring a bell to you?

13   A.  No.

14   Q.  Do you maintain any social media?

15   A.  Yes.

16   Q.  What do you have?

17   A.  LinkedIn and Twitter.

18   Q.  Okay.  Are you active on either of those?

19   A.  Yes.

20   Q.  Have you posted anything about MS on either of

21   those?

22   A.  Not that I can recall.

23   Q.  Okay.  Have you posted anything related to

24   Amedisys on there?

25   A.  No.

1      Q.  When you were applying to become a teacher,

2    were you asked about why your employment with Amedisys

3    ended?

4      A.  Not that I can recall.

5      Q.  At any point from the end of November of 2020,

6    apart from what you've told us with respect to the

7    antidepressant that was prescribed, but have you seen

8    any physicians, counselors, members of clergy or anyone

9    to discuss any of the events that occurred at Amedisys

10   or any of the intended effects that it caused on you?

11     A.  Say that again.

12     Q.  That was a really bad question.

13         Let's go back.  You had told me earlier

14   that you were prescribed an antidepressant?

15     A.  Uh-huh, yes.

16     Q.  Who prescribed that?

17     A.  It was a nurse practitioner, Dolly Barton.  I

18   can't remember her last name.

19     Q.  Dolly, D-o-l-l-y?

20     A.  Yes.

21     Q.  And what was the last name?

22     A.  I can't recall.  It's with a B.  I can't

23   recall.

24     Q.  I'll call her Dolly.  Does Dolly have a

25   specialty?

1    A.  Not that I'm aware of.

2    Q.  Had you seen Dolly before for anything?

3    A.  Not that I can recall.

4    Q.  How did you find Dolly?

5    A.  Through my hospital network that I would go

6  through.

7    Q.  Okay.  Was Dolly someone that you saw on a

8  continuing basis after she prescribed the

9  antidepressant?

10    A.  I can't recall specifically.

11    Q.  Is Dolly still the prescriber of the

12  antidepressant?

13    A.  No.

14    Q.  Who is now?

15    A.  I just had an ongoing prescription.

16    Q.  Well, at some point, I imagine you're going to

17  run out of refills, right?

18    A.  Yes.

19    Q.  Have you done that yet?

20    A.  No.

21    Q.  Okay.  So the initial prescription was good for

22  three years?

23    A.  I don't think it's been three years.  Maybe it

24  has.  I don't know.  I guess.

25    Q.  Two and a half, I guess.  It was good for two

1    and a half years from the time it was prescribed until

2    the present?

3         A.   Uh-huh, yes.

4         Q.   I've got to visit Dolly.

5              Other than Dolly, have you seen any other

6    health care provider for any depression, anxiety or

7    other emotional issues?

8         A.   No.

9         Q.   When you met with Dolly, did you tell her what

10   you believed were the stressors that were causing you to

11   feel the way you were?

12        A.   I don't recall, but -- I mean, I told her

13   something.  I don't recall specifically what I said.

14        Q.   Do you remember discussing Amedisys at all with

15   Dolly?

16        A.   It's possible.

17        Q.   You don't remember one way or another?

18        A.   I don't remember.

19        Q.   The decision to not allow you to work from

20   home, did that impact you emotionally in any way?

21        A.   Yes, it did.

22        Q.   How?

23        A.   Emotionally, physically.  When I get stressed

24   out, it -- it bothers my body a lot, even now.  But a

25   lot of it is emotionally, like what am I going to do,

1 how am I going to continue on, what -- just what -- I

2 don't remember everything that was playing through my

3 mind, but, yeah, emotionally and physically.

4     Q.  Okay.  Anything else?  I don't want to cut you

5 off.

6     A.  I'm trying to think.  Yes, mentally as well,

7 just to try to be able to focus --

8     Q.  Yeah.

9     A.  -- to do my day-to-day.

10     Q.  Specifically the decision to not allow you to

11 work from home, though?

12     A.  Uh-huh.

13     Q.  Yeah?

14     A.  Yeah.

15     Q.  Okay.  Did that ever -- those feelings improve

16 over time?

17     A.  I don't know that -- I don't know that they

18 did.  I don't know because -- no, they did not improve

19 over time.

20     Q.  What were the -- you said emotional and

21 physical.  What were the physical symptoms that you

22 experienced as a result only of the decision not to

23 allow you to work from home?

24     A.  Increased issues with concentrating,

25 physical -- how can I describe it?  I'll say the stress

1    which caused the pain, which caused, like, these little

2    tics and twitches.  That's the best way that I can --

3         Q.  Okay.

4         A.  That's one of the best ways that I can possibly

5    describe that.

6              An increase in anxiety and depression.  So

7    that -- the MS is with sleep and fatigue.  And fatigue

8    is not the same thing as sleep when you talk about

9    someone with MS.  That's -- those are two different

10   things.

11        Q.  Right.  Did you suffer from a lack of sleep?

12        A.  Yes.

13        Q.  Anything else?

14        A.  Nothing that I can recall at the moment.

15        Q.  Did those symptoms and what you were

16   experiencing emotionally and physically change with the

17   decision to terminate your employment?

18        A.  No.

19        Q.  They remained?

20        A.  Yes.

21        Q.  Did they improve or get worse at any point?

22        A.  They did not get -- they did not improve.

23        Q.  Okay.

24        A.  Because I have to replay this.

25              Let me rephrase that.  I'm not going to say

1    I have to replay it.  I replay it in my mind, and it's

2    just emotionally.

3         Q.  And you were still, after the decision to

4    terminate your employment, experiencing depression and

5    anxiety?

6         A.  Yes.

7         Q.  If that's, in fact, the case, why didn't you go

8    back to Dolly or any other nurse practitioner or doctor

9    to say this isn't working?

10        A.  To say what's not working?

11        Q.  The medication.

12        A.  I mean, it -- I'm not going to say that it's

13   not working, but it's not going to -- it didn't

14   alleviate the symptoms altogether, if that's what you're

15   asking about the medicine.  Like alleviated symptoms

16   altogether --

17        Q.  Uh-huh.

18        A.  -- no.

19        Q.  Did the medicine improve them?

20        A.  To an extent, but they're still there.  It was

21   still there.

22        Q.  I guess I'll go back to my question.  Is there

23   a reason why you haven't gone back to Dolly or any other

24   health care provider to say, I'm still having these

25   symptoms, albeit in whatever form they're in?

1     A.  I mean, I have an appointment coming up, but

2  that's not -- that wasn't the question like you asked

3  past, but I have one coming up.

4     Q.  For that purpose?

5     A.  And others, but, yes, for that.  That is

6  definitely on the radar.

7     Q.  Okay.  So putting that appointment aside, is

8  there a reason why, in the last two and a half years,

9  you haven't done that?

10     A.  No, no reason.

11     Q.  And you had indicated, I think, prior to

12  Asana Hospice, that you had at times in your life been

13  on antidepressants?

14     A.  Uh-huh, yes.

15     Q.  And antianxiety medicine?

16     A.  Yes.

17     Q.  From the time that you became employed with

18  Amedisys until the present, other than what I'm sure is

19  stress related to MS, have you had any other major

20  medical issues?

21     A.  No.

22     Q.  Any other major stressors in your life during

23  that time period?

24     A.  During what time period?

25     Q.  From the time you became employed with Amedisys

 1  until today.

 2      A.  Just aside from losing my job and just dealing

 3  with, you know, the repercussions of that.  But, no.

 4      Q.  In other words, no marital issues, no deaths in

 5  the family, things like that?

 6      A.  We have marital issues due to me not -- you

 7  know, losing my job, but that's -- that's it.

 8      Q.  Any other stressors?

 9      A.  No.

10      Q.  Other than the text messages that you provided

11  in this case, have you exchanged or did you possess any

12  text messages with any other Amedisys employees?

13      A.  No.

14      Q.  Have you spoken to any Amedisys employees since

15  your employment with Amedisys ended?

16      A.  Amedisys employees, no.

17      Q.  Anyone that you worked with while at Amedisys?

18      A.  Yes.

19      Q.  Who?

20      A.  They're listed.  Jakeena Sweet, Erica Dockins,

21  Lori Elliott, Pamela Brown.  Of course, CJ -- or

22  Carol Hardwick and Dot -- Dorothy Sherrod, Jamie Graves.

23  I think that is it.

24      Q.  You've spoken to all those people since your

25  employment with Amedisys ended?

1     A.  Yes.

2          MR. KECK:  Can you read those to me again?

3          (Requested text read)

4     A.  And Jessie Lopez.

5     Q.  (BY MR. KECK)  Have you discussed this case

6 with any of those individuals?

7     A.  Yes.

8     Q.  Which ones?

9     A.  All of them.

10    Q.  What have you discussed -- is it Sweet?

11    A.  Yes.

12    Q.  -- with Ms. Sweet?

13    A.  That they would be contacted at the time by

14 EEOC in regards to, like, work from home and our

15 schedule and, you know, all those -- those things.

16        <u>So each one of them were a part of that</u>

17 <u>rotating schedule, work from home.</u>  <u>They were all there.</u>

18 And so that was the conversation of letting them know

19 that they could be contacted by EEOC.

20    Q.  And other than the rotational schedule, does

21 Ms. Sweet have any other information or knowledge

22 related to any of your claims?

23    A.  Not that I can recall.

24    Q.  Okay.  Ms. Dockins, who is she?

25    A.  She was the -- she was, like, a chaplain and

1    bereavement coordinator.

2         Q.  Same types of conversations with her?

3         A.  Same.

4         Q.  Okay.  And other than her knowledge relating to

5    the rotational schedule, did she have any other

6    information related to your lawsuit or your claims?

7         A.  No.  I'm sorry.  That's going to be the same

8    for all of them that --

9         Q.  Right.  Not CJ, right?

10        A.  Well, not -- not -- well, she would know a

11   little bit more, only because she knew about the MS.

12   You know, we had that conversation prior, but --

13        Q.  She knew what she knew prior to her leaving

14   Amedisys?

15        A.  Correct.

16        Q.  But she was gone long before the rotational

17   schedule was put in place, or at least until it was

18   taken away, I should say?

19        A.  Yes.  Right before, yes.

20        Q.  Okay.  Ms. Elliott, same thing?

21        A.  Yes.

22        Q.  Ms. Brown, same thing?

23        A.  Correct.

24        Q.  Ms. Graves?

25        A.  Yes.

1     Q.   And Ms. Lopez?

2     A.   Yes.

3     Q.   Apart from what we've already talked about with

4  Ms. Lopez otherwise today?

5     A.   Correct, yes.

6     Q.   And then also with Dot Sherrod, apart from

7  what we've otherwise talked about today?

8     A.   Yes.  And the Eva, Evangeline Ozurigbo.

9     Q.   What was her position?

10     A.   She was the clinical manager.

11     Q.   Okay.  That's good.  Have you discussed with

12  any of those individuals an election of benefits form?

13     A.   Not that I can recall.

14     Q.   Were any of those -- all those individuals were

15  at one point or another employed at the Fort Worth care

16  center?

17     A.   Except for Jessie.

18     Q.   Jessie?

19     A.   Jessie worked at the Dallas care center,

20  correct, but, yes, correct, everyone else.

21     Q.   And we talked about those earlier?

22     A.   Correct.

23          MR. KECK:  Okay.  Let's take five minutes.

24  I think I'm almost done.  Okay?  Let's go off the

25  record.

1          (A recess was taken.)

2          THE REPORTER:  Go ahead.

3          MR. KECK:  Okay.  Let's go back on the

4    record.

5     Q.  (BY MR. KECK)  Ms. Jenkins, you understand that

6    you're still under oath?

7     A.  Yes.

8     Q.  Okay.  The antidepressants that we've been

9    referring to, are you taking those in -- do you take

10   those regularly?

11    A.  I was.

12    Q.  Okay.  When did you stop?

13    A.  December of last year.  Wait a minute.  This is

14   2023.  January -- I was trying to -- I slowed down

15   taking them January 2022.  I still have them.

16    Q.  Right.  So that helps me understand.  Why did

17   you stop taking them?

18    A.  Just how I was feeling.  At that time, by that

19   time, I felt like I was doing a little bit better, but I

20   started back taking them.

21    Q.  When did you start back taking them?

22    A.  What month is this?  We're in February.

23   Probably around September, October of last year.  This

24   is '23, so '22.

25    Q.  Okay.  So you stopped taking antidepressants

1  for about nine or ten months?

2      A.  Yeah, about eight months.

3      Q.  And you said you stopped taking them because

4  you were feeling better?

5      A.  I started to feel a little -- at least I

6  thought I did, yeah.

7      Q.  Did you stop taking those upon the advice of a

8  medical provider?

9      A.  No.

10     Q.  You just made that decision and stopped?

11     A.  I did.

12     Q.  Okay.  And I assume the converse is true;

13  you've made the decision on your own to restart them?

14     A.  To restart them, but I'm going -- I have an

15  appointment to see my doctor to talk about that.

16     Q.  When you stopped taking them in January of

17  2022 -- and I assume this is true, but when you say you

18  were feeling better, it's because the depression and

19  anxiety had improved by that point?

20     A.  Thought it did, yes.

21     Q.  Okay.  And is it possible that it could have

22  improved because the medication you were taking was

23  working?

24     A.  Could be, yeah.

25     Q.  Because it got worse after you stopped, right?

1      A.  Little bit, yeah.

2      Q.  Okay.  The other question I have for you is,

3   prior to Asana Hospice, the employers that you worked

4   for from that point back to 2011 when you were diagnosed

5   with MS, were any of those positions remote?

6      A.  No, not -- not remote.

7      Q.  You were in the office, in other words?

8      A.  Yes, part-time for some of them.  And the job

9   prior -- right prior to Asana, which was Kindred

10  Hospice, it was the same position, so I was in and out.

11  I wasn't in the office, like, every day.

12     Q.  When you weren't in the office, what were you

13  doing?

14     A.  I would either work from home or be out in the

15  field.

16     Q.  Okay.  What would you do in the situations

17  where you were out in the field and had to use the

18  restroom?

19     A.  I can go home or -- I mean, like, if I just had

20  to, I mean, like, stop and use the bathroom?

21     Q.  Uh-huh.

22     A.  I mean, I knew where I could stop and use a

23  public bathroom.  It's not the ideal place, but --

24     Q.  Right.  I guess what I'm trying to understand

25  is one of the issues that you identified earlier was

1  this bathroom -- proximity to the bathroom, right?

2      A.  Yes.

3      Q.  And I guess my question was, I'm just trying to

4  reconcile that with your previous employers and how you

5  were able to perform those jobs when you didn't have

6  access to a bathroom.  Clearly, driving home, no matter

7  where you're at, is going to take longer than walking

8  down the hall.

9      A.  Right.  I mean, if I have to, I'll just have an

10 accident on myself.  Then I would have to clean up.

11     Q.  Okay.

12     A.  That's -- you know, yes, if my body goes and I

13 have to use the bathroom, I have to use the bathroom.  I

14 can't control that.

15     Q.  Right.

16     A.  And how can I explain it?  It's -- those issues

17 have gotten worse.  Let me put it like that.  They've

18 gotten worse over time and not better.

19     Q.  Okay.  When did they get worse?

20     A.  Probably starting 2016, 2017.

21     Q.  That's when they started to get worse?

22     A.  Uh-huh.  Like the frequency.

23     Q.  Is that a yes?

24     A.  Yes.

25     Q.  Were they worse, better or the same in 2017

1    when compared to November of 2020?

2         A.   Was it worse in 2017?  Is that what you're

3    saying?

4         Q.   Is it worse, better or the same?

5         A.   In 2017 is when you're asking?

6         Q.   Correct.

7         A.   Compared to 2020?  It would be better in 2017

8    versus 2020, yes.

9         Q.   Okay.  Other than what we've talked about

10   today, is there anything else that you want to add,

11   clarify, discuss that you don't think we talked about

12   that you believe is important?

13        A.   Not that I can think of.

14        Q.   Okay.  Do you believe that I've been fair with

15   you today and haven't tried to trick you, for example?

16        A.   Yes.

17             MR. KECK:  Okay.  The only thing that I'll

18   say before I rest here is that we'll reserve the right

19   to recall you to testify only on the fact that we

20   received discovery yesterday that indicated several

21   responses would, in fact, be supplemented.  So I don't

22   know what that entails, but depending on what that is,

23   we'll reserve that right.  So with that, I don't have

24   any further questions.

25             MR. MASTERSON:  We'll reserve questions

1  until time of trial.

2              THE REPORTER:  Okay.  Off the record.

3              (End of proceedings at 3:28 p.m.)

4              (According to Federal Rule 30(e)(1), the

5               deponent or party must request to read

6               and sign before the deposition is

7               completed.  No request was made, so

8               signature is considered waived for this

9               transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS   X

2    COUNTY OF DALLAS X

3

4        I, LISA M. DURHAM, Certified Shorthand Reporter

5    duly commissioned and qualified in and for the State of

6    Texas, do hereby certify that there came before me on

7    February 9, 2023, at the offices of Kilgore & Kilgore,

8    PLLC, located at 3141 Hood Street, Suite 500, in the

9    City of Dallas, County of Dallas, and State of Texas,

10   the following named person, to wit:  TIEL ARMON JENKINS,

11   who was duly sworn to testify the truth, the whole truth

12   and nothing but the truth of her knowledge touching and

13   concerning the matters in controversy in this cause;

14   that she was thereupon examined upon her oath and her

15   examination reduced to typewriting under my supervision;

16   that the deposition is a true record of the testimony

17   given by the witness and that signature of the witness,

18   pursuant to Federal Rules of Civil Procedure Rule

19   30(e)(1)(A) and (B), as well as Rule 30(e)(2):

20        _____ was requested by the deponent and/or a party

21   before completion of the deposition.

22        XXXXXX was not requested by the deponent and/or a

23   party before the completion of the deposition;

24

25

1      And that the amount of time used by each party at
2  the deposition is as follows:
3      MR. KECK: 03:34:22
       MR. MASTERSON: 00:00:00
4

5      I further certify that I am neither attorney for,
6  nor related to or employed by, any of the parties to the
7  action in which this deposition is taken, and further
8  that I am not a relative or employee of any attorney or
9  counsel employed by the parties hereto or financially
10 interested in the action.
11     Given under my hand and seal of office on this the
12 16th day of February, A.D., 2023.
13

14

15

16

17                   Lisa M. Durham, Texas CSR #6651
                     Veritext Legal Solutions
18                   Firm Registration #571
                     300 Throckmorton Street
19                   Suite 1600
                     Fort Worth, Texas  76102
20                   (817) 336-3042
                     Expiration Date:  01/31/24
21

22

23

24

25



# POLICY MANUAL

**THIS POLICY MANUAL IS NOT A CONTRACT, EITHER EXPRESS OR I

EXHIBIT
A-1

**SECTION 1: EMPLOYMENT** .......................................3

1.1 Corporate Compliance..................................3
1.2 Employee Education about False Claims Recovery Introduction..................................4
1.3 Code of Ethical Business Conduct................6
1.4 Equal Employment Opportunity and Affirmative Action ...................................7
1.5 Harassment.........................................8
1.6 Individuals with Disabilities.........................9
1.7 Requests for Disability or Religious Accommodation.....................................9
1.8 Job Posting/Transfers ................................10
1.9 At-Will Employment ...................................10
1.10 Moonlighting/Outside Employment...........10
1.11 Continuous Service ......................................11
1.12 Employment of Relatives and Anti-Fraternization ........................................11
1.13 Rules of Conduct...........................................12
1.14 Critical Offense Violations............................12
1.15 Corrective Action Process..............................13
1.16 SEPARATION of Employment.....................15
1.17 Eligibility for Rehire ...................................16
1.18 Termination Appeal Process Compliant .....16
1.19 Attendance ....................................................16
1.20 Maintaining Professional Licensure and Reporting Disciplinary Actions ...................17
1.21 Reporting Arrest, Sanctions and debarment ......................................................................17
1.22 Timekeeping Policy ......................................18
1.23 Lunch/Rest Periods.....................................19
1.24 Criminal Background Check & Exclusion Check Policy ..................................................19
1.25 Office of Inspector General  and System for Award Management Checks.......................21

**SECTION 2: TIME OFF, LEAVES OF ABSENCE, FAMILY AND EDUCATION ASSISTANCE.................21**

2.1 Paid Time Off ("PTO")................................21
2.2 Holidays.........................................................21
2.3 Family and Medical Leave Act ("FMLA") ...22
2.4 General Leave of Absence.............................25
2.5 Benefits coverage for leaves ofABSENCE ........25
2.6 Military Leave of Absence ............................26
2.7 TIME OFF FOR Bereavement......................26
2.8 TIME OFF for Jury Duty .............................27
2.9 TIME OFF FOR Voting................................27
2.10 Disaster Pay...................................................27

2.11 Employee Assistance Program ("EAP") .......27
.12 Tuition Reimbursement/ Educational Assistance.......................................................27

**SECTION 3: INFORMATION SECURITY.................28**

3.1 Information Security....................................28
3.2 Information Security Policy.........................28
3.3 HIPAA Privacy Policy ..................................29
3.4 Confidential Information..............................29

**SECTION 4: GENERAL POLICIES ........................30**

4.1 Social Media Policy ...................................... 30
4.2 Taping of Meetings and Conversations .......32
4.3 Internal Communications.............................33
4.4 Law Enforcement and Government Agencies ......................................................................33
4.5 Visitors ..........................................................33
4.6 Solicitation/distribution rules ....................33
4.7 Dress Code ....................................................33
4.8 SMOKE FREE Workplace Policy.................34
4.9 Expense Reimbursement Policies and Guidelines ......................................................34
4.10 Drug-Free Workplace ...................................34
4.11 Safety and Workers' Compensation ............35
4.12 Senior Executive Travel Policy ....................36
4.13 Payroll Deadline Policy ................................36
4.14 Travel and Expense Policy ...........................42

**STATE SPECIFIC** ......................................................43

**ACKNOWLEDGEMENT OF THE AMEDISYS POLICY MANUAL.................................................. 44**

**App. 163**

with the Amedisys Corporate Compliance Plan (which is available in electronic format at each location, and on the Company's intranet website at

Compliance Support Center

Compliance Plan

Compliance Code of Conduct

It is important to note that violating the law could subject Amedisys and the individuals involved to civil and/or criminal proceedings, regulatory action and private lawsuits. Further, any director, officer or employee who violates the policies and guidelines in the Code will be subject to disciplinary action, up to and including termination of employment or removal as a director and may be personally liable to the Company and/or its shareholders and/or third parties (including but not limited to the federal and state government).

The Company has established audit procedures to detect illegal practices. However, if you become aware of an ethical or legal violation, including violation of the policies in the Code, you have an obligation to report it to the Company's Chief Compliance Officer or to the Company's Compliance Hotline (1.800.464.0020).

## 1.4 EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION

It is the policy of Amedisys not to discriminate or allow the harassment of employees or applicants on the basis of sex, gender identity, sexual orientation, race, color, religious creed, national origin, physical or mental disability, protected veteran status, or any other characteristic protected by law. This prohibition applies to all employment practices, including recruitment, job application, hiring, training, promotion, transfer, compensation, job assignments, benefits, discipline, demotion, termination and/or any other terms and conditions of employment. This policy applies to all jobs at the Company, and throughout the duration of employment. It is our goal and our commitment to treat our employees, and our applicants for employment, equally without regard to any characteristics protected by law, and to make all of our employment decisions based solely on legitimate, job-related criteria. Employees who violate this policy by engaging in prohibited discrimination or harassment will be subject to disciplinary, up to and including termination.

**DISABILITY & RELIGIOUS ACCOMMODATIONS**

In addition to prohibiting discrimination and harassment, Amedisys is committed to and shall provide qualified employees with reasonable accommodations of their required religious observances and their physical or mental disabilities. Employees and applicants are encouraged to inform their supervisor, or their Employee Relations Consultant in Human Resources, if they need a reasonable accommodation to perform the essential functions of their job. Thereafter, Amedisys will engage in the good faith interactive process with the employee to determinate what, if any, reasonable accommodation can be provided to the employee without posing an undue burden on the Company. In the case of disability accommodations, consultation with the employee's medical provider may be required. Any related questions should be directed to Human Resources, specifically to the employee's Employee Relations Consultant.

**ANTI-RETALIATION**

Any employees who witnesses, is subject to, or in good faith believes this anti-discrimination policy has been violated is encouraged to report it to their supervisor, Human Resources, or any officer of the Company. Such reports will be investigated promptly, fairly, and as thoroughly and as confidentially as the circumstances warrant. Amedisys will take the corrective action necessary to resolve any potential violation of the policy, up to and including termination, and the Company will not tolerate discrimination in the workplace. Amedisys prohibits the taking of any adverse employment action against someone who makes or supports a good faith report that this policy has been violated, or who participates in the investigation thereof. Any violator of this anti-retaliation policy will be subject to disciplinary action, up to and including termination.

**AFFIRMATIVE ACTION**

Amedisys will solicit the cooperation and support of all employees for the Company's Affirmative Action Programs. Our Affirmative Action Programs include an audit and reporting system of our minority and veteran employment statistics, which, among other things, uses metrics and other information to measure the effectiveness of our Programs. The Affirmative Action Officer has been assigned responsibility for periodically reviewing progress in the compliance and implementation of affirmative action in accordance with applicable law. The Company's programs of affirmative action are available for inspection in the Human Resources Department, Monday through Friday, from 9:00

a.m. to 5:00 p.m. upon request. In addition, employees and applicants will not be subjected to harassment, intimidation, threats, coercion, or discrimination because they have engaged in, or may have engaged in, filing a complaint, assisting or participating in an investigation, compliance review or hearing, or other activity related to the administration of this policy or Amedisys's Affirmative Action Programs.

Amedisys is committed to providing a welcoming, safe and professional workplace for all employees that is free from all forms of harassment. Harassment of any Company employee based on the employee's sex, gender identity, sexual orientation, race, color, religious creed, national origin, physical or mental disability, protected veteran status, or any other characteristic protected by law is strictly prohibited and will not be tolerated. Any violation of this policy will result in disciplinary action up to and including termination.

The law prohibits harassment when it rises to the level of a hostile work environment. A hostile work environment is defined as unwelcome conduct that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Our policy, however, prohibits all conduct that may constitute harassment, even if it does not yet rise to the level of a hostile work environment under the law. Such conduct undermines the integrity of the employment relationship, is inconsistent with our values, and impairs our organizational goals. All employees must be allowed to work in an environment free from unwelcome or offensive conduct that could be reasonably considered or could comprise unlawful harassment. Such prohibited conduct includes, but may not be limited to, offensive remarks, jokes, gestures, materials, and other conduct aimed at or targeting an employee's racial or religious identity, their sex, age, ethnicity, disability, or any other characteristic protected by law. Our employees must, and are therefore expected to, treat one another – as well as patients, and third parties – with respect and dignity. Anything less will not be tolerated.

Unwelcome harassment prohibited by Amedisys can also be sexual in nature, such as unsolicited or undesired sexual advances, comments or overtones. Requests or insinuations for sexual favors and quid pro quo harassment (i.e., when the satisfaction of sexual demands is made the condition of job benefits or continued employment or is used as the basis for employment decisions regarding the individual)) are strictly prohibited. Again, all Amedisys employees are expected to treat each other with respect and dignity. Sexual harassment, and all conduct that comprises it, is not allowed in our workplaces, and will result in disciplinary action, up to and including termination.

Employees who experience any form of harassment should report the offensive conduct immediately to their supervisor. If employees know of harassing behavior, they should likewise report the conduct immediately to their supervisor. If a reporting employee prefers not to discuss the matter with his/her supervisor – for any reason, but particularly if the supervisor is the alleged wrongdoer – the employee should report the matter directly to an Employee Relations Consultant in the Human Resources Department, or to any Executive Officer of the Company. An employee can also call the Amedisys Help Desk at 888-777-4312, option 1 for Human Resources, to file a complaint or the Compliance Hotline at 800-464-0020.

Amedisys will not take any adverse action against employees who make a good faith report of harassing conduct or who otherwise support the reported or participate in the investigation of the same. Neither will the Company tolerate those who treat employees adversely for that reason. When a complaint or report of harassment is received, it will be investigated promptly. Amedisys will conduct investigations of such conduct in a fair manner and be as thorough and as discreet as the circumstances allow.

This policy applies to all applicants and employees and prohibits harassment, discrimination and retaliation whether engaged in by employees, a supervisor or manager, or even by someone not directly connected to Amedisys (e.g., an outside vendor or consultant). Conduct prohibited by this policy is not allowed at Company workplaces, properties, in any patient home, during any work-related travel or transit, and at any Company setting, function or social event.

Any questions regarding this policy should be directed to either the Human Resources Department or the Legal Department.

The Help Desk toll-free phone number is 888-777-4312, option 1 for Human Resources.

Amedisys is committed to providing equal opportunities in employment for qualified individuals with disabilities in accordance with all applicable provisions of the Americans with Disabilities Act ("ADA") and similar state and local laws. It is the Company's policy not to discriminate against any qualified employee or applicant with regard to any terms or conditions of employment because of such individual's disability, perceived disability, or a record of a disability. All employees, even those with a disability, must be able to safely and adequately perform the essential functions of their job with or without a reasonable accommodation. Consistent with this policy, Amedisys will provide reasonable accommodations to any qualified individual with a disability, who need such an accommodation in order to perform the essential functions of his or her job, provided that such accommodation does not pose an undue hardship on the Company.

## 1.7    REQUESTS FOR DISABILITY OR RELIGIOUS ACCOMMODATION

### DISABILITY

Qualified individuals with disabilities who may need an accommodation of their disability to perform the essential functions of their job may make a request for the same to their manager/supervisor or to an Employee Relations Consultant in the Human Resources Department. Upon receipt of such a request, the manager/supervisor and the Employee Relations Consultant will meet with the requesting individual to discuss and identify the precise limitations resulting from the disability, its negative impact upon or conflict with the individual's essential job functions, and the potential accommodation(s), if any that could alleviate those problems.

The Company will determine the feasibility, or reasonableness, of any potential accommodations considering various factors, including, but not limited to, the nature and cost of the accommodation, the facility's overall financial resources and organization, the impact of the accommodation on the requesting employee, and its impact on the operation of the Company and/or the facility where the employee works, including its impact on the work demands and burdens of other employees and on the Company's and/or the facility's ability to conduct business.

Employees are expected to fully cooperate in the accommodation process. The duty to cooperate includes making complete and sincere efforts to provide management with current medical information as needed for the Company to ascertain its obligations and the employee's rights. Employees who do not meaningfully or timely cooperate in the accommodation process will lose the potential for an accommodation, due to their failure to engage in the good faith interactive process.

Following the conclusion of the good faith, interactive process, the Company will communicate whether an accommodation of the employee's disability can be reasonably provided without posing an undue hardship. If so, it will be implemented as soon as practical. If not, the Company will communicate with the employee about their options and their continued employment with Amedisys going forward.

### RELIGION

Amedisys is also committed to and will reasonably accommodate the religious practices of its employees. The process for an accommodation of individual's religion are similar to disability: (1) the employee should request an accommodation (to either their supervisor or an ERC), identifying the conflict between their required religious observance(s) and the essential function(s) of their job; (2) the employee must engage in the good, faith interactive process with Amedisys to see what, if any, reasonable accommodation can alleviate that conflict without posing an undue burden on the company; and (3) Amedisys will make its determination regarding the same job can be done, communicate the outcome to the employee, and, if an accommodation can be made, the Company will implement it as soon as practical. Whether a requested accommodation can be provided will be determined based on the facts and circumstances of each particular case.

An employee or job applicant who has questions regarding this policy, or who would like to make an accommodation request, or who believes that there has been discrimination or denial of a reasonable accommodation in violation of this policy should notify an Employee Relations Consultant by calling the Amedisys Help Desk toll-free phone number: 888-777-4312, option 1 for Human Resources Employees can also contact the Compliance Line anonymously at 800-464-0020. All such inquiries or complaints will be treated as confidential to the extent practicable. No employee will be retaliated against for their good faith participation under this policy, or for seeking an accommodation hereunder,

in the terms and conditions of their employment. Violation of Amedisys anti-retaliation policy will result in disciplinary action, up to and including termination of employment.

Amedisys is committed to building careers, promoting from within and developing our own leaders. All employees are encouraged to apply for positions for which they qualify. Job openings may be posted on the Amedisys website. Job postings will contain the following information: A) job title, B) location of position, C) skills, education and experience required, and D) contact name and deadline for application. Job openings should be posted for a minimum five (5) days to allow any internal candidates that may be interested in the job to apply.

Any employee who wants to transfer to another position or the same position in another location is required to: be in good standing, apply for the position, meet the minimum requirements of the position and notify his or her current supervisor of their interest in applying for the position. As part of the transfer process, the hiring manager must conduct a reference check with the employee's current supervisor. As with all open positions, the candidate who best fits the needs of the position (whether internal or external) will be selected.

Promotions and transfers within the Company are based on merit and/or business necessity. For consideration for a promotion all employees must be in good standing. For leadership positions (AVP and above) an employee must successfully complete eighteen (18) months in their current role. For management positions (senior director, director, DOO, CM, Manager, etc.) an employee must successfully complete twelve (12) months in their current role before being eligible. For all other positions or for a transfer or job change, employees must successfully complete six (6) months in their current position. If there is a strong business circumstance that requires moving internal talent within a timeframe less than the policy requires, it will be evaluated and approved by SVP and Employee Relations Manager and/or VP Business Leadership Group to determine if an exception should be granted.

Your employment at Amedisys is for no definite duration. This simply means that you are free to choose to terminate your employment for any reason or for no reason at any time with or without notice; correspondingly the Company may terminate your employment at any time for any reason or no reason with or without notice. This manual is not meant to cover every situation or answer every question about your job, but it is meant to be a guide. This manual is not an employment contract, expressed or implied. The Company is flexible in the development, administration and application of its benefits, policies and procedures and may change or revise the benefits, policies and procedures with or without notice in its sole discretion.

This policy does not strictly prohibit all outside employment; however, positions with Amedisys require an employee's full effort and attention. Therefore, employment outside of Amedisys may be limited or excluded hereby.

All persons employed by the Company owe a duty of loyalty and fidelity to Amedisys. Employees shall at all times devote their full working time, attention, best efforts, and energies to the role they serve for the Company. No employee shall misappropriate, take or otherwise use confidential trade secrets or other proprietary information belonging to Amedisys (including but not limited to manuals, documents, handbooks, patient lists, software, and marketing collateral) except for the exclusive benefit of Amedisys, and employees shall be expected to treat such information with respect and confidence both during their employment and following the separation thereof.

Employees who hold outside employment at the time of their hire by Amedisys or who gain outside employment (including private or contractual) thereafter must notify their supervisor and gain SVP approval. These situations will be evaluated on a case-by-case basis to ensure that such employment does not: A) compromise an employee's ability to perform his/her job effectively and dutifully; B) create an actual or apparent conflict of interest; or C) compromise proprietary business information or cause any other adverse consequence to business operations. Amedisys may ask the employee to resign the outside employment or deny continued employment with Amedisys, if the result is undesirable to the Company.

Resources Department as soon as possible, but at latest within 30 days, after the development of a close personal relationship, and if necessary, you will be given an adequate amount of time to find other employment or separate from the Company. Any exception to the Employment of Relatives/Anti-Fraternization policy must be approved by the CEO and CHRO.

## 1.13   RULES OF CONDUCT

Rules of Conduct are intended to facilitate the safety, productivity, well-being, accountability, and quality of work for all our employees. The following non-exhaustive list contains examples of behavior that may result in corrective disciplinary action, including in some instances immediate separation from employment. Common sense, good judgment and professional behavior are expected of each Amedisys employee. Allegations of the occurrence of the below behavior will be reviewed and investigated by a member of management and/or the Employee Relations team. Thereafter a recommendation regarding the appropriate corrective action to be administered will be given, which will be consistent with Company policy, our Core Values, the employee's record of performance and behavior, and the nature of the infraction. The following list is not intended to be exhaustive, and employees may be subject to corrective disciplinary action for other reasons in addition to those set forth in this list.

1. Violation of the Company's motor vehicle safety policy;

2. For employees who drive as a requirement of their job, failure to properly report motor vehicle violations or accidents;

3. Failure to report arrests or other serious encounters with law enforcement;

4. Abandoning an employee's shift;

5. Allowing non-employees or unapproved volunteers to accompany staff to a patient visit without prior approval from Chief Privacy Officer. This includes, but is not limited to, such persons observing care, waiting in another room of a patient's residence, waiting in the clinician's vehicle outside the patient, client residence or dropping the employee off at the patient or client residence

6. Excessive tardiness, absenteeism or absence without proper notification

7. Sleeping on the job;

8. Insubordination to a supervisor or management

9. Unprofessionalism, behavior not in line with the Amedisys Core Beliefs, offensive behavior, or disrespectful treatment to coworkers, patients, their friends and/or families, or third parties while on the job or representing Amedisys;

10. Divulgence of protected health information, personally identifying information, or confidential information;

11. Sharing of computer security password or breach of computer security through unauthorized access;

12. Failure to follow Company or established professional protocols for quality patient care including inappropriate engagement with a patient or client's family member(s) or visitors;

13. Violation of Company email and/or Internet use, electronic communications or Social Media policy;

14. Unreasonable refusal to accept a patient assignment;

15. Unauthorized use of the name and/or records of the Company;

16. Failure to follow Amedisys written policies and procedures

17. Refusal to submit to search or to participate in an investigation of wrongdoing;

18. Violation of any applicable law or rule of professional conduct;

19. Accepting gifts, financial support or any object of material value in any form from a patient, client, visitor or family member;

20. Conduct that adversely impacts Amedisys' reputation among patients, referral sources or in the community; and

21. Failure to maintain proper credentials, licenses, etc. required for the job; and

22. Any Critical Offense Violation.

## 1.14   CRITICAL OFFENSE VIOLATIONS

The following is a non-exhaustive list of unacceptable behaviors that are considered critical offenses. These critical offenses will ordinarily result in immediate separation of employment. Employees who are separated as a result of a critical offense will

App. 168

be considered ineligible for rehire. Other offenses may be deemed critical as well and likewise result in the immediate separation of employment and ineligibility for rehire.

1. Committing, or assisting another in committing, healthcare fraud or abuse or having knowledge of the same and failing to report it appropriately;

2. Providing any intentionally false or misleading information in response to any officer of the Company, internal investigation or governmental inquiry;

3. Theft or destruction of Company, employee or patient property; or the knowledge of or witness to theft or destruction of the same and failing to appropriately notify your immediate supervisor;

4. Falsifying any Company document, including hours worked and visit documentation, the destruction of records without proper authorization, or falsifying (or neglecting) necessary professional licenses;

5. Reporting for work under the influence of alcohol, narcotics, illegal drugs or prescription medication without a prescription, subject to applicable law;

6. Possession or sale of illegal drugs or other controlled substances;

7. Fighting at work, making threatening statements, gestures, or physical contact at work, or any conduct that constitutes workplace violence;

8. Neglect or abuse of visitors, patients or fellow workers;

9. Harassment of any kind;

10. Conviction of a disqualifying felony;

11. Possession or use of firearms or weapons of any kind on Company premises or at Company sponsored events, or while in the presence of a patient or client, subject to state law;

12. Unsafe clinical practice(s);

13. Practicing outside the scope of one's job duties or license including providing medical "advice";

14. Inability to report to work due to incarceration for the conviction of a crime or other wrongful conduct;

15. Downloading, transmitting, or viewing pornography or other explicit materials on Company devices or while at work;

16. Exclusion to participate in government healthcare programs; and

17. Refusal to cooperate in a duly requested drug or alcohol test.

## 1.15 CORRECTIVE ACTION PROCESS

Amedisys expects that all employees conduct themselves in a safe, professional, respectful, and cooperative manner. These standards of behavior correlate with our Code and Rules of Conduct and are essential for providing optimal patient care, fostering a positive and productive work environment for all colleagues, and ensuring strong relationships with our referrals. Violation of these standards of behavior may initiate the corrective action process. Amedisys' corrective action process is meant to be a collaborative effort between the Company and its employees to improve employee performance and address misconduct. The corrective action process is designed to promote achievement of both Amedisys' organizational goals and the individual goals of our employees.

Amedisys corrective action process does not apply to contingent workforce. "Contingent workforce" include individuals contracted through staffing agencies who perform work on behalf of Amedisys as well as employees hired directly by Amedisys for limited terms. Offer letters for limited term employees will include an assignment end date. Amedisys may address performance issues of contingent workforce by ending the assignment or contract. If a limited term employee remains with Amedisys after the end dates indicated in her/her offer letter, s/he is no longer considered a contingent worker.

The Amedisys Corrective Action Process is designed to provide a fair, transparent and structured process, which gives employees the feedback they need to succeed, in order to:

• Address misconduct and/or inadequate performance;

• Prevent a recurrence of employee misconduct and/or inadequate performance; and

• Improve employee performance

# HSP BUSINESS OFFICE MANAGER

**Responsible to**
Director of Operations

**Directly Supervises and Evaluates**
All non-clinical administrative staff.

**Description**
Responsible for planning, directing and controlling the billing and office support functions. This position directs administrative services and operations for the care center including billing, purchasing, human resources, communications systems, space utilization, secretarial support and mail services. This position coordinates systems and procedures with medical records, data entry, claims review, and personnel functions to ensure efficient operations.

## JOB DUTIES/KNOWLEDGE (20%)

1. Supervises and provides directions to non-clinical administrative staff in an effort to ensure quality and continuity of services.

2. Ensures continuous coverage in all administrative areas through appropriate staffing assignments and workload distribution. Coordinates staff replacement as necessary.

3. Ensures appropriate orientation for all new staff.

4. Properly screens, interviews, and makes appropriate hiring decisions for non-clinical administrative staff.

5. May perform non-clinical staff performance appraisals/competency reviews as necessary and in compliance with agency policies and procedures.

6. Accountable for ensuring compliance with all new and current employee documentation required by Human Resources and regulatory agencies for maintaining employment within the organization including, but not limited to, I9 compliance, professional licensure, background checks and all other documents related to employment.

**Ensures efficient operation of the payroll function**

1. Ensures accurate and timely payroll and timekeeping processes.

2. Ensures compliance with the company's payroll and timekeeping policies contained in the employee handbook.

3. Ensures that all non-exempt employees (including such employees who are paid



EXHIBIT
A-2

on an hourly, salary or per visit basis) are accurately recording all time worked.

4. Reviews payroll timesheets and reimbursement requests to ensure integrity of information before submitting to the corporate payroll department by verifying agent logs with payroll timesheets.

5. Understands and ensures that any change to an employee's timesheet is approved by the employee.

6. Understands that managers and supervisors (including the BOM) are not authorized to alter wages or timesheets when an employee works unauthorized overtime, or if there is a dispute about the amount of hours worked, and that such concerns or disputes must immediately be reported to the HR Hotline (800.485.0633) for investigation and resolution, and no action should be taken by managers or supervisors without review and approval from HR.

7. Assures timely submission/transmission of payroll information.

8. Assists and answers questions from employees pertaining to payroll matters. Verifies salary for employees as necessary.

9. Initiates Payroll Exception Requests as needed on a minimal but timely basis.

**Promotes compliance with all fiscal intermediary and/or other third party payors, through education, coaching, and other assistance as necessary**

1. Maintains current knowledge of, and causes compliance with all federal, state and local regulations.

2. Ensures accurate and timely billing processes.

3. Assists Director and/or Administrator in maintaining required information for audits and licensure reviews including keeping policy and procedure books and personnel records up-to-date.

4. Works with Billing Reimbursement Department in conjunction with semi-monthly billing periods, as well as with bills held in prior billing periods.

5. Provides reports as requested related to billing such as census reports, absent data reports, revenue statistics, visit counts, patient calendars, and modified 486 forms for billing processes. Submits billing (Hold visits not billed) list and statistics to corporate billing department. Provides monthly, quarterly, and annual reports to the corporate billing department as requested.

6. Supervises, evaluates, and analyzes overall operations of medical records, data

**App. 171**

entry, and claims review by reviewing patient charts for compliance/accuracy with telephone orders/POCs frequencies ordered and checking patient information for absent data before submission.

7. Responsible for the completion of all billing adjustments through Care Center Director and AR/Billing department and maintains accurate record of all adjustments.

8. Ensures adjustments are made on a minimal, but timely basis.

9. Notifies Director as needed when documentation is delinquent from staff.

10. Ensures follow up on intermediary help letters, MMSP questionnaires and aging reports.

11. Maintains security and confidentiality with regard to patient and staff information.

**Performs various human resource functions in compliance with agency policies and procedures**

1. Initiates new hire paperwork, personnel status/salary change forms, benefits related materials and process per care center policies and procedures.

2. Maintains personnel records in accordance with care center policies and procedures.

3. Maintains personnel licensure tracking system and initiate notices for licensure renewals.

4. Assists with the processing of workers' compensation claims in coordination with Director and/or Compliance Coordinator.

5. Assists with application processing in coordination with Director and/or Administrator.

**Monitors systems, identifies problem areas, and develops and implements action plans as necessary**

1. Assesses, analyzes, and monitors administrative care center systems and procedures. Makes recommendations for improved systems and procedures and increased efficiency of operations.

2. Maintains an ongoing evaluation of space and equipment needs for the care center.

3. Responsible for maintenance and/or makes service calls for all office equipment and building maintenance.

**App. 172**

4. Contacts/communicates with the IT Department regarding system problems, repairs, and troubleshooting as needed.

**Other duties as assigned**

1. Responsible for reconciliation of petty cash for care center.

2. Forwards and processes Accounts Payables according to care center policies and procedures.

3. Monitors, controls, and orders office and medical supplies. Prepares/conducts inventory control reports as directed and according to care center policies and procedures.

## JOB PERFORMANCE (15%)
**Demonstrates initiative and skills in planning and organizing work**

1. Demonstrates a desire to set and meet objectives and to find increasingly efficient ways to perform tasks.

2. Completes work with accuracy and within agency time frames.

3. Requires minimal supervision and is self-directed.

4. Adheres to agency infection control and safety policies, including reporting issues related to infection control and safety, and demonstrates use of infection control and safety policies in job position.

## MISSION/AGENCY STANDARDS (15%)
### Demonstrates organizational awareness and commitment
1. Understands and appropriately applies the chain of command in relation to job position and supervision.

2. Knows and understands the agency mission in relation to own job position.

### Observes confidentiality policy at all times
1. Protects, honors and respects patient and co-workers' confidentiality and right to privacy with regard to information.

### Observes attendance and attire policies
1. Adheres to agency policy with regard to punctuality and attendance.

2. Demonstrates cooperation with scheduling requests to meet agency needs.

3. Adheres to agency dress code.

### Complies with all other related policies, procedures and requests
1. Demonstrates awareness of location and knowledge of agency's Policy and Procedure Manual and resource materials and communicates information to staff with regard to available support services, resources, agency Policy and Procedures and organizational plans.

2. Adheres to policies and procedures and is flexible to changes in duties and responsibilities.

### Conserves agency resources
1. Maintains agency property, supplies and equipment per agency policy.

2. Maintains the work area to reduce the likelihood of safety hazards.

## COMMUNICATION SKILLS (20%)
### Demonstrates interpersonal understanding and utilizes effective communication skills
1. Considers effects of words and actions on others.

2. Written and verbal communication is expressed clearly and in a cooperative manner.

3. Utilizes listening skills that indicate understanding and promotes accurate interpretation of others' concerns, motivations and feelings.

**App. 174**

4. Recognizes the influence of beliefs and cultures on behaviors and accepts strengths and limitations in others.

5. Attends and participates in meetings.

6. Recognizes when others are in need of information, assistance or direction and offers and provides help.

7. Works toward resolution of interpersonal conflicts as they arise.

8. Demonstrates respect, patience and understanding in interactions with others.

9. Reads and appropriately applies information into practice.

10. Acknowledges others verbally and nonverbally (eye contact, expression, tone of voice) promptly and courteously.

11. Utilizes appropriate phone etiquette.

**Exhibits behaviors of cooperation**

1. Develops cooperation and collaborative work efforts that generally benefit all involved parties.

2. Demonstrates the initiative to meet the needs of the agency by assisting co-workers when work load permits.

3. Demonstrates an effective leadership style and solves problems in a logical manner after accurately analyzing and researching facts.

**PERSONAL/PROFESSIONAL DEVELOPMENT (10%)**
**Continuing education and personal/professional development responsibilities**

1. Maintains personal health status requirements in relation to job position.

2. Maintains current personnel file information and provides information to agency in timely manner.

3. Sets own development challenges and volunteers to learn.

4. Assists with orientation of new personnel.

5. Attends agency provided in-service programs to fulfill requirements of position and agency policies.

6. Demonstrates commitment, professional growth, and competency.

**App. 175**

**Exhibits adaptability, flexibility, self-control and maturity in work and behavior**

1. Maintains stable performance and emotions when faced with opposition, pressure and/or stressful conditions.

2. Develops work relationships that honor and respect others.

## PROBLEM SOLVING (10%)

**Exhibits critical thinking abilities and applies them for continuous improvement of services and the agency**

1. Uses knowledge, experience and other resources as necessary to make logical decisions and solve problems.

2. Analyzes work processes and makes suggestions for improvement.

3. Directs, supervises, coordinates and evaluates office operations and functions.

## LEADERSHIP (10%)

1. Uses leadership position to set positive, attainable expectations, objectives and goals for others within the organization.

2. Takes action to enforce rules; confronts others about problems when necessary.

3. Empowers others by sharing responsibility to encourage a deep sense of commitment and ownership.

4. Demonstrates creativity and innovation. Takes reasonable risks and accepts full accountability for actions taken.

5. Allows subordinates to take reasonable risks and accepts accountability for their actions.

6. Develops a spirit of cooperation and teamwork while leading a group of people.

7. Works for solutions that generally benefit all involved parties.

**Demonstrates self-confidence and ability to think conceptually in leading and directing others**

1. Recognizes complex connections in situations and is able to identify the key or underlying issues.

2. Demonstrates the ability to make decisions independently which benefit the agency as a whole based on identification of key or underlying issues.

3. Demonstrates a strongly positive image of self and own skills, capabilities and judgment.

**App. 176**

## QUALIFICATIONS

1. High school diploma required. Bachelor Degree in business or related field preferred.
2. Minimum of two (2) years office or related experience. Healthcare environment preferred.
3. Demonstrated knowledge of the appropriate skills for communicating with individuals of all ages, especially the geriatric population. Excellent interpersonal skills including excellent verbal and written communication skills.
4. Strong computer and software skills.
5. Working knowledge of personnel management, record keeping, and office administration.
6. Dependable transportation, valid driver's license and automobile insurance coverage.

*State Specific-QUALIFICATIONS*
*-Virginia State Specific:*
>*Virginia Hospice Salary Scale is maintained at Amedisys Inc., Human Resources Department.*

## DEGREE OF TRAVEL

Occasional travel outside of the office to run errands, attend meetings, etc.

## DEGREE OF DISRUPTION TO ROUTINE, OVERTIME

High level of flexibility required. Occasional long hours.

## SAFETY HAZARDS IN JOB

Long periods of sitting. Subject to eye and hand strain from work on the computer. Exposure to elements such as inclement weather. Possible motor vehicle accidents.

I have read and do fully understand this job description.

Employee Signature             Date 1/7/21

**App. 177**

| PHYSICAL DEMANDS | NEVER | OCCASIONALLY | FREQUENTLY | CONTINUALLY |
|---|---|---|---|---|
| Sit | | | | X |
| Stand | | | | X |
| Walk | | | | X |
| Bend/Stoop | | | | X |
| Squat | | | | X |
| Crawl | | X | | |
| Climb | | X | | |
| Reach above Shoulder Level | | | X | |
| Kneel | | | X | |
| Balance | | | X | |
| Lift, Carry, Push, Pull | | | | |
| Maximum 10 Lbs. | | | | X |
| Maximum 20 Lbs. | | | | X |
| Maximum 50 Lbs. | | | X | |
| Maximum Over 50 Lbs. | | X | | |
| Must Be Able To | | | | |
| See | | | | X |
| Hear | | | | X |
| Speak | | | | X |
| Use One Hand | | | | X |
| Use Both Hands | | | | X |
| Environmental Conditions | NEVER | OCCASIONALLY | FREQUENTLY | CONTINUALLY |
| Involves Being | | | | |
| Inside | | | | X |
| Outside | X | | | |
| Exposed to Temperatures of | | | | |
| 32° F and less | X | | | |
| 100° F and more | X | | | |
| Wet & Humid | X | | | |
| Noise, Vibration | | X | | |
| Fumes, Dust | X | | | |
| Hazards, Exposure | NEVER | OCCASIONALLY | FREQUENTLY | CONTINUALLY |
| Infectious Waste | X | | | |
| Toxic Chemicals | X | | | |
| Needles/Body Fluids | X | | | |
| Radiation | X | | | |
| Chemotherapeutics | X | | | |

Occasionally = 1% to 33% of the time    Frequently = 34% to 66% of the time   Continually = 67% to 100% of the time

**App. 178**

| | |
|---|---|
| **From:** | Tiel Jenkins |
| **To:** | Kellie Brady |
| **Subject:** | RE: ADA Accommodation Request |
| **Date:** | Monday, December 7, 2020 3:26:42 PM |
| **Attachments:** | image002.jpg |
| | image003.jpg |

Correct.

Tiel Jenkins, M.S.
*Business Office Manager*

817.570.7190 Office
732.384.2311 Fax

Asana Hospice, an Amedisys Company
6300 Ridglea Place,Suite 1107
Fort Worth, TX 76116

**www.amedisys.com**



*"It's at the Heart of What We Do"*

**From:** Kellie Brady <kellie.brady@amedisys.com>
**Sent:** Monday, December 7, 2020 3:24 PM
**To:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Subject:** RE: ADA Accommodation Request

And just to confirm – none of your prior or current leadership is/was aware of your need for an accommodation due to a medical reason? As in, you have not disclosed to them that you need a flexible schedule due to a personal medical reason?

I wanted to get a better timeline before I reached out to your leadership team, as we worked through the ADA Accommodation process.

**Kellie Brady**
*Employee Relations Consultant* | Hospice



**Amedisys Inc.**
3854 American Way, Suite A.
Baton Rouge, LA 70816
Office: 225.299.3619 | ext. 3619



EXHIBIT
A-3

App. 179

Fax: 855.800.0162
**kellie.brady@amedisys.com**
www.amedisys.com

*Visit our* **Employee Relations SharePoint Site** *for general ER questions*

**From:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Sent:** Monday, December 7, 2020 3:22 PM
**To:** Kellie Brady <kellie.brady@amedisys.com>
**Subject:** RE: ADA Accommodation Request

- June/July – employee rotated full days working in the office
- August / September – employee still rotated full days working in the office
- September 14th – October20th – working full days in office as I was training for the BOM position ( had flexibility to leave when needed)
- October 20th went to half days in the office
- November – employees went back to rotating working in the office
- November 18th – leadership asked you to be in the office full time

Tiel Jenkins, M.S.
*Business Office Manager*

817.570.7190 Office
732.384.2311 Fax

Asana Hospice, an Amedisys Company
6300 Ridglea Place,Suite 1107
Fort Worth, TX 76116

**www.amedisys.com**



*"It's at the Heart of What We Do"*

**From:** Kellie Brady <kellie.brady@amedisys.com>
**Sent:** Monday, December 7, 2020 2:26 PM
**To:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Subject:** RE: ADA Accommodation Request

Hi Tiel –

Just to make sure I am understanding correctly, as it appears your schedule has fluctuated a bit throughout the last few months.

- June/July – employee rotated full days working in the office
- August – You worked in the office in the AM/at home in PM
- September/October – working half days in the office (other half at home)
- November – employees rotated working in the office
- End of November/December – leadership asked you to be in the office full time

Please let me know if the above is correct.

**Kellie Brady**
*Employee Relations Consultant* | Hospice



**Amedisys Inc.**
3854 American Way, Suite A.
Baton Rouge, LA 70816
Office: 225.299.3619 | ext. 3619
Fax: 855.800.0162
**kellie.brady@amedisys.com**
www.amedisys.com

*Visit our* **Employee Relations SharePoint Site** *for general ER questions*

**From:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Sent:** Friday, December 4, 2020 3:04 PM
**To:** Kellie Brady <kellie.brady@amedisys.com>
**Subject:** RE: ADA Accommodation Request

Sure,
Starting back in June before I took on the role of BOM due to COVID employees rotated working in the office:
Monday- BOM/ BOS( she was out for almost 2 months due to COVID)
Tuesday- Chaplain
Wednesday- Myself
Thursday- Social Worker
Friday_ Bereavement Coordinator
The DOO- Carol Hardwick came in daily and our CM Jamie Graves would rotate Mondays as she had a case load

In August the CM and BOM resigned and my ask before accepting the position was to split half days with the BOS. I would come in the morning and she would come in the afternoon. The other staff

members still came in to help answer the phones as I was training and learning my role, but they did not stay all day as that put more people in the office.

Tiel Jenkins, M.S.
*Business Office Manager*

817.570.7190 Office
732.384.2311 Fax

Asana Hospice, an Amedisys Company
6300 Ridglea Place, Suite 1107
Fort Worth, TX 76116

**www.amedisys.com**



*"It's at the Heart of What We Do"*

**From:** Kellie Brady <kellie.brady@amedisys.com>
**Sent:** Friday, December 4, 2020 2:56 PM
**To:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Subject:** ADA Accommodation Request

Hi Tiel –

I have a few follow up questions for you as I was looking through your request and my notes from our call. I know you stated that when you took on the role of BOM you and the former BOS rotated days in the office. Can you share with me what that rotation looked like?

Additionally you stated that you were able to have a more flexible schedule and work partially at home and partially in the office after Stephanie left the company – can you share with me what that looked like?

I am trying to seek to understand what your schedule looked like prior to being asked to be in the office 5 days a week.

Please let me know if you have any questions – or if this would be easier to discuss via phone.

Thank you,

Kellie Brady

*Employee Relations Consultant* | Hospice



**Amedisys Inc.**
3854 American Way, Suite A.
Baton Rouge, LA 70816
Office: 225.299.3619 | ext. 3619
Fax: 855.800.0162
kellie.brady@amedisys.com
www.amedisys.com

*Visit our* **Employee Relations SharePoint Site** *for general ER questions*



*CONFIDENTIAL*

## MEDICAL INQUIRY FORM
## RELATED TO AN
## ACCOMMODATION REQUEST

Date: _12/15/2020_

---

**Patient Name:** _Tiel Jenkins_

Your patient has requested that Amedisys provide him/her with a reasonable accommodation of his/her medical condition at work. To assist Amedisys in determining what, and to what extent, an accommodation will enable your patient to perform the essential functions of his/her job, **please complete this form as soon as possible** and, within 14 days from the date above, either send it to the address/fax number on the last page or, if so informed by your patient, return it to him/her.

| A. Questions to Help Determine Whether an Employee has a Disability |
|---|

Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions will help determine whether your patient has a disability under the law.

| Does your patient have a physical or mental impairment? | Yes ☑ | No ☐ |
|---|---|---|

*If yes*, what is the impairment?   _Problem with Concentration_

| **Substantial limitations.** Does the impairment substantially limit a major life activity? (*A major life activity is substantially limited when compared to most people in the general population and when it is permanent or long-term.*) | Yes ☐ | No ☑ |
|---|---|---|

If *yes*, what **major life activity and/or activities** (including major bodily functions) is/are affected?

- ☐ Bending
- ☐ Breathing
- ☐ Caring for Self
- ☐ Concentrating
- ☐ Eating
- ☐ Hearing
- ☐ Interacting with Others
- ☐ Learning
- ☐ Lifting
- ☐ Performing Manual Tasks
- ☐ Reaching
- ☐ Reading
- ☐ Seeing
- ☐ Sitting
- ☐ Sleeping
- ☐ Speaking
- ☐ Standing
- ☐ Thinking
- ☐ Walking
- ☐ Working
- ☐ Assistance with Managing Medications
- ☐ Other: (describe)

EXHIBIT
**A-4**

**App. 184**



Major bodily functions:

- ☑ Bladder
- ☑ Bowel
- ☐ Brain
- ☐ Cardiovascular
- ☐ Circulatory

- ☐ Digestive
- ☐ Endocrine
- ☐ Genitourinary
- ☐ Hemic
- ☐ Immune

- ☐ Lymphatic
- ☑ Musculoskeletal
- ☑ Neurological
- ☐ Normal Cell Growth
- ☐ Operation of an Organ

- ☐ Reproductive
- ☐ Respiratory
- ☐ Special Sense Organs & Skin
- ☐ Other: (describe)

What is the expected duration of the patient's impairment, including any residual effects? If the impairment is episodic, please indicate how frequent those episodes are expected to be and how long they will last.

Patient has multiple Sclerosis, relapsing reruting type Episodes and of relapses one not Predictable.

*Continued on next page*

### B. Questions to Help Determine Whether an Accommodation is Needed

An employee with a disability is entitled to an accommodation at work when the accommodation is necessary for the employee to perform the essential functions of his or her job. **Please review and consult the employee's job description, which is attached to this form, and answer the following questions:**

Are any of the employee's job functions impeded by the impairment noted above?     ☐ Yes  ☑ No

If yes, which job functions are so impeded and how?

### C. Questions to Help Determine Effective Accommodation Options

Do you have any suggestions regarding possible accommodations to your patient's work environment or schedule which would enable or improve the employee's performance of the impeded job functions? ☑ Yes   ☐ No
If so, what are they? 1) Working from home as needed
2) Able to take leave if she is feeling sick


amedisys

How would your suggestions improve the employee's ability to perform job functions?

- It will allow her to concentrate better
- Resting in between helps to improve muscle spasm

If the patient was provided with that accommodation, would the patient be able to return to work? ☑ **Yes** ☐ **No**

If yes, please list the date your patient could return to work: Patient is able to work c̄ accommodations

**D. Other Questions or Comments** (*additional pages may be attached, if necessary*)

This patient has multiple sclerosis. This condition causes periodic relapses. Patient also experiences fatigue, weakness, muscle spasms and trouble in concentration on an ongoing basis. Recommend to allow some accommodations at work so that she can function better.

**App. 186**



**amedisys**

---

**E. Health Care Provider's Information.**

Signature: _Prin_     Credentials: _FNP_   Date: _12/15/2020_

Name: _Princy Varghese_     Practice: _Neurology_

Address: _1400 South Main St, Fort Worth, 76104_

Phone number: _817-702-8400_     Fax number: _817-702-3980_

Confidential fax: **855.800.0162** *or*

Mail: Amedisys, Inc., ATTN: Kellie Brady, Employee Relations Consultant, 3854 American Way, Suite A, Baton Rouge, LA 70816 *or*

Email: kellie.brady@amedisys.com

---

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

For purposes of California: The California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibits employers and other covered entities from requesting, or requiring, genetic information of an individual or family member of the individual except as specifically allowed by law. To comply with the Act, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information," as defined by CalGINA, includes information about the individual's or the individual's family member's genetic tests, information regarding the manifestation of a disease or disorder in a family member of the individual, and includes information from genetic services or participation in clinical research that includes genetic services by an individual or any family member of the individual. "Genetic Information" does not include information about an individual's sex or age.

 Gmail

**Tiel Jenkins <jenkinstiel@gmail.com>**

## FW: ADA Accommodation Request
1 message

**Tiel Jenkins** <tiel.jenkins@amedisys.com>
To: "jenkinstiel@gmail.com" <jenkinstiel@gmail.com>

Wed, Jan 13, 2021 at 7:24 AM

**From:** Kellie Brady <kellie.brady@amedisys.com>
**Sent:** Thursday, December 31, 2020 11:31 AM
**To:** Tiel Jenkins <tiel.jenkins@amedisys.com>
**Subject:** ADA Accommodation Request

Hi Tiel –

As you know, Amedisys has engaged with you in the good faith interactive process to determine what reasonable accommodation may be necessary for you to perform the essential functions of your job with Amedisys. As a result of that process, we have determined that you are not a qualified individual with a disability and, therefore, are not entitled to an accommodation under the law.

The accommodation that you requested was to work from home from 1pm – 4pm daily. This accommodation will not be provided because you are not a qualified person with a disability.

As we discussed on the phone, there are Leave options that might be available to you through our Absence Management Vendor, MetLife. I have included their contact information below.

**Met Life Total Absence Management**

Ph: 888-284-3951

Website: www.metlife/mybenefits.com

**Amedisys Benefits Center**

888.528.7066 (7am to 7pm CST, M - F)

Please do not hesitate to contact me if you have any questions.

Thank you,

EXHIBIT
A-5

**App. 188**

**Kellie Brady**

*Employee Relations Consultant* | Hospice

 amedisys

**Amedisys Inc.**

3854 American Way, Suite A.

Baton Rouge, LA 70816

Office: 225.299.3619  |  ext. 3619

Fax: 855.800.0162

**kellie.brady@amedisys.com**

www.amedisys.com

*Visit our* **Employee Relations SharePoint Site** *for general ER questions*

---

*** NOTICE--The attached communication contains privileged and confidential information. If you are not the intended recipient, DO NOT read, copy, or disseminate this communication. Non-intended recipients are hereby placed on notice that any unauthorized disclosure, duplication, distribution, or taking of any action in reliance on the contents of these materials is expressly prohibited. If you have received this communication in error, please delete this information in its entirety and contact the Amedisys Privacy Hotline at 1-866-518-6684. Also, please immediately notify the sender via e-mail that you have received this communication in error. ***

**App. 189**


amedisys
HOSPICE

# ELECTION OF BENEFIT STATEMENT

I, W̲█████ C̲█████ _____ choose to elect the Medicare hospice benefit and receive

Hospice services from _____ Ajana Hospice _____
(Beneficiary Name)          (Hospice Agency)

**Hospice Philosophy:**
I acknowledge that I have been given a full explanation and have an understanding of the purpose of hospice care. Hospice care is to relieve pain and other symptoms related to my terminal illness and related conditions and such care will not be directed toward cure. The focus of hospice care is to provide comfort and support to both me and my family/caregivers.

**Effects of a Medicare Hospice Election:**
I understand that by electing hospice care under the Medicare Hospice Benefit, I am acknowledging that I understand the palliative rather than curative nature of hospice care, as it relates to my terminal illness and related conditions. I understand that by electing hospice care under the Medicare Hospice Benefit, I am waiving (give up) all rights to Medicare payments for services related to my terminal illness and related conditions and I understand that while this election is in force, Medicare will make payments for care related to my terminal illness and related conditions only to the designated hospice and attending physician that I have selected. I understand that services not related to my terminal illness or related conditions will continue to be eligible for coverage by Medicare; however, I also understand that services unrelated to my terminal illness and related conditions are exceptional and unusual and hospice should cover virtually all care related to my terminal illness and related conditions needed under the hospice election.

**Right to choose an attending physician:**
I understand that I have a right to choose my attending physician to oversee my care. My attending physician will work in collaboration with the hospice agency to provide care related to my terminal illness and related conditions. I understand that my chosen attending physician, in consultation with the Hospice Medical Director and other members of the Hospice Interdisciplinary Team will coordinate my Hospice care services.

☐ I do not wish to choose an attending physician
☑ I acknowledge that my choice for an attending physician is: _7th enter_

Physician Full name: _Nabrao Kazi_ NPI (if known): _____
Office Address: _1212 Venice Blvd LA angeles Ca_

**Hospice Coverage and Right to Request "Patient Notification of Hospice Non-Covered Items, Services, and Drugs":**
I acknowledge that I have been provided with information about my financial responsibility for certain hospice services (drug copayment and inpatient respite care). I understand that I have the right to request at any time, in writing, the "Patient Notification of Hospice Non-Covered Items, Services, and Drugs" addendum that lists the items, services, and drugs that the hospice has determined to be unrelated to my terminal illness and related conditions that would not be covered by the hospice. The hospice must furnish this notification within 5 days, if you request this form on the start of care date, and within 72 hours (or 3 days) if you request this form during the course of hospice care. I acknowledge that I have been provided information regarding the provision of Immediate Advocacy through the Beneficiary and Family-Centered Care Quality Organization (BFCC-QIO) if I disagree with any of the hospice's determinations and I have been provided with the contact information for the BFCC-QIO that services my area.

BFCC-QIO Name: _____

BFCC-QIO Phone Number: _____
I can also visit this website to find the BFCC-QIO for my area. https://qioprogram.org/contact-zones or call 1-800-MEDICARE (1-800-633-4227).
TTY users can call 1-877-486-2048.
☐ I elect to receive the "Patient Notification of Hospice Non-Covered Items, Services, and Drugs"
Initials _____ Date _____ (Hospice: Please provide the beneficiary with the addendum. Must be signed and dated accompanying the election statement.)
☑ I decline to receive the "Patient Notification of Hospice Non-Covered Items, Services, and Drugs"
Initials _____ Date _12/31/20_

I acknowledge and understand the above, and authorize Medicare hospice coverage to be provided by:

_Ajana Hospice_ to begin on _12|31|20_ ☑
(Hospice Agency)                          (Effective Date of Election)

Note: The effective date of the election, which may be the first day of hospice care of a later date but may be no earlier than the date of the election statement. An individual may not designate an effective date that is retroactive.

_____  _12/31/20_
Signature of Beneficiary/Representative        (Date)
☐ Beneficiary is unable to sign –
Reason: _____

_____  _____
Licensed Professional Signature                (Date)

Patient Name & MRN:                            Date:
W̲█████ C̲█████                                _12/31/20_

White Copy - Clinical Record        Yellow Copy - Home Folder

EXHIBIT A-6
App. 190

**ELECTION OF BENEFIT STATEMENT**

SEPARATION



amedisys

| Employee Name:<br>**Tiel Jenkins** | Role:<br>**HSP Business Office Manager** | Hire Date:<br>**07/23/2018** |
|---|---|---|
| Care Center Location / Corporate Department<br>#0789 – Fort Worth, TX | | Date(s) of previously issued PIPs, performance issues or infractions |

**Reason for Separation:**

**Violation of Company Policy**
*1.14 Failure to follow Amedisys written policies and procedures*
*AA-004 Election of Hospice Benefit*
*RI-001 Patient and Family Rights and Responsibilities*

*[handwritten: this was not backdated, the date was the same date the nurse had and failed to enter]*

- 1/5/2020 – Tiel altered an Election of Benefits form by backdating the form and adding the attending physician information after it had already been signed by the patient/caregiver; thus, resulting in the patient having to be discharged and readmitted and a write off to the Care Center. When Tiel added the attending physician information to the already signed EOB document, she violated Amedisys Policy AA-004 and RI-001. *[handwritten: Kemari was sent, ask for me to add falsi action]*
  - Policy AA-004 Election of Hospice Benefit states that the Election Statement should include *"identification of the patient's attending Physician and acknowledgement that the attending physician was chosen by the patient."*
  - Policy RI-001 Patient and Family Rights and Responsibilities states that the patient and family have the right to *"choose their own private attending physician and other health care providers."*
  - Tiel admitted verbally to her Director of Operations and in an email to the RDCO, Clinical Manager and Director of Operations that she had added this information and that she had *"made a huge mistake"* by adding this information onto the Election of Benefits form. *[handwritten: after having a conversation w/ Tina Kdb that what I did was wrong.... not before.]*

Tiel signed the Amedisys Policy Manual Attestation on 09/20/2020.

---

| Supervisor's Name: Jacqueline Williams | Witness's Name: Gary Walker |
|---|---|
| Supervisor's Signature:<br>*Jacqueline Williams 1/28/2021* | Witness's Signature:<br>*Via Teams Gary Walker 10:10am*<br>*1-28-2021* |

**Employee's Name:**

**Employee's Signature:**

**Date:** *1/28/2021*

Employee's signature on this document is an acknowledgement that this form has been provided to you and does not necessarily imply agreement with the plan.

EXHIBIT
**A-7**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **TIEL JENKINS,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **AMEDISYS HOLDING, L.L.C. D/B/A** | § | **CIVIL ACTION NO.: 4:22-cv-1021** |
| **ASANA HOSPICE, AN AMEDISYS** | § | |
| **CO.** | § | |
| | § | **JURY TRIAL DEMANDED** |
| *Defendant.* | | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
FIRST REQUESTS FOR ADMISSIONS**

---

Tiel Jenkins ("Plaintiff" or "Jenkins") responds and/or objects to Defendant Amedisys Holdings, LLC d/b/a Asana Hospice, an Amedisys Co.'s ("Defendant" or "Amedisys") First Request for Admissions, as follows:

**GENERAL OBJECTIONS**

1.      Plaintiff objects to all Requests to the extent said discovery requests information that is exempted from discovery as work-product.  To the extent that said Requests call for the disclosure of confidential communications with his/her attorney or attorney's representatives, Plaintiffs assert the attorney-client privilege.

2.      Plaintiff will construe all terms as defined in the Federal Rules of Civil Procedure or according to their ordinary meaning.  Plaintiff will respond to the document requests as required by the Federal Rules of Civil Procedure.



**REQUEST NO. 1:** Admit that Exhibit A attached hereto is a true and accurate copy of the Charge of Discrimination that you filed with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about March 5, 2021 and assigned case number 450-2021-2628.

**Response:** Admit.

**REQUEST NO. 2:** Admit you never filed any amendments to Charge Number 450-2021-2628 with the EEOC and/or Texas Workforce Commission.

**Response:** Admit.

**REQUEST NO. 3:** Admit that other than Charge Number 450-2021-2628, you did not file any other Charges of Discrimination with the EEOC or Texas Workforce Commission against Defendant.

**Response:** Admit.

**REQUEST NO. 4:** Admit that Exhibit B attached hereto is a true and accurate copy of the Determination issued by the EEOC with respect to Charge Number 450-201-02628 signed on July 27, 2022 (the "EEOC Determination").

**Response:** Admit.

**REQUEST NO. 5:** Admit that EEOC Determination contains no reference to the termination of your employment with Respondent.

**Response:** Deny.

**REQUEST NO. 6:** Admit that the EEOC never attempted to conciliate any claim of discrimination in relation to the termination of your employment with Amedisys.

**Response:** Deny.

**REQUEST NO. 7:** Admit that the EEOC never investigated any claim of discrimination in relation to the termination of your employment with Amedisys.

**Response:** Deny.

**REQUEST NO. 8:** Admit that Exhibit C attached hereto is a true and accurate copy of the completed Medical Inquiry Form Related To An Accommodation Request that you provided to Amedisys.

**Response:** Admit.

**REQUEST NO. 9:** Admit that Exhibit C attached hereto is a true and accurate copy of the completed Medical Inquiry Form Related To An Accommodation Request that you requested your medical provider send to Amedisys in connection with your request for a workplace accommodation.

**Response:** Admit.

**REQUEST NO. 10:** Admit that Exhibit C attached hereto is a true and accurate copy of Amedisys' Medical Inquiry Form Related To An Accommodation Request completed by Princy Varghese.

**Response:** Admit.

**REQUEST NO. 11:** Admit that the completed Amedisys' Medical Inquiry Form Related To An Accommodation Request attached hereto as Exhibit C has the box "No" checked in response to the question, "Substantial limitations. Does the impairment substantially limit a major life activity? (A major life activity is substantially limited when compared to most people in the general population and when it is permanent or long-term)."

**Response:** Admit.

**REQUEST NO. 12:** Admit that the completed Amedisys' Medical Inquiry Form Related To An Accommodation Request attached hereto as Exhibit C has the box "No" checked in response to the question, "Are any of the employee's job functions impeded by the impairment noted above."

**Response:** Admit.

**REQUEST NO. 13:** Admit that on January 5, 2021, you added the attending physician's name and start of care date on the election of benefits form for patient "W.L.C" after the patient had already signed the form.

**Response:** Admit.

**REQUEST NO. 14:** Admit that prior to altering the election of benefits form for patient "W.L.C", you did not ask the Director of Operations for advice on how to fix the errors on the form.

**Response:** Admit.

**REQUEST NO. 15:** Admit that on January 5, 2021, you sent an email to Crystal Nering stating, "Let me first admit that I made a huge mistake. I take ownership in that, but my thinking is either way we will need to readmit this patient and get the consents resigned. Would that be the correct assumption?"

**Response:** Deny.

**REQUEST NO. 16:** Admit that prior to January 5, 2021, you understood that it violated Amedisys' Rules to alter a patient consent form after the patient signed the consent form.

**Response:** Deny.

**REQUEST NO. 17:** Admit that on December 7, 2020, you wrote to Kellie Brady in an email that none of your prior or current leadership is or was aware of your need for an accommodation due to a medical reason?

**Response:** Admit.

Respectfully Submitted,

**KILGORE & KILGORE, PLLC**

By: *W. D. Masterson*
       W.D. Masterson
       SBN: 13184000
       wdm@kilgorelaw.com
       3141 Hood Street, Suite 500
       Dallas, Texas 75219
       (214) 969-9099 - Telephone
       (214) 953-0133 - Facsimile

**ATTORNEYS FOR PLAINTIFF**
**TIEL JENKINS**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on Defendant's counsel of record via E-Mail, on this 6ᵗʰ day of February 2023.

Arthur V. Lambert
FISHER & PHILLIPS LLP
500 N. Akard Street, Suite 3550
Dallas, TX 75201
*alambert@fisherphillips.com*

Jason D Keck (*pro hac vice*)
Scott C Fanning (*pro hac vice*)
FISHER & PHILLIPS LLP
10 S. Wacker Dr., Ste. 3450
Chicago, IL 60606
*jkeck@fisherphillips.com*
*sfanning@fisherphillips.com*

*W. D. Masterson*

W. D. Masterson

# EXHIBIT A



EXHIBIT
**B-1**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | **450-2021-02628** |

| **TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION** | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| **MS. TIEL JENKINS** | **(817) 230-7105** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **5916 TRAIL LAKE DR, FT WORTH,TX 76133** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **ASANA , AN AMEDISYS CO** | **501+** | |

| Street Address | City, State and ZIP Code |
|---|---|
| **6300 RIDLEA PLACE, SUITE 1107, FORT WORTH, TX 76116** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **12-17-2020** | **01-28-2021** |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**I.     PERSONAL HARM:**
 **a.  On or about 12/17/2020, I submitted medical documentation for a reasonable accommodation request to Kelliy Brady (Employee Relations Consultant) for my disability. On 12/31/2020, my reasonable accommodation request was denied.**
**II.  RESPONDENTS REASON FOR ADVERSE ACTION:**
**a.     I received an email from Kelliy Bray stating my reasonable accommodation request was denied because I was not a qualified individual with a disability.**
**III.     DISCRIMINATION STATEMENT:**
**I believe that I was discriminated against based on disability, in violation of the Americans with Disabilities Act of 1990.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Tiel Jenkins on 03-05-2021 11:25 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2. AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an

**App. 199**

investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT B



EXHIBIT
**B-2**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Dallas District Office**

207 S. Houston Street, 3rd Floor
Dallas, TX 75202-4726
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Dallas Direct Dial: (972) 918-3580
FAX: (214) 253-2720
Website: www.eeoc.gov

**CHARGE NUMBER: 450-2021-02628**

Tiel Jenkins                                                   **CHARGING PARTY**
5916 Trail Lake Drive
Fort Worth, Texas 76133

Amedisys Holding, LLC d/b/a ASANA              **RESPONDENT**
C/O Jason Keck, Attorney
Fisher & Phillips, LLP
10 S. Wacker Drive, Suite 3450
Chicago, Illinois 60606

## <u>DETERMINATION</u>

Under the authority vested in me by the Commission, I issue on behalf of the Commission, the following determination as to the merits of the subject charge filed under Title I of the Americans with Disabilities Act of 1990, as amended ("ADAAA").

All requirements for coverage have been met. Respondent is an employer within the meaning of the ADA, and the timeliness and all other jurisdictional requirements for coverage are satisfied.

Charging Party, Tiel Jenkins, alleged she was discriminated against because of her disability when Respondent failed or refused to provide a reasonable accommodation for her disability. Respondent denied the allegations and claimed it would not accommodate Charging Party because she was not an individual with a disability covered under ADAAA. The Respondent denies the allegations.

During the investigation, the parties were afforded the opportunity to submit evidence in support of their respective positions. Charging Party was diagnosed with a qualifying disability prior to her employment with Respondent. Charging Party's symptoms includes incontinence, extreme fatigue, and back spasms that can be exacerbated by stress. The symptoms ordinarily worsen throughout the day. The evidence showed Charging Party requested an accommodation in December 2020 to work from home for the afternoon hours of each day, following a period of months where she worked from home four days of her five-day workweek. The evidence further showed Respondent denied Charging Party's requested accommodation without engaging in the interactive process prior to denial, claiming Charging Party was not a qualified individual. However, evidence gathered indicated reasonable accommodations were available and could have been offered to the Charging Party.

**App. 202**

For these reasons, the Commission finds there is reasonable cause to believe Respondent discriminated against the Charging Party in violation of the Americans with Disabilities Act of 1990, as amended, by failing or refusing to accommodate Charging Party's disability and associated limitations.

Upon finding that there is reason to believe that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. The Commission will also consider compensatory and punitive damages under the Civil Rights Act of 1991.

If the Respondent declines to enter into conciliation discussions, or when the Commission's representative for any reason is unable to secure a settlement acceptable to the Commission, the Commission shall so inform the parties in writing and advise them of the court enforcement alternative available to the Charging Party, aggrieved persons and the Commission. The confidentiality provisions of the statute and Commission regulations apply to information discussed or given during conciliation.

You are reminded that Federal law prohibits retaliation against persons who exercised their right to inquire or complain about matters they believe may violate the law. Discrimination against persons who have cooperated in Commission investigations is also prohibited. These protections apply regardless of the Commission's determination on the merits of the charge.

On Behalf of the Commission:

Rayford O. Irvin
Digitally signed by Rayford O. Irvin
Date: 2022.07.27 21:49:04 -05'00'

_____
Date

_____
Rayford O. Irvin
Acting District Director

**App. 203**

# EXHIBIT C





*CONFIDENTIAL*

# MEDICAL INQUIRY FORM
## RELATED TO AN
## ACCOMMODATION REQUEST

Date: __12/15/2020__

Patient Name: __Tiel Jenkins__

Your patient has requested that Amedisys provide him/her with a reasonable accommodation of his/her medical condition at work. To assist Amedisys in determining what, and to what extent, an accommodation will enable your patient to perform the essential functions of his/her job, **please *complete this form* as soon as possible** and, within 14 days from the date above, either send it to the address/fax number on the last page or, if so informed by your patient, return it to him/her.

### A. Questions to Help Determine Whether an Employee has a Disability

Under the ADA, an employee has a disability if he or she has a physical or mental impairment that substantially limits one or more major life activities or has a record of such impairment. The following questions will help determine whether your patient has a disability under the law.

| Does your patient have a physical or mental impairment? | Yes ☑ | No ☐ |
|---|---|---|

If yes, what is the impairment?   *Problem with Concentration*

| Substantial limitations. Does the impairment substantially limit a major life activity? *(A major life activity is substantially limited when compared to most people in the general population and when it is permanent or long-term.)* | Yes ☐ | No ☑ |
|---|---|---|

If yes, what **major life activity/or activities** (including major bodily functions) is/are affected?

| | | | | |
|---|---|---|---|---|
| ☐ Bending | ☐ Hearing | ☐ Reaching | ☐ Speaking | ☐ Assistance with Managing Medications |
| ☐ Breathing | ☐ Interacting with Others | ☐ Reading | ☐ Standing | |
| ☐ Caring for Self | ☐ Learning | ☐ Seeing | ☐ Thinking | |
| ☐ Concentrating | ☐ Lifting | ☐ Sitting | ☐ Walking | ☐ Other: (describe) |
| ☐ Eating | ☐ Performing Manual Tasks | ☐ Sleeping | ☐ Working | |


amedisys

Major bodily functions:

- ☑ Bladder
- ☑ Bowel
- ☐ Brain
- ☐ Cardiovascular
- ☐ Circulatory

- ☐ Digestive
- ☐ Endocrine
- ☐ Genitourinary
- ☐ Hemic
- ☐ Immune

- ☐ Lymphatic
- ☑ Musculoskeletal
- ☑ Neurological
- ☐ Normal Cell Growth
- ☐ Operation of an Organ

- ☐ Reproductive
- ☐ Respiratory
- ☐ Special Sense Organs & Skin
- ☐ Other: (describe)

What is the expected duration of the patient's impairment, including any residual effects? If the impairment is episodic, please indicate how frequent those episodes are expected to be and how long they will last.

Patient has multiple sclerosis, relapsing remitting type. PP Episodes and of relapses one not Predictable.

Continued on next page

## B. Questions to Help Determine Whether an Accommodation is Needed

An employee with a disability is entitled to an accommodation at work when the accommodation is necessary for the employee to perform the essential functions of his or her job. **Please review and consult the employee's job description, which is attached to this form, and answer the following questions:**

Are any of the employee's job functions impeded by the impairment noted above?   ☐ Yes   ☑ No

If yes, which job functions are so impeded and how?

## C. Questions to Help Determine Effective Accommodation Options

Do you have any suggestions regarding possible accommodations to your patient's work environment or schedule which would enable or improve the employee's performance of the impeded job functions? ☑ Yes   ☐ No
If so, what are they?   1) Working from home as needed
2) Able to take leave if she is feeling sick

**App. 206**



How would your suggestions improve the employee's ability to perform job functions?

- It will allow her to concentrate better
- Resting in between helps to improve muscle spasm

If the patient was provided with that accommodation, would the patient be able to return to work? ☑ Yes ☐ No

If yes, please list the date your patient could return to work: Patient is able to work c̄ recommadatoms

**D. Other Questions or Comments** (*additional pages may be attached, if necessary*)

This patient has multiple sclerosis. This condition causes periodic relapses. Patient also experiences fatigue, weakness, muscle spasms and trouble in concentration on an ongoing basis. Recommend to allow some accommodations at work so that she can function better



## E. Health Care Provider's Information.

Signature: _Pin_  Credentials: _PrvP_  Date: _12/15/2020_

Name: _Princy Varghese_  Practice: _Neurology_

Address: _1400 South Main St, Fort Worth, 76104_

Phone number: _817-702-8400_  Fax number: _817-702-3980_

Confidential fax: 855.800.0162 *or*

Mail: Amedisys, Inc., ATTN: Kellie Brady, Employee Relations Consultant, 3854 American Way, Suite A, Baton Rouge, LA 70816 *or*

Email: kellie.brady@amedisys.com

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

For purposes of California: The California Genetic Information Nondiscrimination Act of 2011 (CalGINA) prohibits employers and other covered entities from requesting, or requiring, genetic information of an individual or family member of the individual except as specifically allowed by law. To comply with the Act, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information," as defined by CalGINA, includes information about the individual's or the individual's family member's genetic tests, information regarding the manifestation of a disease or disorder in a family member of the individual, and includes information from genetic services or participation in clinical research that includes genetic services by an individual or any family member of the individual. "Genetic Information" does not include information about an individual's sex or age.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **TIEL JENKINS,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:22-CV-01021-P** |
| | § | |
| **AMEDISYS HOLDING, L.L.C.** | § | |
| **D/B/A ASANA HOSPICE, AN** | § | |
| **AMEDISYS CO.,** | § | |
| | § | |
| **DEFENDANT.** | § | |

---

### DECLARATION OF KELLIE BRADY

---

I, Kellie Brady, being duly sworn, do hereby state as follows:

1.      I am currently employed by Amedisys Holding, LLC ("Amedisys") as a Senior Employee Relations Consultant. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently to each fact.

2.      In December 2020 and January 2021, I was assigned to provide support to, among other areas, Amedisys' Care Center in Fort Worth, Texas.

3.      I became aware of Ms. Tiel Jenkins's request for an accommodation due to her Multiple Sclerosis on or about December 3, 2020.

4.      In connection with her request for an accommodation, Ms. Jenkins and myself exchanged numerous emails regarding the nature of her prior work from home schedule. I provided Ms. Jenkins with, among other things, a form for her medical provider to complete to assist Amedisys in determining whether Ms. Jenkins was eligible for an accommodation and, if



EXHIBIT
C

so, what accommodations may be reasonable. This form is known as the "ADA Accommodation" Form.

5.      Ms. Jenkins returned the ADA Accommodation Form completed by her medical provider on December 17, 2020.

6.      Based on the contents of the completed ADA Accommodation Form, myself along with consultation from Amedisys' Legal Department, determined that Ms. Jenkins was not eligible for an accommodation because her medical provider indicated that Ms. Jenkins did not have an impairment substantially limiting a major life activity and stating that Ms. Jenkins did not have an impairment that impeded her ability to perform her essential job duties.

7.      Accordingly, on December 30, 2020, I sent an e-mail to Ms. Jenkins denying her requested remote work accommodation and offered her information about the availability of and process for requesting time off or leave in the event that she required it.

8.      I also assisted from a Human Resources' perspective with Amedisys' investigation into Ms. Jenkins' falsification and backdating of an Election of Benefit ("EOB") form on January 5, 2020.

9.      During the course of Amedisys's investigation, I reviewed statements from the Director of Operations of the Care Center regarding the incident, emails surrounding the incident, a statement by Ms. Jenkins, and the altered EOB, among other things. I also consulted with members of upper management and Amedisys' Compliance Department.

10.      Amedisys's investigation revealed that Ms. Jenkins added information to an already signed EOB by adding the attending physicians name and information and filling in the date for the start of care. The investigation also considered Ms. Jenkins' admissions that she made a mistake.

11.     As a result of the findings, Amedisys decided to terminate Ms. Jenkins' employment for violating Amedisys' policies.

12.     Amedisys' then SS Hospice Area Vice President of Operations, Gary Walker, was the final decision-maker who decided to terminate Ms. Jenkins employment with Amedisys.

13.     At no point did I disclose to Mr. Walker that Ms. Jenkins suffered from Multiple Sclerosis or any other medical condition.

14.     Ms. Jenkins prior request for an accommodation due to her Multiple Sclerosis, or her Multiple Sclerosis, did not play any role in Amedisys's investigation or recommendations with respect to termination of Ms. Jenkin's employment.

**[THE REMAINDER OF THIS PAGE LEFT BLANK]**

**App. 211**

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my belief.

Executed this __3__ day of March 2023

_____
**Kellie Brady**

**App. 212**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **TIEL JENKINS,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:22-CV-01021-P** |
| | § | |
| **AMEDISYS HOLDING, L.L.C.** | § | |
| **D/B/A ASANA HOSPICE, AN** | § | |
| **AMEDISYS CO.,** | § | |
| | § | |
| **DEFENDANT.** | § | |

## DECLARATION OF PAM KINARD

I, Pam Kinard, being duly sworn, do hereby state as follows:

1.      I am currently employed by Amedisys Holding, LLC ("Amedisys") as Field Compliance Manager. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify competently to each fact.

2.      Amedisys is subject to numerous compliance policies and is committed to providing end-of-life and palliative care services to persons who have terminal diagnoses in conformity with Medicare and Medicaid regulations when required.

3.      Amedisys requires employees and other persons who provide patient care services on behalf of Amedisys or billing or coding functions to comply with all Federal health care program requirements, applicable laws, and with Amedisys's own policies and procedures, including Amedisys's Corporate Compliance Plan.



EXHIBIT
D

**App. 213**

4.     Amedisys's training records confirm that Ms. Jenkins had attended two training courses dedicated to reviewing Amedisys's Corporate Compliance Plan on February 12, 2020, and March 17, 2020.

5.     Attached hereto as Exhibit D-1 is a true and accurate copy of Amedisys' Corporate Compliance Plan ("Compliance Plan").

6.     On Page 10 of the Compliance Plan, under the section titled, "Financial Reporting and Business Records" the Plan states that, "No record or any entry therein will be falsified, back-dated, defaced, intentionally destroyed, or otherwise altered or tampered with in order to gain a real or perceived advantage for the Company."

7.     Additionally, with respect to the provision of hospice services, Amedisys's Compliance Plan states on page 39 under the section titled, "Falsification of Documentation" the following:

> Hospice will not falsify any patient signature on a visit note, consent form, or any other documentation. Likewise, Hospice will not falsify the signature or other documentation of a physician on a referral, order, face-to-face certification, or any other documentation. Hospice will not falsify any part of a clinical record note to misrepresent the occurrence of all or part of any patient visit, including patient vital signs and responses to treatment

8.     Additionally, since 2017, Amedisys has maintained Policy AA-004, Election of Hospice Benefit, that sets forth the requirements of the Election of Benefit statements that are required to be completed in order for a patient to elect the Hospice Medicare Benefit. Attached hereto as Exhibit D-2, is a true and accurate copy of Policy AA-004.

9.     Amedisys's training records show that on October 1, 2020, Ms. Jenkins attended an Election of Benefit Addendum training that discussed Policy AA-004 and recent modifications to the policy.

10.    Policy AA-004 requires, among other things, that the signed Election of Benefit statement include "identification of the patient's attending Physician and acknowledgement that the attending physician was chosen by the patient."

11.    If the patient signs the Election of Benefit statement and the attending physician's name is not listed on the statement, the patient did not satisfy Medicare's requirements for making a valid election of hospice benefits because there is no acknowledgement that the attending physician was chosen by the patient.

12.    I base the foregoing conclusion on my experience and, in part on, CMS Transmittal 209, attached hereto as Exhibit D-3. CMS Transmittal 209 states that "Hospice beneficiaries have the right to choose their attending physician" and it defines "attending physician" to mean the physician "identified by the individual, at the time he or she elects to receive hospice care as having the most significant role in the determination and delivery of the individual's medical care. (See 42 CFR 418.3)"

**[THE REMAINDER OF THIS PAGE LEFT BLANK]**

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my belief.

Executed this 2nd day of March 2023

Pam Kinard
**Pam Kinard**

**App. 216**



# THE AMEDISYS CORPORATE COMPLIANCE PLAN



**AMEDISYS, INC.**
3854 American Way, Suite A, Baton Rouge, LA 70816
(225) 292-2031 • amedisys.com

EXHIBIT
**D-1**

# TABLE OF CONTENTS

OVERVIEW: ...................................................................................................... 3

**PART 1:** Corporate Compliance Plan ......................................................... 7

    Section 1: Overview - General Standards of Conduct ......................... 7

    Section 2: Compliance Oversight ...................................................... 18

    Section 3: Compliance Reporting ...................................................... 20

    Section 4: Compliance Training ......................................................... 21

    Section 5: Responding to Government Inquiries .............................. 23

    Section 6: Compliance Monitoring ................................................... 25

    Section 7: Sanctions and Enforcement ............................................. 27

**PART 2:** Specific Compliance Standards Applicable to Home Health ...... 30

**PART 3:** Specific Compliance Standards Applicable to Hospice ............... 35

**PART 4:** Specific Compliance Standards Applicable to Personal Care Line ... 40

**PART 5:** Supplemental Deficit Reduction Act Provisions ...................... 43

**PART 6:** Special Corporate Integrity Agreement Provisions ................. 46

Created May 1999
Revised October 1999
Revised December 2000
Revised January 2002
Revised March 2003
Revised March 2006
Revised December 2006
Revised December 2008
Revised March 2010
Revised December 2010
Revised July 2013
Revised April 2014
Revised April 2015
Revised January 2016
Revised August 2016
Revised November 2016
Revised December 2017
Revised December 2018
Revised January 2020

## OVERVIEW

The Amedisys Corporate Compliance Program represents the principles and rules guiding the care we provide and how we are reimbursed for that care. The Corporate Compliance Program promotes accuracy and integrity in all aspects of our Company, whether administrative, clinical, clerical, or financial.

Certain key aspects comprise the Company's Compliance Program, such as:

- <u>**Authority**</u> — Our Compliance Program efforts are sanctioned and supported by the Company's governing body. The Amedisys governing body has delegated certain compliance responsibilities to the Chief Compliance Officer ("CCO") and the Corporate Compliance Committee — but all staff are ultimately responsible for compliance.

- <u>**Responsibility**</u> — All Amedisys staff, regardless of status or position or company division, are responsible for ensuring adherence to the Compliance Plan.

- <u>**Corporate Compliance Plan**</u> — The Company, through its governing body, has developed and implemented a written Corporate Compliance Plan and has sanctioned all compliance monitoring and enforcement activities described in the Plan. All staff are aware of the Company's rules and expectations and strive to represent the company in an ethical manner.

- <u>**Standardization**</u> — All staff follow the processes, practices, and written policies specific to this Company; and all divisions and departments operate under these standards.

- <u>**Education**</u> — All Company staff receive training and education, including orientation and annual updates, about standards of conduct, compliance issues, and fraud prevention.

- <u>**Monitoring**</u> — There is a continuous focus on detecting and deterring fraud through audits and disclosure mechanisms, like the Compliance Hotline, with which staff may report suspected fraud and abuse or other questionable behavior.

- <u>**Enforcement**</u> — The Chief Compliance Officer and/or the Corporate Compliance Committee will ensure that appropriate action, including disciplinary action, and responses to reported or identified issues of concern in accordance with the authority granted by the Company's governing body.



The Corporate Compliance Program promotes accuracy and integrity in all aspects of our Company.

## WHERE DO I FIND THE COMPLIANCE PLAN?

The Company's written Corporate Compliance Plan is available to all staff at the corporate office and at every agency. You may access the Amedisys Compliance Plan through the Company's intranet site (amedisys@work) by going to the Compliance subpage under "Support Centers".

Each employee should read the Compliance Plan to ensure we understand all of the requirements and expectations, as well as their impact on our job responsibilities.

As you read through the Compliance Plan, feel free to ask questions and seek clarification about any parts that are unclear.

## HOW DO EMPLOYEES LEARN ABOUT THE COMPLIANCE PLAN?

The importance of compliance and the contents of the Compliance Plan are communicated to all staff through extensive compliance training. Amedisys trains staff on compliance upon hire, at New Employee Orientation, and annually each year.

## HOW DOES COMPLIANCE IMPACT MY JOB?

Regardless of whether you work in direct patient care, back office support, or corporate office support, compliance and the Company's Compliance Plan affects your job. All Company processes relating to care and service delivery will be handled in accordance with the regulations and guidelines established by the entity responsible for payment/coverage of those services, and in compliance with respective federal and state laws and regulations—which includes Medicare, Medicaid, insurance, managed care organizations (HMOs, PPOs, etc.), private pay sources, etc.



Regardless of your position, compliance and the Company's Compliance Plan affects your job.

### Clinical Standards

If you work in clinical services (nursing, home care aide, therapy, social services, nurse practitioners, etc.), you must help ensure that all specific reimbursement criteria are met in order for the patient to qualify for care and services. Therefore, it is important that you have a basic understanding of Company policy and payor standards.

Appropriate assessments and evaluations will be made in accordance with Company policy to determine patient needs and status, and will be documented in a concise, professional manner. In addition, periodic reassessments/reevaluations, based on individual patient needs and/or regulatory requirements, will be performed and documented to ensure that the patient continues to meet the criteria/requirements upon which care and service delivery are based.

You must follow payor regulations as well as the Company's established policies and procedures regarding patient care.

### Billing Standards

All claims for coverage, reimbursement, or payment for care and services rendered, regardless of the source of that payment, will be accurate and complete, will be based on medical necessity, and will be documented in a manner consistent with the payor requirements. The Company follows its established policies and procedures for billing and claims processing.

Each Company staff member involved in any aspect of the billing and claims submission process will be familiar with the appropriate requirements for these activities and will receive special training regarding billing compliance.

We monitor adherence to proper billing procedures through direct auditing and electronic reviews.

## REPORTING OBLIGATIONS

No matter what your role or status is in our Company, if you have compliance concerns about the integrity of the care and services delivered and/or the billing we do for those services, it is your obligation to bring these matters to the attention of the Company's Chief Compliance Officer or any member of the Corporate Compliance Committee.



No matter your role or status in our Company, if you have compliance concerns, you have an obligation to report it.

The Company has established a confidential Corporate Compliance Hotline, which is available 24 hours a day, 7 days a week, to report any compliance problem or ask for guidance regarding any compliance issue. The Corporate Compliance Hotline may be reached by calling 1-800-464-0020.

Under the Company's Compliance Plan, the CCO and the Corporate Compliance Committee will ensure handling of issues identified or reported in a confidential manner. There will be no retaliation permitted against anyone who reports compliance concerns in good faith.

## GENERAL POLICY

The philosophy of Amedisys regarding fraud, waste, and abuse, is based on the fundamental principle of "zero tolerance". Proper conduct is expected of all Company divisions and all employees/staff at all times when conducting business and performing services on behalf of the Company. Amedisys strives to promote an environment of honesty, integrity, and fairness in all Company matters. Inappropriate business behavior, as identified in the written Corporate Compliance Plan and the policies that are an integral part of the Compliance Program, as well as conduct that may be perceived as fraudulent, wasteful, and/or abusive, will not be tolerated. Amedisys personnel shall not violate these compliance policies or other legal or regulatory obligations because of an "industry practice".

The Company's Corporate Compliance Program establishes and oversees measures to detect, deter, and handle fraud, waste, and abuse, and to promote a high level of integrity and ethical behavior among all Company staff. All Company divisions and all Company staff regardless of status or position within the Company will follow the Compliance Plan.

## WHAT IS EXPECTED OF ME?

Every Amedisys employee is expected to represent the Company in an honest, reliable, and ethical manner at all times. Integrity in all interactions is a must, regardless of whether you are dealing with patients or family/caregivers, physicians, peers/co-workers, hospital or other institutional staff, vendors, contractors, payors, or state or federal government authorities, etc.

All staff should be familiar with any federal and/or state regulations that pertain to your respective job role at Amedisys and to ensure compliance with those regulations.

Job description tasks and responsibilities have been developed with a focus on conduct that promotes adherence to Company policies and procedures as well as state and federal regulations. This promotes integrity and discourages fraud and abuse.

Because the Compliance Plan sets forth various activities and behavior that are acceptable, as well as those that are prohibited, each staff member is responsible for being familiar with the Compliance Plan and the manner in which its contents pertain to your responsibilities within the Company.

It is the expectation that each employee not only conduct yourself in an appropriate manner, but also that you remain alert to and report any questionable activity observed around you. Disciplinary action may result from the knowing or negligent failure to report compliance violations.

Ultimately, our Company's compliance is about doing the right thing, for the right reasons, every time.

!

Do the right thing,
for the right reasons,
every time.

**This document constitutes the formal Corporate Compliance Plan for Amedisys Inc., and all service lines, offices, and agencies, including home health care, hospice, and personal care.**

## Section 1: Overview - General Standards of Conduct

The provisions of this Corporate Compliance Plan reflect Amedisys' firm commitment to business and operational practices that are above reproach and reflect our integrity and corporate culture. Above all, we intend to provide quality care and services in an efficient, cost-effective manner while maintaining flexibility in an ever-changing healthcare environment.

This Corporate Compliance Plan is designed to communicate to all Amedisys employees, at all levels, regardless of division, whether corporate or individual Agency staff, the expectations and standards of conduct that we expect to be upheld in the performance of all Company activities and services.

Plainly stated, Amedisys maintains a position of "zero tolerance" when it comes to fraud, waste, and abuse.

Following the Corporate Compliance Plan are the Compliance Policies for the company's various divisions. Each Amedisys division will abide by both the Corporate Compliance Plan and the related general compliance policies of Amedisys, as well as the individual Division Standards of Conduct applicable to their respective divisions (see Part 2, home health division; Part 3, hospice division and Part 4 personal care line).

Amedisys personnel are not to violate these corporate compliance policies or other legal or regulatory obligations because of an "industry practice".

### ANTI-FRAUD PROTECTIONS

Under federal law, it is unlawful to submit false or fraudulent claims for payment for the provision of services to any payor—including Medicare and Medicaid. Amedisys will strive to always be compliant with the law and will enforce a "zero tolerance" for fraud and abuse.

The term "false or fraudulent claims" includes such things as:

1. Submitting claims for services not rendered;
2. Submitting claims for services delivered to non-qualifying or ineligible Medicare beneficiaries;
3. Submitting claims for services provided without physician authorization (certification, orders, etc.);
4. Submitting claims for medically unnecessary services;
5. Submitting claims for inappropriate or excessive services;
6. Intentionally submitting and/or receiving payment for duplicate claims for the same service ("double billing");
7. Billing for substandard and/or inadequate care (including denial of clinically-necessary services);
8. Billing for services provided by unqualified or unlicensed clinical personnel;
9. Submitting claims with supporting documentation containing falsified signatures;
10. Submitting claims for "upcoded" diagnoses;
11. Submitting claims for referrals obtained through kickbacks.

## CLAIMS REVIEWS

In an effort to ensure proper claims submission, Amedisys monitors the claims process both pre- and post-submission. The Company's monitoring processes provide for appropriate review to ensure:

1. sufficient and timely documentation to support the claims,
2. timely, authenticated, and dated physicians' plans of care and related orders,
3. proper evidence that reimbursement requirements have been followed,
4. the patient has met the eligibility criteria,
5. proper diagnosis and coding have been included, and
6. no evidence of duplication of services.

> To ensure proper claims submission, Amedisys has established policies and practices that monitor the claims process.

## CODING REVIEWS

 Although coding for billing actually begins in the field, the coding process undergoes extensive internal controls once patient assessments are uploaded into Amedisys' billing system. Specifically, we utilize an automated coding compliance computer program to sweep all assessments and identify any that feature coding patterns contrary to applicable regulations. Exception reports of all potentially problematic claims are generated and a team of centralized coding experts reviews all exceptions in real time and communicates with local staff to resolve any problems prior to the submission of any claims for payment.

## COST REPORTS

Medicare and certain Medicaid programs require the submission of a cost report detailing the Company's overhead, administrative, and other general costs related to patient care and the provision of related services. Medicare also requires that an organization disclose the identity of all related parties with whom it conducts business. Even though home health is reimbursed under a Prospective Payment System that no longer depends on cost reports, these cost reports are still required and their accuracy is very important. Amedisys will not withhold information regarding related party transactions. Additionally, Amedisys will not inflate, misrepresent, or falsely allocate information on cost reports. All cost report data that is submitted will be accurate, timely filed, and substantiated by appropriate documentation.

Certain cost-report practices are unacceptable, including things such as:

- Submitting falsified information;
- Including non-allowable costs;
- Intentionally including false claims on the cost report;
- Failing to refund credit balances;
- Including non-allowable costs associated with acquisition and/or divestiture of business units;
- Failing to disclose the identity of all related parties with whom the Company conducts business, or inflating, misrepresenting, or falsely allocating the cost of services provided to or by a related party.

## EMPLOYMENT OF EXCLUDED INDIVIDUALS

The Company will not employ or contract with any individual or entity that has been excluded from participation in federal health care programs. The OIG on-line searchable database and the SAM (formerly GSA) exclusion list will be used to verify that employees, physicians, and contracting individuals or entities have not been excluded from participation in federal health care programs prior to hire, contract or first referral and annually thereafter. Persons who have been excluded, but subsequently complete their exclusionary period shall nonetheless be restricted from having direct responsibility over or involvement in the Company's dealings with Medicare or Medicaid.

## NON-DISCRIMINATION

The Company will not discriminate in its admission or discharge practices, or in its employment decisions, on the basis of a person's race, gender, ethnicity, nationality, religion, or other protected class membership.

## CLINICAL DOCUMENTATION

Because the clinical record constitutes the definitive evidence supporting all claims and bills submitted to payors, it is essential that the information contained therein is accurate, precise, and complete. No medical record should ever be falsified, altered, or otherwise written in such a way that it does not accurately reflect the services rendered on the days and at the times

actually provided. Any amendment to a clinical record should be appropriately made according to applicable state law. Visit notes should be signed by the patient and/or their caregiver. In absence of any state-specific authority, corrections to an electronic medical record should be made by following clinical operational policies per your service line.

> It is essential that the information contained in the clinical record is accurate, precise, and complete.

## FINANCIAL REPORTING AND BUSINESS RECORDS

Amedisys maintains a high standard of accuracy and completeness in its financial records. Those records serve as the basis for managing the Company's business, for measuring and fulfilling our obligations to shareholders, patients, employees, suppliers, payors, and others and for compliance with regulatory, tax, and financial reporting requirements.

It is the explicit policy of Amedisys to comply with the recording requirements of applicable law, including Sarbanes-Oxley, established financial standards, generally accepted accounting principles.

All items of income and expenditure, including payroll records, and all assets and liabilities are to be entered on the financial records of the Company and accurately and adequately described as appropriate for legitimate business purposes, as required by law, and in accordance with generally accepted accounting principles. The Company will not unlawfully keep or otherwise fail to properly return overpayments identified and/or adjudicated as owed to the Federal or State governments.

Reports and other information requested by and submitted to governmental authorities, including but not limited to, the respective state's Department of Health and other state government agencies, the United States Department of Health and Human Services, federal Centers for Medicare and Medicaid Services (CMS), fiscal intermediaries, the Office of the Inspector General (OIG), etc., are accurately made in all respects and are rendered in a timely manner in accordance with guidance and instructions from the respective governmental authority. In addition, the Company will make available to authorized government authorities information, as necessary, for such entities to make appropriate determinations with respect to matters under their respective jurisdictions.

The Company and each of its Divisions and operating units, as applicable, will meet required record-keeping obligations. No record or any entry therein will be falsified, back-dated, defaced, intentionally destroyed, or otherwise altered or tampered with in order to gain a real or perceived advantage for the Company. Nothing herein, however, is intended to prevent the routine, periodic purging of unnecessary materials or the preservation of accurate records documenting the reasons for certain actions that might be subsequently questioned, in accordance with Company policy.

## IMPROPER PAYMENTS: BRIBES AND KICKBACKS

Amedisys' compliance includes a focus on proper marketing and business development practices. The primary areas of concern are kickbacks and other forms of illegal remuneration. Such acts place the Company at risk by illegally influencing referral patterns of physicians, hospitals, and other referral sources for financial reasons, as opposed to legitimate, medical reasons. As such, any type of kickback or other remuneration is strictly prohibited.

Under both federal and state law, it is illegal for any person or any company offer, pay, solicit, or receive anything of value to or from any other person to induce or in return for:

1. the referral of an individual(s) or recommendations for the referral of an individual(s) to an agency or related party; and/or

2. the purchase, lease, or order, or recommendations for the purchase, lease, or order, of any goods, service, or item for which payment may be made, directly or indirectly, in whole or in part, by the federal health care programs. This includes such practices as:

   • Payments made to a physician(s) or a physician's staff for certification of patient plans of care or in return for patient referrals;

   • Payments made to a physician(s) for services not rendered;

   • Payment(s) made to physicians for actual services rendered, but where the payment exceeds fair market value; and

   • Providing Amedisys-compensated personnel or Amedisys' assets to other entities including hospitals, physicians, nursing homes, and other health providers for the purpose of inducing referrals or strengthening business relationships.

Payments in the nature of "kickbacks" or "bribes" intended to induce or reward favorable decisions or actions are not to be used in connection with any of the Company's business. For purposes of the Compliance Program, the terms "kickbacks" and "bribes" include any remuneration, whether made directly or indirectly, overtly or covertly, or in cash or in kind.

No employee or representative of the Company shall, in violation of any applicable law, offer or make, solicit or receive, directly or indirectly, through any other person or firm, any payment of anything of value (in the form of compensation, gift, contribution or otherwise) to or from:

   • any person or firm employed by or acting for or on behalf of any customer, whether private or governmental, for the purpose of inducing or rewarding favorable action by the customer in any transaction, or

   • any person or firm employed by or acting for or in behalf of any governmental agency, for the purpose of inducing or rewarding any action or the withholding of any action by such agency in any governmental matter.

The Company will also not submit claims for patients who were knowingly referred to the Company where the referring physician (or a direct member of his/her family) has a financial

relationship—consisting of either an ownership interest or a compensation arrangement—with Amedisys that is not excepted under applicable regulations.

**No Amedisys representative may offer or pay any amounts out of personal or non-company funds that would otherwise be deemed a violation of these rules if done by the Company.**

## Contracts with Referral Sources or Persons/Entities to Whom Amedisys Refers

All contractual arrangements with referral sources, including Physician Consultant agreements and contracts leasing office space, should be reviewed and approved by the Amedisys Chief Compliance Officer. Additionally, under federal law, any contract for Physician Consultants or for the lease of space from a physician or group of physicians, must meet the following standards:

- The agreement must be set out in writing and signed by the parties;

- Specification of the services or lease, including specific times (if in intervals), to be provided by the physician;

- Requirements for documentation of accomplishment of tasks or services rendered by the party providing the service, and maintenance of the documentation by the Company;

- The aggregate services or space contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement;

- The term of the agreement must be for a period of at least 1 year;

- The compensation or payment for the service or lease must be set in advance and consistent with fair market value, and not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the two parties; and

- The services performed under the agreement do not involve the promotion of a business arrangement or other activity that violates any federal or state law or regulation.

"Fair Market Value" (FMV) is established at the corporate level and individualized for each market. Fair market valuations will be based on an amount that a willing buyer and seller would exchange for particular good or service in an arm's length transaction without regard to actual or potential referrals generated between the parties.

- FMV for Physician Consultants—Fair market value will be determined in accordance with corporate compensation surveys and/or G0181 reimbursement standards. No Physician Consultant who may be an actual or potential referral source will be paid in excess of the fair market value standards set by the CCO.

- FMV for Leases—Fair market value will be based upon the average of multiple, comparable rentals from other similarly-situated products, premises, or services in the local market that are not owned by an actual or potential referral source.

## Inducements to Patients & Beneficiaries

Consistent with federal law, no gift or other remuneration may be given to any actual or potential patient or patient's family, either directly or indirectly, overtly or covertly, in cash or

in kind, in order to induce or reward such person(s) to utilize Amedisys' services. Items not of substantial value (i.e., less than $10 per individual gift and not more than $50 in the aggregate annually) may be given to a patient, provided such is not presented as a quid-pro-quo for utilizing Amedisys' services. Charitable and/or other humanitarian gifts that may potentially benefit a patient may be given through a legitimate charitable organization, provided the recipient is not aware of the original source of the contribution.

## Physician Consultant Payments

No physician or other referral source may provide consulting or advisory work for Amedisys (including Medical Director services) without having an Amedisys-approved contract in place. The CCO or his designee should review each agreement to ensure it comports with federal safe harbors. All invoices for payments to physician consultants must be approved by the CCO prior to payment. Invoices must be submitted on appropriate forms and contain satisfactory documentation that legitimate services were provided.

Physician ownership of or significant financial interest in Amedisys may not exceed applicable regulations.

Joint ventures between Amedisys personnel and individuals or entities who can make Medicare/Medicaid referrals are not to be allowed without the prior approval of the Chief Compliance Officer.

## Safe Harbors and Regulatory Exceptions

The Company may make use of safe harbor and regulatory exceptions to the Federal anti-kickback law and/or Stark law, where appropriate, which may permit certain financial practices between Amedisys and referral sources.

Based on federal regulations, these restrictions are not intended to apply to ordinary and reasonable business entertainment or gifts not of substantial value (i.e., less than $300 in annual, aggregate value), customary in local business relationships, and not in violation of law as applied in that location. When customer organizations, governmental agencies, or others have published policies intended to provide guidance with respect to acceptance of entertainment, gifts, or other business courtesies by their employees, such policies should be respected.

> Company management should exercise sound discretion and control in authorizing entertainment or gifts.

Company management should exercise sound discretion and control in authorizing entertainment or gifts. However, this should not be construed in any way as encouragement to make or receive such entertainment or gifts.

## CORPORATE COMMUNICATIONS

Promotional material circulated under our company's name makes a representation on behalf of Amedisys. Given the gravity and potential consequences--both from a legal and a business standpoint--that can impact Amedisys, all such communications must be reviewed and approved at a corporate level by the Senior Vice President of Marketing and the CCO before being disseminated. This includes, but is not limited to:

- Communication and print material
- Advertising/media relations (print, radio, television, Internet, outdoor, etc.)
- Printed collateral for special events (dinner meetings/symposiums, career/job fairs, consumer health fairs, etc.)
- Speaking engagements
- Exhibit/display board designs, and trade shows and exhibits.
- Publishing of outcomes information

Marketing is responsible for and must coordinate the concept, design and development of the actual item, while Legal ensures that the communication is not violative of the law or any third party's rights. The CCO is responsible for ensuring that our marketing practices are consistent with Federal healthcare fraud and abuse laws, including but not limited to the Federal Anti-Kickback Statute and the Stark Law. All these corporate groups work closely together to ensure that all local, regional and national communication is compliant with all legal requirements as well as the company's image and brand.

## ANTITRUST (ANTI-COMPETITIVE BEHAVIOR)

Antitrust laws are designed to protect free and fair competition. Amedisys will strictly abide by the letter and intent of federal and state antitrust laws in order to promote honest competition. In an effort to familiarize employees with the basic principles of what antitrust law means and how it applies to Amedisys, the following summarizes the applicable laws and regulations.

> Amedisys will strictly abide by the letter and intent of federal and state antitrust laws in order to promote honest competition.

Each individual employee should recognize possible antitrust issues and avoid both illegal conduct as well as questionable conduct that may prompt investigations or litigation. Employees should confer with the CEO or his designee or with the Company's Chief Compliance Officer for advice whenever they face a business issue raising possible antitrust concerns.

- All arrangements and relationships with competitors must be carefully entered into since such relationships frequently raise anti-competitive/antitrust issues. Any understanding or agreement (including those agreement that are implied from a course of conduct) with any competitor to fix prices, agree on labor costs, or allocate markets, is illegal in most instances.

- Because of the potential risk for antitrust issues, no employee should discuss or exchange any information with a competitor concerning: (i) any aspect of pricing, including maximum or minimum prices, discounts, or credit or payment terms, (ii) services to be provided in the market, (iii) key costs such as labor costs, or (iv) other non-price information (such as marketing plans), without first obtaining the approval of the Legal Department.

- Relationships with customers and suppliers also raise antitrust issues in certain circumstances, particularly if the Company occupies a significant market position in its geographic region. The legal department should be consulted before (i) entering into any exclusive dealing arrangement in which you agree with a supplier (including a physician) not to do business with the supplier's competitors, (ii) conditioning the sale of one product on the requirement that the customer also buys another of the vendor's products or services or the vendor's full line of products or services, (iii) refusing to deal with suppliers (including physicians) who sell to or otherwise benefit competitors, and (iv) refusing to do business or deal with customers or suppliers for competitive reasons such as to lessen competition or to attempt to create or maintain a monopoly (e.g., a refusal to deal with suppliers who sell to customers who are price-cutters).

> It is important that common sense and good judgment be used to avoid antitrust problems.

- It is important that common sense and good judgment be used to avoid antitrust problems. Avoid discussing any prohibited or sensitive subjects with a competitor unless you are proceeding with the advice and consent of the Company's CEO. If a competitor raises a prohibited subject, end the conversation immediately. Be particularly alert at professional, industry/trade association meetings in your choice of words both orally and in writing about any prohibited conduct since someday it might be disclosed. Do not provide any information in response to an oral or written inquiry concerning an antitrust issue without first consulting with the CEO or the CCO.

- On a case-by-case basis, the CEO will determine the need for additional detailed guidelines to address various antitrust issues and will confer with the Company's CCO and outside legal counsel for guidance. Those guidelines should be consulted and followed.

## COMPLIANCE WITH OTHER LAWS AND REGULATIONS

Amedisys is in the business of providing Medicare and Medicaid home health care, hospice, personal care, nurse practitioner, and therapy services to patients throughout the United States. These services will be provided pursuant to applicable federal, state, and local laws, rules, and regulations and may be subject to other regulations, such as those pertaining to access to treatment, consent to treatment, medical record keeping, patients' rights, terminal care decision-making, and Medicare or Medicaid regulations. As a health care provider, Amedisys is also subject to HIPAA, and the Company and its employees will abide by the Company's HIPAA policies and procedures at all times.

Additionally, like other businesses, the Company is subject to relevant federal and state laws or statutes, discrimination laws, and general and professional liability laws.

Every employee should be familiar with the general legal and regulatory requirements that apply to his/her area of responsibility and should periodically keep current with the changes thereto. Employees, however, are not expected to become experts in all legal and regulatory requirements and, therefore, should consult with the CCO or other designated management representative for advice whenever faced with an issue that raises possible legal or regulatory concerns.

Significant training will be provided at both the corporate level and the agency level to ensure that staff are qualified to perform their jobs and to ensure that everyone is generally knowledgeable about the law and our legal duties.

> Every employee should be familiar with the general legal and regulatory requirements that apply to his/her area of responsibility.

## CONFLICTS OF INTEREST

Conflicts of interest should not be allowed to exist or remain in place where a person's actions or activities on behalf of the Company also involve the obtaining of a personal benefit or gain, or result in an adverse effect upon the best interests of the Company, or provide a competitor an improper or illegal gain or advantage to the Company's detriment. Some specific examples of potential conflict of interest situations:

- Holding a financial interest in, or engaging in activities on a consulting basis, or otherwise, with an agency or other entity which provides services, supplies, or equipment to Amedisys or with an agency or entity which is in competition with Amedisys, or is engaged in activities in which Amedisys may have a present or future interest. (This does not apply to personal investments of less than five (5) percent in the stocks or shares of corporations or institutions traded on a major national securities exchange.)

- Speculating or dealing in services, equipment, or supplies which are purchased by Amedisys if the individual stands to gain financially, or where such speculations or dealings would be contrary to the Company's best interests.

- Borrowing money from suppliers or contractors. (This does not apply to transactions with banks or commercial lending institutions that do not involve concessions to the individual because of such individual's position within the Company).

- Accepting favors, gifts, or entertainment that others may perceive to be substantial enough to influence such individual's selection of services, or to influence such individual's judgment in otherwise representing the Company. Acceptance of perishable or other gifts of a nominal value (less than $50) or reasonable personal entertainment is not improper, but care must be exercised to be sure than continuation of such action does not gradually lead to an embarrassing or unwanted obligation. In the case of gifts that are of a substantial nature, these should be returned to the donor with the explanation that Amedisys' policy prohibits acceptance.

- Acquisition by purchase or lease of real estate in which it is known that Amedisys might have an interest, or which may appreciate in value because of the Company's possible interest in nearby property. An employee should not acquire any financial interest in a business when the acquisition of such business is or should be under consideration by the Company.

All conflict of interest questions or concerns must be disclosed to the CEO of the Company, the Company's Chief Compliance Officer, and/or to the Compliance Committee described later in this plan. Corrective action generally will focus on minimizing or eliminating the conflict of interest between the individual and Company.

> Each Amedisys employee is free to participate actively in the political affairs of his or her community, state, and country.

## POLITICAL ACTIVITY

Each Amedisys employee is free to participate actively in the political affairs of his or her community, state, and country, and to stay informed on public issues and on the positions and qualifications of candidates for public office. Amedisys does not seek to limit the activities in which employees may participate on their own time or the gifts or contributions they make with their own funds.

Nevertheless, no gift or contribution may be made or authorized to be made with Company funds or resources to any candidate for public office, campaign fund, political party, or organization, unless such gift or contribution is expressly permitted by state and federal law. Any such actions must be approved in advance by the CEO.

With the exception of payments required or authorized by law to be made to public officials, such as tax payments or payments for licenses or permits, no payment, gift or contribution may be made, either with Company funds or the personal funds of any Company or Agency employee, to any official or employee of any federal, state or local government for the purpose, in whole or in part, of influencing such official's or employee's conduct, action or decision in any matter. No payment shall be made in the nature of a kickback or bribe designed to encourage or elicit favorable action.

Nothing in this plan shall prohibit or restrict the Company from establishing a political action committee for purposes of lobbying and promoting legislative beneficial to the Company and its shareholders, provided, however, that the formation of any PAC shall be approved in advance by the CEO.



The following information describes the guidance, monitoring, reporting, and enforcement procedures that ensures effective compliance. The Amedisys governing Board of Directors is ultimately accountable for the Company's compliance program and the overall compliance of the Company and all its divisions.

### THE ROLE OF THE CHIEF COMPLIANCE OFFICER

The Amedisys governing body has designated a Chief Compliance Officer (CCO) to serve as the focal point for all compliance activities. This individual will be responsible for planning, organizing, implementing, and overseeing the compliance program. The CCO will be accountable to the Amedisys CEO and governing body and will be responsible for at least the following:

> Guidance
>
> Monitoring
>
> Reporting
>
> Enforcement

- Developing, coordinating, and participating in education and training of all Company staff, including leadership and management, with respect to the compliance program;

- Developing and periodically reviewing policies and procedures related to the compliance plan, standards of conduct, education and training, fraud and abuse, monitoring and review activities;

- Evaluating reported instances of questionable behavior (i.e., potential fraud or abuse), assessing each individual situation on a case-by-case basis, and gathering essential facts and related information in each case;

- Reviewing the nature and content of calls received via the Compliance Hotline and taking appropriate action;

- Coordinating personnel issues with the Company's Human Resources Department, including investigations and disciplinary action as well as education and training;

- Assisting the Company's management staff in coordinating internal compliance review and monitoring activities;

- Submission of periodic and annual reports on compliance activities to the Company's CEO and governing body; and

- Ensuring periodic review, evaluation, updating and revision of the compliance program and related elements.

- Reviewing all contracts with actual or potential referral sources or those from whom Amedisys may receive referrals for services or those to whom Amedisys may refer patients.

As needed, the CCO will confer with the Compliance Committee, particularly when evaluating

sensitive issues or alleged fraudulent or abusive behavior, and when making a determination as to the appropriate action to be taken. The CCO also will make recommendations concerning disciplinary action. In addition, the CCO will also assess the potential liability, if any, for the Company in each situation, as well as the possible outcome if no action were to be taken.

Objectivity, discretion, and confidentiality will be ensured in the evaluation of all instances of reported questionable behavior.

The CCO will also be available for management and staff questions relating to the elements of the Compliance Plan.

> The Chief Compliance Officer is available for staff questions relating to the elements of the Compliance Plan.

## THE CORPORATE COMPLIANCE COMMITTEE

The Corporate Compliance Committee is responsible for generally overseeing the Company's compliance program (under the delegated authority of the governing body). The Corporate Compliance Committee consists of members of Amedisys' executive leadership staff, who have the authority to take action at the highest level.

Amedisys' Corporate Compliance Committee is comprised of, but not limited to, people with the following titles:

- President and/or Chief Executive Officer
- Chief Compliance Officer
- Chief Financial Officer
- Chief Operating Officer
- Chief Information Officer
- Chief Human Resource Officer
- Chief Enablement Officer

- General Counsel & SVP Government Relations
- President of Home Health
- President of Hospice
- Senior Vice President of Assurance Services
- Vice President Deputy Compliance Officer
- VP Compliance - Audit

For current list of individuals and their contact information, please view the Compliance Committee List on Amedisys@Work, using the following path:

Amedisys@Work > Support Centers > Compliance > Links > Compliance Committee List

The Company's CCO serves as the Chairman of the Compliance Committee.

This Corporate Compliance Committee meets regularly, at least once per quarter and more frequently as needed, to review established standards and procedures, review communication and monitoring activity, review any reports of suspected violations of the program, and assist in determining consistent disciplinary and other action for compliance program enforcement. Information concerning the Compliance Committee's activities is also periodically submitted to the Amedisys Board of Directors (i.e., governing body) by the CCO.

All meetings of the Corporate Compliance Committee are documented in meeting minutes and maintained in a confidential manner to ensure the integrity of the Amedisys compliance program.

# Section 3: Compliance Reporting

All Amedisys employees have a duty to the Company to report any questionable activity or fraudulent conduct. Additionally, all employee All Amedisys employees have a duty to the Company to report any questionable activity or fraudulent conduct. Additionally, all employees are encouraged to question activities thought to be potentially fraudulent prior to undertaking them. Employees may be subject to disciplinary action, up to and including termination, for failing to report violations of the Compliance Plan.

**How to Report**—To assist and encourage prompt reporting of suspected problems without the fear of retribution, employees may report suspected violations by telephone to the CCO or to any member of the Compliance Committee on an anonymous basis. Amedisys also provides a confidential Compliance Hotline, which may be used at any time.

 **THE TOLL-FREE COMPLIANCE HOTLINE NUMBER IS: 1-800-464-0020.**

Calls to the Compliance Hotline will be received 24 hours a day, 7 days a week, via a third-party answering service, ComplianceLine, who answers calls, obtains information, and forwards issues to the CCO. A log of all calls will be maintained by the CCO and summary information will be communicated to the Compliance Committee and the Board of Directors. The CCO and Compliance Committee will then evaluate the reported activity, determine the relevant facts, and take appropriate enforcement and other corrective action as indicated.

While the Company will handle all complaints as confidentially as possible, staff should nonetheless be aware that their allegations and/or identity are subject to disclosure as necessary to complete the Company's investigation or as required by law, but in all instances, the Company will maintain confidentiality to the fullest extent possible. Our non-retaliation policy also applies to calls made to the Compliance Hotline.

> The Compliance Hotline is also available to report any questionable accounting practices or financial improprieties.

Any employee, regardless of position or status, may call the Compliance Hotline to obtain assistance and advice on issues relating to the Compliance Plan, policies and procedures, and other matters pertaining to actual or potential fraud and abuse.

The Amedisys Compliance Hotline is also available for any person to report questionable accounting practices or financial improprieties involving Amedisys or any division or operating unit. Any complaint implicating the Company's accounting or financial reporting will be immediately forwarded by the CCO to the Chairman of the Audit Committee of the Amedisys Board of Directors.

# Section 4: Compliance Training

The best way for Amedisys to fight and deter fraudulent activity is through the prevention of its occurrence; and the primary mechanism for preventing fraud and abuse is through mandatory, routine compliance training and education.

## GENERAL COMPLIANCE TRAINING



All Amedisys staff, regardless of Division or position within the Company's corporate offices or individual Agency locations, will receive training on the Compliance Plan and related aspects of the overall compliance program. Because the compliance program for Amedisys pertains to any individual who provides patient care and services for Amedisys, compliance education will also be provided to individuals who are utilized by the Company or any Agency on an individual contract or arrangement contract basis. Established Compliance Program policies and procedures regarding training and related documentation will be followed.

All new employees are required to complete basic compliance training during orientation and within thirty- (30) days of hire. Additionally, all new employees will receive additional compliance training during New Employee Orientation. For tenured staff, periodic compliance updates and in-services will be conducted as needed, but at least on an annual basis.

This portion of the compliance program training will be established and maintained by the Company's CCO with recommendations from the Compliance Committee as to pertinent topics and issues to be addressed at these training sessions.

Employees who join Amedisys through an acquisition are required to complete all Amedisys compliance training sessions during their agency transition process, with oversight by appropriate Amedisys corporate personnel.

Documentation of completion of compliance program training should be maintained in each staff member's personnel record. Every effort will be made to ensure that all Company staff, regardless of employment status, are enlightened and aware of the Company's Compliance Plan, including accepted standards of conduct, and its relevance to their respective position and role within the Company.

> The primary mechanism for preventing fraud and abuse is through compliance training and education.

## BILLING COMPLIANCE TRAINING

Because the billing process represents the touchstone for all revenue and compliance risk, Amedisys has implemented a comprehensive billing compliance training program. This program is required of all staff involved in billing and coding functions for the Company.

The annual billing compliance process training details the specific billing system controls and procedures designed to insure the propriety of Amedisys' claims to Medicare and other payors. Participants are required to complete the training, sign a training certification, and then take a post-test. In the event an employee scores less than 100% on the post-test, it must be repeated, and failing to achieve a perfect score will cause the employee to be removed from his/her position. This training is repeated annually, and each year staff are required to demonstrate ongoing competencies in the system and the mandatory procedural safeguards for billing.

> The billing process represents the touchstone for all revenue and compliance risk; therefore, Amedisys requires comprehensive training on billing compliance.

## BUSINESS DEVELOPMENT TRAINING

The sales and marketing functions of the Company exist to develop and grow the business. However, because of the numerous laws that impact our marketing efforts, most notably the Federal Anti-Kickback law (and its various state law counterparts) and the Stark law, it is essential that all sales staff undergo comprehensive training on proper marketing activities.

To that end, all new sales staff must participate in additional Business Development Compliance Training regarding appropriate marketing and business development practices upon hire and annually thereafter.



# Section 5: Responding To Government Inquiries

The Company intends to cooperate fully with any governmental audit or investigation. Company management, in consultation with legal counsel, will assist any duly authorized investigators or auditors in their efforts to obtain information necessary for the conduct of an investigation or audit. Nonetheless, the Company's management has a responsibility to protect the legal and constitutional rights of the Company, and will do so within the bounds of the law while cooperating with governmental authorities to the fullest extent possible.

> Amedisys will cooperate fully with any governmental audit or investigation.

The oversight of anti-fraud and abuse efforts within Amedisys is centralized within the office of the General Counsel. The General Counsel will be notified as soon as possible when a governmental representative (i.e., agent, auditor, representative, or investigator) contacts any employee about the Company. This includes any question, audit, request for information, subpoena, subpoena duces tecum, letter, or search warrant, and includes any such communication, whether verbal, written, electronic, or face-to-face.

## LAW ENFORCEMENT REQUESTS & SEARCH WARRANTS

Should a governmental representative contact or visit any employee or Company office during business hours, the Company's General Counsel should be immediately contacted at (225) 292-2031. Should such contact or visit occur after regular business hours, the General Counsel should be notified as soon as possible, and in no event later than the next business day.

If a governmental representative attempts to execute a search warrant at any Amedisys business location, the Company's General Counsel should be immediately notified. No employee should take any action that would interfere with the agents conducting the search. At no time should any documents or other evidence be destroyed, removed, altered, or hidden.

Supervisors and employees should cooperate in locating items listed in the search warrant. Requests for any items not listed on the warrant should not be honored unless expressly approved in advance by the Company's General Counsel.

Supervisors and employees are not required to provide any explanation or verbal information concerning the Company, its operations, bookkeeping, methods, records, policies, or procedures, nor should any Amedisys personnel interpret any document for government representatives. (For example, questions regarding the usage of off-site storage facilities should be directed to the Company's General Counsel and no further information should be given to the government agent(s) concerning this subject matter.)

## LAW ENFORCEMENT CONTACT WITH EMPLOYEES

In the event individual employees or contractors are contacted by governmental agencies related to investigations and/or audits of Amedisys or its affiliates, such personnel should not provide information, records, data, or documents—regardless of format—without the prior approval of the Company's General Counsel. The General Counsel should immediately be notified of any contact directed to personnel by any government representative, whether such contact occurs at work, at home, or via mail, telephone, or face-to-face. No response or communication should be made to any government representative without the prior approval of the Company's General Counsel. In the event the Company determines that legal representation for the Company and/or the employee is required prior to any communication with government representatives, the Company may provide such. Individual personnel are also free to retain separate counsel at their own expense. No company documents will be released to any government representative without the prior approval of the General Counsel.



## CONFIDENTIALITY

Any government inquiry or investigation, including but not limited to the issuance of any warrant, subpoena, or correspondence, is confidential information and should not be disclosed to third parties. In no event should such inquiry or investigation be publicized or commented on publicly. Any inquiries from media or other third parties should be directed to the Company's General Counsel or his/her designee. Persons who may be aware of government inquiries or investigations should also be mindful of restrictions imposed by the Securities and Exchange Commission applicable to persons who purchase or sell securities of public entities while in possession of material, non-public information.

# Section 6: Compliance Monitoring

Compliance monitoring efforts consist of periodic reviews of applicable rules and policies, as well as frequent audits of compliance risks.

All employees should have a sufficient familiarity and sensitivity to the legal and ethical issues with which they deal to assure a good sense of where the boundaries lie and are able to seek assistance as required. Managing personnel are subject to disciplinary action for failing to detect non-compliance where reasonable diligence would have led to discovery of the problems and allowed for earlier, corrective action.

To that end, knowledge of and compliance with Compliance Program policies is expected of all Company staff regardless of division or position within the Company.

Additionally, the CCO and members of the Corporate Compliance Committee are available for guidance to all employees with respect to matters requiring consideration under this Compliance Plan. Any employee who has questions is encouraged to consult with his or her manager or supervisor, the CCO, or any member of the Compliance Committee for assistance.

## COMPLIANCE AUDITS

Amedisys engages in frequent reviews of company activities to ensure compliance with all laws and regulations, as well as Company policies and procedures, in each agency, division, and department. Reviews include, but are not limited to, agency assessments by both agency and corporate personnel, clinical operations audits, conditions of participation audits, Compliance Department audits, internal audits, Sarbanes Oxley audits, and annual external audits of consolidated financial statements for the Company.

> Employees should have a good sense of where the boundaries are and are encouraged to seek assistance as required.

Specifically, claims are reviewed prior to submission to the fiscal intermediary to ensure that proper regulations and related reimbursement requirements are followed. All initial checks are automated through the company's computerized billing system; and any claim that fails the basic system checks is then manually audited by staff.

All staff will follow Amedisys operational policies and procedures with respect to billing processes, proper coding, episode management, and documentation. Specific pre-billing requirements include the following:

- All claims submitted will be for services actually rendered, medically necessary, and justified by appropriate, accurate documentation.

- Final claims will not be submitted without signed and dated physician's orders.

- Claims will be completed in accordance with Medicare guidelines and related intermediary instructions.

- No claims will be submitted for questionable visits or for care or services provided to beneficiaries who do not meet the basic Medicare eligibility criteria.

The Company's monitoring processes also include a periodic review of leases and other contracts for services, as well as cost report reviews by appropriate staff. Additionally, expense reports are reviewed to ensure that all expenses related to marketing and sales are proper, and that no improper remuneration—either in cash or in kind—is being paid to any person having control over the referral of business to the Company.

Finally, the Compliance Department assesses potential risk through the compliance risk scorecard, which compiles numerous financial, clinical, operational, complaint, regulatory, and environmental risks that may lend themselves to the potential for improper billing Each quarter, the Company's Compliance Audit Managers conduct clinical audits for agencies deemed to be at the highest risk based on the compliance risk scorecard or other metrics. In response to problems identified during audits or reviews,
agencies are required to submit action plans and engage in focused education, which is approved by the Compliance Manager. Agencies that are required to implement action plans are then subsequently re-audited or placed on pre-billing reviews to ensure that problems identified in prior audits are not recurring.

In all compliance-related audits, any trend or matter found to be potentially fraudulent is reported to the Chief Compliance Officer and investigated.

## EXIT INTERVIEWS

A mechanism for obtaining employee feedback concerning the compliance of the organization and the propriety of our practices is through an exit interview. All employees who leave the organization, regardless of whether the separation is voluntary or involuntary, are given the opportunity to participate in an online exit interview., Any compliance allegation raised in a post-employment exit interview triggers a review by the Compliance Department.

## OVERPAYMENTS

In the event that overpayments are identified (either internally or through final administrative or legal adjudication), the Company will promptly refund all amounts properly owed to the payor. All overpayments must be returned within 60 days. Additionally, the Company will take all reasonable steps to insure that, to the extent such overpayments are attributable to the fault of the Company, the circumstances contributing to the occurrence of the overpayment do not recur in the future.



## Section 7: Sanctions & Enforcement

For any compliance program to have real teeth and serve as an effective deterrent against fraud, it must have the authority and ability to take disciplinary action for violations of the Compliance Plan occurs.

### ZERO TOLERANCE

Because of the risks posed to the Company and its shareholders by fraudulent behavior, Amedisys takes a zero tolerance policy relative to fraud, abuse, and waste involving federal health care programs. Any Direct Violation or Ancillary Violation of this Compliance Plan or any violation of a federal health care law by an Amedisys employee will result in company disciplinary action.

- Direct Violations include circumstances in which persons authorize or participate directly in a violation of law, regulations, or Company compliance policies or procedures.

- Ancillary Violations include circumstances where persons withhold or fail to report information about violations of law, regulations, or Company violations, or persons retaliate or attempt to retaliate against individuals who report suspected violations.

Additionally, any departure from the company's billing procedures—especially those related to the manipulation of computerized system safeguards (i.e., system holds) designed to prevent claims from being submitted without sufficient documentation or with unresolved frequency inconsistencies—will be regarded as zero tolerance offenses, the occurrence of which will result in immediate termination.

**App. 243**

27

## ENFORCEMENT STANDARDS

Because of the significant legal and ethical consequences of non-compliance with this Compliance Plan, the CCO and the Compliance Committee will take disciplinary action with respect to not only those who violate the Plan, but also those who fail to report known or detected violations or fail to respond appropriately to a suspected or reported violation.

> Disciplinary action will be taken against those who violate the Compliance Plan as well as those who fail to report known violations.

Disciplinary action should be appropriate under each circumstance. Disciplinary action may range from verbal counseling, to formal write-ups, to termination. The severity of disciplinary action depends upon factors including but not limited to the seriousness of the violation, the frequency of the offense, any pattern of conduct, strength of supporting evidence, and the circumstances surrounding the violation. Although consideration may be given to whether the violation was intentional, as well as good faith shown by the employee in reporting the violation and assisting in the correction process, Amedisys reserves the right to take any disciplinary action deemed necessary to protect the Company. It is the responsibility of the CCO, in collaboration with the Compliance Committee, to ensure that the Company's Compliance Plan is enforced in a fair and consistent manner.

The Amedisys CCO will report to the Company's governing body all reported instances of questionable behavior, the results of the respective evaluations and/or investigations, actions taken to resolve or handle the matter, and any disciplinary action that resulted from such activity. Persons who may compromise the integrity of an investigation because of their role should be removed from any work assignment or position of influence until such time as the investigation is completed.

## REMEDIAL ACTION

In the event that a material violation of the law is discovered, the Compliance Committee shall take all necessary actions to correct the problem and insure that it does not recur, including but not limited to: implementation of a corrective action plan, return of any identified overpayments, reporting the violation to the Payor or fiscal intermediary, reporting the violation to law enforcement (including the OIG), and reporting the violation to the licensing body(s) of the person(s) involved. These corrective actions shall not be exclusive nor shall the election of any one or more be required, except as circumstances specifically warrant. All such actions should be taken within sixty- (60) days of any determination that a violation has occurred.

## REPORTS TO LICENSING AUTHORITIES

In the event an employee is determined to have committed a Direct Violation, such matter(s) will be reported by the Chief Compliance Officer to any licensing authority (e.g. State Nursing

Board, etc.) having jurisdiction over the employee's profession.  In the event of an Ancillary Violation, such matter(s) will be reported as required by the relevant licensing authority.

## NON-RETALIATION

No person shall retaliate or discriminate against a person who, in good faith, reports a compliance issue, question, complaint, or concern.   Retaliation shall be deemed to include but not be limited to termination, reduction in pay, unusual and/or unreasonable changes in working condition, and other negative treatment of a pecuniary and non-pecuniary nature for which the sole and proximate cause is the victim's status as a complainant.

Notwithstanding these protections, the Company is still able to take reasonable disciplinary actions for reasons separate and apart from a person's report of compliance problems, including failure to satisfactorily meet job requirements.

Nothing shall restrict the Company from taking disciplinary action against any person who violates the Compliance Program, and may subsequently attempt to report that violation.

Persons who, in good faith, report compliance problems shall be afforded all the protections available under the law as whistleblowers, and retaliation against a whistleblower will be deemed a violation of the Company's Compliance Plan.

The same non-retaliation protections are afforded to persons who report a health care fraud violation, as well as those voicing concerns over the company's financial and/or accounting practices.

No person shall retaliate or discriminate against a person who, in good faith, reports a compliance issue.

# PART 2:
## SPECIFIC COMPLIANCE STANDARDS
## APPLICABLE TO AMEDISYS HOME HEALTH

## INTRODUCTION

Amedisys Inc., provides home health care services, inclusive of skilled nursing, therapy (including but not limited to physical therapy, occupational therapy, and speech therapy), home health aide services, and medical social workers, by and through individual subsidiaries (hereinafter referred to individually and collectively as "Home Health").

The policies contained in this Section constitute specific compliance standards applicable to Home Health. It is intended that all provisions of the Amedisys Compliance Manual and all Amedisys compliance standards and policies shall likewise apply to Home Health, and such corporate policies shall be read in concert with these standards. This includes, but is not limited to, policies regarding compliance oversight, the Amedisys Corporate Compliance Committee, the Amedisys Compliance Hotline, compliance training, compliance oversight and auditing, anti-kickback policies, as well as Amedisys HIPAA policies and procedures.

## GENERAL POLICY

Home Health and its staff will comply with all applicable Federal, State and local laws and regulations.

## SPECIFIC REQUIREMENTS & PROHIBITIONS

Home health shall not engage in any of the following prohibited activities:

- Billing for Services Not Rendered
  Home Health should not submit a claim that represents that the agency performed a service all or part of which was simply not performed.

- Billing for Medically Unnecessary Services
  Home Health should not knowingly submit reimbursement for a service that is not warranted by the patient's current and documented medical condition.

  – Therapy Episode Management. Home Health will not falsely bill for a physical therapy visit that did not actually occur, nor perform a physical therapy visit that is not clinically justified solely to exceed a threshold for increased reimbursement.

  – LUPA Episode Management. Home Health will not falsely bill for a visit that did not actually occur, nor perform a visit that is not clinically justified solely to avoid a diminution in episodic payment attributable to a Low Utilization Payment Adjustment (LUPA).

- **Upcoding**
  OASIS responses and other clinical documentation will accurately reflect the patient's true clinical condition, and Home Health will never falsify or exaggerate the clinical severity or functional limitations of any patient(s) in order to inflate reimbursement.

- **Duplicative Billing**
  Home Health should not submit more than one claim for the same service or submit claims to more than one primary payor at the same time.

- **Incentives to Referral Sources**
  Home Health should not offer or give anything of value—directly or indirectly, overtly or covertly, in cash or in kind—to any actual or potential referral source, including but not limited to physicians, hospitals, patients, etc.—to induce or reward referrals in violation of state or federal anti-kickback laws. This prohibition specifically includes, but is not limited to, arrangements such as the payment of a fee to a physician for each plan of care certified, providing items or services for free or below fair market value to beneficiaries, providing nursing or administrative services for free or below fair market value to physicians, hospitals, or other referral sources, or providing salaries to a referring physician for services either not rendered or in excess of fair market value for services rendered.

- **Stark Law Violations**
  Home Health should not create or permit a financial relationship between Home Health and a referring physician (or an immediate family member of such physician) in violation of 42 U.S.C. 1395nn. For purposes of this section, a "financial relationship" includes an ownership interest or compensation arrangement not otherwise permissible under an applicable exception. Questions regarding any actual or potential Stark law violation should be directed to the Chief Compliance Officer.

- **Payor Standards**
  Home Health may bill payors only if all of the payor's specific requirements are satisfied. In particular, Home Health may only bill Medicare when: (a) the services are provided to homebound patients, (b) for qualifying services, and (c) where a physician has certified the plan of care.

  – <u>Duplication of Services by Caregiver.</u> Home Health should not knowingly or recklessly disregard willing and able caregivers when providing home health services. Where a family member or other person is or will be providing services that adequately meet a patient's needs, it is not reasonable and necessary for a home health agency to furnish such services.

  – <u>Homebound Status.</u> Home Health should ensure that the homebound status of a Medicare beneficiary is verified and that the specific factors qualifying the patient as homebound are properly documented. Any determinative assessment of homebound status, including a plan of care signed by a qualified physician, should be completed prior to billing Medicare for services.

- Qualifying Services.  Home Health must ensure that patients for whom it bills Medicare have a need for skilled nursing care on an intermittent basis, physical therapy, speech-language pathology services, or a continuing need for occupational therapy.  Other dependent services—such as home health aides, medical social workers, and occupational therapists—may be performed in conjunction with a qualifying service.  However, after qualifying services have ceased, Home Health may not continue billing Medicare for other dependent services.

- Physician Certification.  Home Health may bill only when the agency is acting upon a physician's certification attesting that the services provided to a patient are medically necessary and meet the requirements for Medicare-covered home health.  The home health plan of care must be established, dated, and signed by a qualified physician.  The plan of care must also be periodically reviewed by the physician in order for the patient to receive care in subsequent episodes.

## Overutilization

Home health should bill for visits only when they are medically necessary.  No visit should be made for financial reasons;  rather, any visit should correspond to a legitimate medical need of the patient and be in furtherance of the patient's goals and plan of care.  No patient should be admitted for care or recertified for additional episodes of care unless such admission or readmission is clinically appropriate.

## Inadequate Staffing

Home Health should not bill for any services provided by unqualified or unlicensed clinical personnel.  Home Health should also provide adequate management and oversight of subcontracted services.

## Underutilization

Home Health should not knowingly deny needed care to patients solely to keep costs low.  Rather, each patient should receive the optimal level of care consistent with the Company's disease management programs and related clinical tracks.  No medically-necessary visit should be refused or denied because of the financial impact to the Company.

## Episode Management

Patient episodes of care will be managed in such a way that the proper clinical care is delivered to the patient.  While it is the goal to be as efficient as possible and manage utilization appropriately, no visits will be made or denied solely for financial reasons and contrary to the patient's best interests clinically.

- Documentation Violations

  Home Health should ensure that sufficient documentation evidencing the services performed and supporting reimbursement exists prior to billing claims to payors. Additionally, no clinical documentation should be falsified, backdated, or altered. Notwithstanding the foregoing, documentation errors may be corrected consistent with state regulations and Company policy. No physician signature may be forged on any document, including orders and plans of care. No beneficiary signature may be forged on visit note or logs, or any company form.

- Patient Solicitation

  Home Health may not engage in improper patient solicitation activities, including but not limited to high pressure marketing of uncovered or unnecessary services, or offering free gifts or services to patients for the purposes of maximizing business growth and patient retention.

- Patient Abandonment

  Home Health should not abandon patients in need of care in violation of applicable statutes, regulations, and Federal health care program requirements. Home Health should utilize Advance Beneficiary Notices prior to terminating home care services in conformity with applicable laws and regulations.

- Non-Discrimination

  No patient should be discriminated against in relation to admission, discharge, or services provided on the basis of any federally-protected class.

- Misuse of Provider Numbers

  Home Health should not knowingly misuse provider certification numbers. Similarly, Home Health should adhere at all times to home health agency licensing requirements and Medicare program conditions of participation.

- Other Prospective Payment System Abuses.

  Home Health will not submit duplicate billings of charges that are subsumed within the PPS payment. Home Health will properly report and characterize any change in patient conditions used to establish the episodic payment, and will make adjustments as necessitated by such changes.

- Falsification of Documentation

  Home Health will not falsify any patient signature on a visit note, consent form, or any other documentation. Likewise, Home Health will not falsify the signature or other documentation of a physician on a referral, order, face-to-face certification, or any other documentation. Home Health will not falsify any part of a clinical record note to misrepresent the occurrence of all or part of any patient visit, including patient vital signs and responses to treatment.

## CLAIMS DEVELOPMENT AND SUBMISSION

Home Health's reimbursement process must comport with current Federal health care requirements regarding the submission of claims and Medicare cost reports.

- Billing Prerequisites
  Documentation of all nursing and other home health services, including subcontracted services, must be received prior to billing to ensure that only accurate and properly documented services are billed. A plan of care signed by an authorized physician, along with a certificate of medical necessity, must be on file prior to billing.

- Claims Standards
  The diagnosis and procedure codes for home health services reported on the reimbursement claim should be based on the patient's medical record and other documentation. The Healthcare Common Procedure Coding System (HCPCS) code and/or Home Health Resource Group (HHRG) used in billing should accurately describe the service that was ordered by the physician and performed by Home Health.

- Bonus Incentive Restrictions
  Compensation for billing personnel should not offer any financial incentive based on volume or value of claims submitted such that claims are submitted regardless of whether they meet applicable coverage criteria for reimbursement or accurately represent the services rendered.

- Claims Reviews
  Pre- and post-submission reviews of claims will ensure that all claims submitted for reimbursement by Home Health accurately represent medically necessary services actually provided, supported by sufficient documentation, and in conformity with any applicable coverage criteria for reimbursement.

## SENIOR LIVING FACILITIES

Home Health shall not furnish services in senior living facilities (inclusive of assisted living facilities, independent living facilities, personal care homes, group homes, or residential care facilities) that are duplicative of services already furnished, or required to be furnished by the senior living facility.

# PART 3:
## SPECIFIC COMPLIANCE STANDARDS
## APPLICABLE TO HOSPICE

## INTRODUCTION

Amedisys, Inc. and all subsidiaries are subject to the general compliance policies of Amedisys, Inc. Hospice is a provider of end-of-life and palliative care services to persons who have terminal diagnoses in conformity with Medicare and Medicaid regulations.

The policies contained in this Section constitute specific compliance standards applicable to Hospice. It is intended that all provisions of the Amedisys Compliance Manual and all Amedisys compliance standards and policies shall likewise apply to Hospice, and such corporate policies shall be read in concert with these standards. This includes, but is not limited to, policies regarding compliance oversight, the Amedisys Corporate Compliance Committee, the Amedisys Compliance Hotline, compliance training, compliance oversight and auditing, anti-kickback policies, as well as Amedisys HIPAA policies and procedures. These compliance standards shall also be applicable to Medical Directors, Associate Medical Directors and Hospice Physicians associated with Hospice.

## GENERAL POLICY

Hospice and its staff will comply with all applicable Federal, State and local laws and regulations. Hospice shall adhere to all hospice licensing requirements and Medicare program conditions of participation.

## SERVICE PREREQUISITES

- Informed Patient Consent

  Hospice shall ensure that patients (or their authorized representatives) are fully informed about the determination of patient's life limiting condition, and the Medicare Hospice Benefit, including but not limited to information concerning the palliative nature of the care and services that will be provided if the patient elects the benefit, as well as the waiver of the right to receive standard Medicare benefits related to curative treatments for the terminal condition.

  - Care Coordination. When a patient is admitted to Hospice's services, Hospice will ensure that there are no other arrangements with other health care provider(s) that are also submitting claims for services already covered by the Medicare Hospice Benefit or for services that are unallowable for reimbursement under the Medicare Hospice Benefit, including but not limited to: (a) standard Medicare benefits for treatment of the terminal illness; (b) treatment by another hospice agency not arranged for by Hospice; and (c) care from another provider that duplicates the care required to be furnished by Hospice. Where other providers are involved in a patient's care, Hospice will coordinate the care to insure the appropriate and non-duplicative billings occur.

- Terminal Condition Requirement

  Only those patients who are "terminally ill", (i.e., where there exists a thorough medical review of a patient's admitting diagnosis and prognosis that the patient's life expectancy is six months or less if the illness runs its normal course) may be admitted for Hospice services. Hospice must ensure that a patient's medical record contains complete documentation to support the certification made by the physician or attending physician.

  – <u>Falsification of Terminal Condition.</u> No patient medical record or plan of care shall be falsified or exaggerated to suggest that the patient's condition is more serious or the patient's prognosis is more negative than it actually is, for the purposes of justifying hospice care reimbursement.

  – <u>Physician Certifications.</u> All physician certifications and recertifications of Hospice plans of care shall be prepared timely, and no physician signature will be falsified or forged.

- Plan of Care

  Hospice should take all reasonable steps to ensure that each patient receives care in accordance with the Plan of Care collaboratively established by the Hospice physician (or attending physician) and the Interdisciplinary Group (as defined below). The Plan of Care will be reviewed and updated in accordance with the directives set forth in the Plan of Care. Such review should be recorded in the patient's medical record. Each Plan of Care should, at a minimum, contain the following:

  – An assessment of the patient's needs and identification of services to be provided, including the management of discomfort and symptom relief; and

  – A detailed description of the scope and frequency of services needed to meet the needs of the patient and the patient's family.

- Periodic Review of Services

  As part of Hospice's monitoring program, Hospice will:

  – Periodically review the appropriateness of the Interdisciplinary Group services and level of services being provided;

  – Periodically review the appropriateness of the admission standards required by Hospice in its acceptance of patients.

  – Regularly review the Company's length of stay;

  – Review, as necessary, any delays in admission or in the provisions of services provided by the Interdisciplinary Group; and

  – Periodically review the specific treatment modalities provided by the Company.

Any problems identified in any of the foregoing reviews shall be brought to the attention of the Chief Compliance Officer.

## SPECIFIC REQUIREMENTS & PROHIBITIONS

• Under-Utilization

Hospice shall not knowingly deny needed care to patients to keep costs low. Resources shall be allocated to provide optimal care consistent with the needs of the patient and patient's family. Patient needs and reasonable requests for palliative treatment, including continuous care and the provision of durable medical equipment, should be accommodated to the extent possible.

– Revocation of Medicare Hospice Benefit. Hospice will not encourage or pressure a patient to revoke his/her Medicare Hospice Benefit for the purpose of eliminating costs associated with more expensive care. Any discontinuation of hospice services or the Medicare Hospice Benefit should be undertaken only upon the patient's request or when it is in the patient's best interests, and without regard to the financial impact to Hospice.

• Late Referrals

No eligible patient shall be denied hospice services solely because the referring physician delayed in making the referral. In such circumstances, the referring physician should be educated regarding the risks, costs, and quality of care problems associated with late referrals.

• Extended Service

All active patients shall receive sufficient oversight by Hospice consistent with prevailing industry standards and payor requirements. Additionally, following the initial 90-day certification period, Hospice will review the patient's condition with its Medical Director and any consulting physician or other medical doctor working with the patient to ensure that the patient's condition remains terminal and the patient otherwise remains eligible for continued hospice care under the Medicare Hospice Benefit. In the event a patient is no longer deemed terminal or is otherwise ineligible for the Medicare Hospice Benefit, such patient will not be recertified with Hospice.

• Kickbacks

Hospice shall not provide any financial incentive to actual or potential referral sources, including but not limited to physicians, nursing homes, hospitals, or patients, with the intent to influence referrals. None of the following financial arrangements will be permitted to be undertaken by Hospice:

(a) payment of fee to a physician for each certification of terminal illness;

(b) providing nursing, administrative, or other services for free or below fair market value to physicians, hospitals, nursing homes, assisted living facilities, etc.; and

(c) payment of any amounts in excess of the Medicare-allowable reimbursement for consulting physician services.

– Room-and-Board Payments. Any payment by Hospice to a nursing home for "room-and-board" for a Hospice patient shall not exceed the amount that the

nursing home would have otherwise received directly from the payor if the patient had not been enrolled in Hospice.

- Nursing Home Services

Hospice may see patients in skilled nursing facilities or nursing facilities (individually and collectively, "Facility) only where Hospice has a written agreement in place under which the hospice takes full responsibility for the professional management of the patient's hospice care and the Facility agrees to provide room-and-board. Where Hospice is servicing patient(s) residing in a nursing home, Hospice shall not delegate or otherwise depend on nursing home staff to provide Hospice's services, nor shall Hospice provide fewer services or less care than normally provided to patients not residing in a Facility. Hospice will collaborate with the Facility as to the services required by each patient in accordance with such patient's Plan of Care. Hospice will appropriately communicate with the Facility when changes to the Plan of Care are indicated and document such changes. Such communication will establish and express an understanding of the scope of services to be rendered by each entity. The coordination of services through this communication should be documented in the patient's clinical records notwithstanding the Facility's documentation of the same.

- Provision of Core Services

Hospice shall not improperly relinquish the provision of core services and professional management responsibilities to nursing homes, volunteers, or other privately-paid professionals. Non-core hospice services may be provided at fair market value in accordance with contracts with other providers, subject to professional management and oversight by Hospice. Hospice shall make all core services available to meet the needs of its patients and shall not discharge patients in need of costly inpatient care absent the direction of the Plan of Care, as may be modified from time to time.

  – Staff Eligibility. All Hospice employees must be licensed in accordance with applicable Federal, State, and local laws and regulations. Hospice shall not bill for any care provided by unqualified or unlicensed clinical personnel.

  – Volunteers. Hospice shall coordinate, manage, and provide sufficient oversight of volunteers, who shall be subject to the same screening, training, and disciplinary policies as Hospice employees.

- Medically Unnecessary Services

Hospice shall not bill for medically unnecessary services or for a higher level of care than is necessary for its patients. For purposes of this section, the term "medically unnecessary services" means those services that are not reasonable and necessary for the palliation or management of a terminal illness. For example, Hospice shall not provide and bill for continuous care where only routine home care is necessary.

- Interdisciplinary Group
Hospice's interdisciplinary group shall meet periodically and provide sufficient oversight of patient care (including the patient's medical condition, progression, and status) in accordance with Federal and State regulations. The interdisciplinary group shall also ensure that no Hospice patient(s) receives substandard care.

- Substandard Care
Hospice shall not knowingly bill for inadequate or substandard care.

- Marketing
No person acting on behalf of Hospice, including Account Executives and Account Managers, shall engage in deceptive or high-pressure marketing of hospice care to beneficiaries, including but not limited to offering or giving free gifts or services to patients to induce business. Because of the practical impact of electing hospice, marketing strategies should not offer incomplete or inadequate information about the Medicare Hospice Benefit to induce beneficiaries to elect hospice and thereby waive aggressive treatment options that Medicare would otherwise cover. Marketing activities should not create a misperception that the initial terminal prognosis of a patient is of limited importance or relevance and that hospice benefits may almost routinely be provided over an indefinite time period.

  – Patient Charting Prohibited. No Hospice representative may engage in improper patient solicitation activities, such as patient charting (i.e., reviewing records of patients in hospitals or nursing facilities without the patient's permissions in an attempt to determine eligibility prior to recruitment.)

  – Bonus and Commission Restrictions. Hospice shall not provide any bonus or pay any sales commissions based upon length of stay in hospice.

- Reimbursement Cap Manipulation
Hospice shall not knowingly misuse provider certification numbers to improperly bill payors. Specifically, no patient shall be transferred from one Hospice agency to another Hospice agency for the purposes of circumventing applicable reimbursement caps.

- Billing Considerations
Hospice shall only seek reimbursement for services that: (a) it reasonably believes are both reasonable and necessary for the palliation or management of terminal illness, (b) were ordered by a physician or other appropriately licensed individual, and (c) for which sufficient documentation of services provided exists.

- Falsification of Documentation
Hospice will not falsify any patient signature on a visit note, consent form, or any other documentation. Likewise, Hospice will not falsify the signature or other documentation of a physician on a referral, order, face-to-face certification, or any other documentation. Hospice will not falsify any part of a clinical record note to misrepresent the occurrence of all or part of any patient visit, including patient vital signs and responses to treatment.

# PART4:
## SPECIFIC COMPLIANCE STANDARDS
## APPLICABLE TO PERSONAL CARE LINE

## INTRODUCTION

Amedisys Inc., provides personal care services, inclusive of personal care, homemaking, companionship, chore, grocery delivery, and laundry services. (hereinafter referred to individually and collectively as "Personal Care"). Personal Care Nursing services will provide for personal care plan development, supervision of personal care aides, monitoring of services and service plans, supervision of services and directing of care. Personal Care Nursing also provides medication and medical monitoring of chronic stable patients.

The policies contained in this Section constitute specific compliance standards applicable to Personal Care. It is intended that all provisions of the Amedisys Compliance Manual and all Amedisys compliance standards and policies shall likewise apply to Personal Care, and such corporate policies shall be read in concert with these standards. This includes, but is not limited to, policies regarding compliance oversight, the Amedisys Corporate Compliance Committee, the Amedisys Compliance Hotline, compliance training, compliance oversight and auditing, anti-kickback policies, as well as Amedisys HIPAA policies and procedures.

## GENERAL POLICY

Personal Care and its staff will comply with all applicable Federal, State and local laws and regulations.

## SPECIFIC REQUIREMENTS & PROHIBITIONS

Personal Care shall not engage in any of the following prohibited activities:

- **Billing for Services Not Rendered**
  Personal Care should not submit a claim that represents that the agency performed a service (all or in part) that was not performed.

- **Billing for Unauthorized Services**
  Personal Care should not knowingly submit reimbursement for a service that is not warranted by the patient's current authorization.

- **Upcoding**
  Clinical documentation will accurately reflect the patient's true clinical condition, and Personal Care will not falsify or exaggerate the clinical severity or functional limitations of any patient(s) in order to inflate reimbursement.

- Duplicative Billing
  Personal Care should not submit more than one claim for the same service or submit claims to more than one primary payor at the same time.

- Incentives to Referral Sources
  Personal Care should not offer or give anything of value—directly or indirectly, overtly or covertly, in cash or in kind—to any actual or potential referral source, including but not limited to case manager, contract, physicians, hospitals, patients, etc.—to induce or reward referrals in violation of state or federal anti-kickback laws.

- Payor Standards
  Personal Care may bill payors only if all the payor's specific requirements are satisfied.

  - <u>Duplication of Services by Caregiver.</u> Personal Care should not knowingly or recklessly disregard willing and able caregivers when providing Personal Care services. Where a family member or other person is or will be providing services that adequately meet a patient's needs, it is not reasonable and necessary for a Personal Care agency to furnish such services.

- Inadequate Staffing
  Personal Care should not bill for any services provided by unqualified or unlicensed clinical personnel. Personal Care should also provide adequate management and oversight of subcontracted services.

- Documentation Violations
  Personal Care should ensure that sufficient documentation evidencing the services performed and supporting reimbursement exists prior to billing claims to payors. Additionally, no documentation should be falsified, backdated, or altered. Notwithstanding the foregoing, documentation errors may be corrected consistent with state regulations and Company policy. No patient or beneficiary signature may be forged on visit note or logs, or any company form.

- Patient Solicitation
  Personal Care may not engage in improper patient solicitation activities, including but not limited to high pressure marketing of uncovered or unnecessary services, or offering free gifts or services to patients for the purposes of maximizing business growth and patient retention.

- Patient Abandonment
  Personal Care should not abandon patients in need of care in violation of applicable statutes, regulations, and/or State or Federal health care program requirements. Personal Care should discuss with patients, caregivers, families case managers and contracts prior to terminating home care services in conformity with applicable laws, contracts and regulations.

- Non-Discrimination
  No patient should be discriminated against in relation to admission, discharge, or services provided on the basis of any federally protected class.

- Licensing and Regulatory Oversight
  Personal Care should adhere at all times to Personal Care agency licensing requirements and Contract, State and Federal program conditions of participation.

- Falsification of Documentation
  Personal Care will not falsify any patient signature on a visit note, consent form, or any other documentation. Likewise, Personal Care will not falsify any part of a clinical record note to misrepresent the occurrence of all or part of any patient visit, including all services authorized to the patient.

- Patient Safety
  Personal Care will provide services to patients keeping patient safety first. Services and care plan will be monitored for appropriate level of care, appropriate amount of services, and the agency capacity to deliver the care while maintaining patient safety.

- Quality of Services
  Services will be delivered in a consumer directed model with the patient involved in the personal care service delivery plan. Patient satisfaction with services will be monitored. The quality of the service delivery will be monitored and measured to assess the quality of care.

# PART 5:
## SUPPLEMENTAL DEFICIT REDUCTION ACT PROVISIONS

## INTRODUCTION

Section 6032 of the Deficit Reduction Act of 2005 (DRA) requires health care providers receiving at least $5 million in annual Medicaid payments to provide information in its policies concerning the Federal False Claims Act and similar state laws.

## THE FALSE CLAIMS ACT

The Federal False Claims Act (31 U.S.C. §§ 3729-3733) provides that no person shall:

- Knowingly present, or cause to be presented, to an officer or employee of the United States government a false or fraudulent claim for payment or approval;

- Knowingly make, use, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government;

- Conspire to defraud the government by getting a false or fraudulent claim allowed or paid;

- Have possession, custody, or control of property or money used, or to be used, by the government and, intending to defraud the government or willfully to conceal the property, deliver or cause to be delivered, less property than the amount for which the person receives a certificate or receipt;

- Authorize to make or deliver a document certifying receipt of property used or to be used by the government, and intending to defraud the government, make or deliver the receipt without completely knowing that the information on the receipt is true;

- Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the government who lawfully may not sell or pledge the property;

- Knowingly make, use, or cause to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the government.

For purposes of this law, the terms "knowing" and "knowingly" mean that a person has actual knowledge of the information, or acts in deliberate ignorance or reckless disregard of the truth or falsity of the information.

Violations of the Federal False Claims Act are punished by a civil monetary penalty ranging from $5,000 - $10,000, plus three times the amount of damages sustained.

Civil actions to enforce the False Claims Act may be brought by either the federal government or a private person through the filing of a qui tam action. When a private person files a qui tam action, the government is afforded an opportunity to investigate and review the claims raised. If warranted, the government may intervene and assume prosecution of the case. The

government may decline to prosecute the case, yet the private person may proceed on his/her own.  The private person has a right to share in a recovery if certain conditions are met. Notwithstanding the foregoing, if the qui tam relator is found to have been involved in the underlying conduct, his/her share of the proceeds may be reduced or precluded entirely.

## WHISTLEBLOWER  PROTECTIONS

Federal law also provides special protections for whistleblowers.  Specifically, any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his/her employer because of lawful acts done by the employee or on behalf of the employee or others in furtherance of a FCA action, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under the False Claims Act, shall be entitled to all relief necessary to make the employee whole, including reinstatement with the same seniority, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and attorney's fees.

## STATE FALSE CLAIMS ACT

Additionally, many states have also enacted their own state false claims acts.  Many of these state statutes virtually mirror those of the federal law, while others vary in differing degrees. Some of these states do not have state whistleblower/qui tam provisions, but the policies were drafted to capture all state laws, including those states that have FCA-like provisions related to Medicaid claims or general insurance.  The states listed below have a state false claims act law:

| | | |
|---|---|---|
| Alabama | Kentucky | North Carolina |
| Arizona | Louisiana | Ohio |
| Arkansas | Maine | Oklahoma |
| California | Maryland | Oregon |
| Colorado | Massachusetts | Pennsylvania |
| Connecticut | Michigan | Rhode Island |
| Delaware | Minnesota | South Carolina |
| Florida | Mississippi | Tennessee |
| Georgia | Missouri | Texas |
| Idaho | Nebraska | Virginia |
| Illinois | Nevada | Washington |
| Indiana | New Jersey | West Virginia |
| Iowa | New Mexico | Wisconsin |
| Kansas | New York | |

## AMEDISYS POLICIES & PROCEDURES

Amedisys maintains all of its policies and procedures for detecting and preventing fraud, waste, and abuse in its Corporate Compliance Plan. The Amedisys Corporate Compliance Plan may be accessed in hard copy format in every office, as well as electronically through www.amedisys.com and/or the public folders section of the Company's computer network.

As specified in the Amedisys Corporate Compliance Plan, and consistent with the Company's core belief to communicate without fear of retribution, employees who in good faith report compliance problems related to fraud, waste, and abuse will not face retaliation or discrimination because of their status as whistleblowers. For more information concerning employees' rights as whistleblowers, please refer to Section 3 of the Corporate Compliance Plan.

# PART 6:
## SPECIAL CORPORATE INTEGRITY AGREEMENT PROVISIONS

## INTRODUCTION

On January 30, 2015, Compassionate Care Hospice Group, Ltd and Compassionate Care Hospice of New York LLC, (herein referred to as "CCH") entered into a five-year agreement with the Office of Inspector General of the Department of Health and Human Services following the settlement of an investigation by the U.S. Department of Justice. This agreement is known as a "Corporate Integrity Agreement" (CIA) and contains agreed-to provisions designed to improve the compliance activities of the Company. The term, "Corporate Compliance Plan" is synonymous with the term "Policies and Procedures" as defined under Section III.B.2 of the CIA.

The policies contained in this Section constitute specific compliance standards applicable to Hospice Division. The policies contained herein are part of the requirements of the CIA and should be read in addition to the general Corporate Compliance Plan (Part 1), and the CCH Compliance Plan Policy #1024, which is posted to the Compliance Support page on Amedisys@Work.

## GENERAL STANDARDS

Amedisys is committed to full compliance with all Federal health care program requirements, including our commitment to prepare and submit accurate claims that are consistent with these program requirements.

Amedisys requires all of our employees, officers, directors, and owners, as well as our contractors, subcontractors, agents, and other persons who provide patient care services, billing or coding functions comply with all Federal health care program requirements, applicable laws, and with Amedisys' own policies and procedures, including our Corporate Compliance Plan.

Amedisys also requires all of our employees, officers, directors, and owners, as well as our contractors, subcontractors, agents, and other persons who provide patient care services, billing or coding functions report to our Chief Compliance Officer any suspected violations of any Federal health care program requirements, or applicable law, or Amedisys' own policies and procedures.

All individuals who work for Amedisys have the right to disclose any identified issues or questions associated with Amedisys' policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law; and such disclosures may be made through our Compliance Hotline (1.800.464.0020). In so doing, Amedisys is committed to maintaining, as appropriate, the anonymity and confidentiality of the disclosures and protecting individuals who make disclosures from any retaliation or retribution arising out of the disclosure.

## STRUCTURE

Amedisys will continue to operate its compliance program throughout the term of the Corporate Integrity Agreement, and will not modify or restrict the compliance program in any respect that would violate the terms of the CIA or applicable Federal or State law. The Company's commitment to a basic compliance infrastructure will include a Chief Compliance Officer, who is independent and a member of senior management, a senior management Corporate Compliance Committee, and a Compliance and Ethics Committee of the Board of Directors. In addition, pursuant to Section III 3 of the CCH CIA, a Chief Quality Officer will be maintained for the term of the CIA and report to the Chief Compliance Officer.

- Board of Directors Obligations.
  The Board of Directors, through its Compliance and Ethics Committee will be responsible for the review and oversight of matters related to compliance with Federal health care program requirements and the obligations of the CIA. They shall meet at least quarterly to review and oversee the Compliance Program. They shall also approve an annual resolution summarizing its review and oversight of Amedisys' compliance.

- Management Accountability and Certifications.
  Compliance will be an essential component of all managers' job descriptions and performance evaluations. Agency Directors of Operation and their up-line managers are required to submit an annual certification that their care center or functional area is in material compliance with all applicable Federal health care program requirements and the obligations of the CIA. In the event any person required to submit a compliance certification is unable to make the representations required in the certification, the Company will immediately investigate the reasons underlying the inability to make the certification.

- Code of Conduct.
  All Amedisys employees and contractors will be provided information concerning Amedisys Compliance and Ethics Program and its Code of Ethical Business Conduct (collectively, "Code of Conduct"). This document will be provided within 30 days of a new employee's hire or the contractor's engagement. Those who receive the Code of Conduct will be required to certify the receipt, reading, understanding, and agreement to abide by the Code of Conduct. The Code of Conduct will also be posted on the Company's intranet so that it is accessible to all Amedisys employees. Amedisys shall periodically review the Code of Conduct to determine if revisions are necessary and shall make any necessary revisions based on that review. The Code of Conduct shall be distributed to all employees, contractors, and certain other parties annually. Additionally, under the CCH CIA, employees and contractors of the Hospice service line will be provided the CCH Code of Conduct, Policy #1009.

- Policies and Procedures.
  The Amedisys and CCH Compliance Plans will be provided to all Amedisys employees and contractors. The Compliance Plans will be assessed and updated, as may be necessary, not less than annually. Any changes or revisions to the Compliance Plan will be communicated to and made available all affected employees and contractors. At a minimum, the Compliance Plan will be posted on the Company's intranet so that it is accessible to all Amedisys employees.

## TRAINING

Training and education represent the best mechanism for ensuring compliance with the law and with the requirements of the CIA. All employees and contractors should receive adequate compliance training upon hire and annually thereafter, including the following:

- General Training.
  All employees and contractors must complete upon hire, and annually general training regarding CCH CIA requirements and Compliance Program, including but not limited to the Code of Conduct. This is referred to CCH 3Cs training.

- Specific Training.
  All Billing, Coding, and Reimbursement covered persons are involved in the preparation or submission of claims for reimbursement from any Federal health care program, and/or the internal review or auditing of claims submitted to any Federal health care program must complete adequate training within 30 days of hire, and annually thereafter content focusing on: (1) Federal health care program requirements regarding accurate coding and submission of claims; (2) policies, procedures, and other requirements applicable to the documentation of medical records; (3) the personal obligation of each person to ensure the accuracy of claims; (4) applicable reimbursement statutes, regulations, program requirements, and directives; (5) the legal sanctions for violations of Federal health care program requirements; and (6) examples of proper and improper claims submission practices.

  All Clinical Services covered persons involved in the delivery of care to patients shall complete adequate training within 30 days of hire, and annually thereafter content focusing on: (1) Federal health care program requirements regarding accurate coding and submission of claims; (2) policies, procedures, and other requirements applicable to the documentation of medical records; (3) the personal obligation of each person to ensure the accuracy of claims; (4) applicable reimbursement statutes, regulations, program requirements, and directives; (5) the legal sanctions for violations of Federal health care program requirements; and (6) examples of proper and improper medical record documentation practices.

- Governing Authority Training
  New members of the Governing authority shall receive the Governing Authority training within 30 days after becoming a member.

To the extent that computer-based training is utilized, the Chief Compliance Officer and other members of the Compliance Department staff will be made available to answer questions and provide additional information. The training courses will be reviewed annually in order to update the content to reflect changes to Federal health care program requirements and issues discovered during internal audits or claims reviews conducted under the CIA.

## INTERNAL RISK MITIGATION AUDIT PROGRAM

Amedisys will utilize an internal Risk Mitigation Audit Program (referred to as RMA) to proactively identify and remediate key compliance risks for the organization. The RMA Program is headed by the Chief Compliance Officer and consists of the following:

- Risk Assessment
  A centralized annual risk assessment and internal review process to identify and address risks associated with the submission of claims for items and services furnished has been developed. The risk assessment and internal review process should include: (1) a process for identifying and prioritizing risks; (2) developing remediation plans in response to those risks, including internal auditing and monitoring of the identified risk areas; and (3) tracking results to assess the effectiveness of the remediation plans. The risk assessment and internal review process requires compliance, legal, and department leaders, at least annually, to evaluate and identify risks associated with the submission of claims for items and services furnished and implement specific plans to address and mitigate the identified risks.

- Work Plan
  Work Plans are developed annually based on the findings of the Risk Assessments. On an ongoing basis the Work Plan is monitored for adherence and progress.

## COMPLIANCE EXPERT

A compliance expert was retained to ensure that the compliance program was operating effectively. A compliance expert is retained and at a minimum shall:

- meet with the Governing Authority quarterly to assist each Governing Authority member in meeting his or her obligation to review and oversee matters related to CCH's compliance with Federal health care program requirements and the obligations of this CIA;

- be kept apprised of any direct reports that the Compliance Officer otherwise makes to the Governing Authority;

- assist the Governing Authority in reviewing and assessing CCH's Compliance Program;

- offer recommendations periodically, as appropriate, to improve the effectiveness of CCH's Compliance Program; and

- for the first, third, and fifth Reporting Periods, conduct a comprehensive review of the effectiveness of CCH's Compliance Program and prepare a report describing the results of such review (Compliance Program Review Report). A copy of the Compliance Program

Review Report shall be provided to OIG along with the Annual Report for the applicable Reporting Period.

## DISCLOSURE PROGRAM

Amedisys will maintain the use of its Compliance Hotline (1.800.464.0020) for the duration of the CIA and beyond expiration of the CIA. Callers are assured of a non-retribution, non-retaliation policy for calls made and information relayed through the Compliance Hotline. In addition, callers are assured that they can remain anonymous and all such communications will be treated confidentially to the fullest extent possible. The Compliance Department will make a good faith inquiry into all allegations. For any disclosure that is sufficiently specific that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice, and (2) provides an opportunity for taking corrective action, the Amedisys Compliance Department will conduct

an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted. The Chief Compliance Officer will ensure that a disclosure log of all complaints received is maintained by the Company.

## WORKFORCE ELIGIBILITY

Amedisys will continue to screen all prospective and current employees, contractors, and others deemed to be "Covered Persons" under the CIA. Such persons will be screened against the Office of Inspector General's List of Excluded Individuals/Entities and the General Services Administration's System for Award Management. These screenings shall be undertaken on a monthly basis. No Covered Person who is listed on the OIG or GSA exclusion lists shall be permitted to work or perform any services for Amedisys and the Company will not submit any claims for services rendered by ineligible employees. All employees and contractors are required to immediately disclose any debarment, exclusion, suspension, or other event

that makes that person ineligible to participate in Federal health care and/or procurement programs. In the event Amedisys has actual notice that an employee or contractor has become

ineligible or faces potential ineligibility due to being charged with a criminal offense within the scope of 42 U.S.C. Section 1320a-7(a), 1320a-7(b)(1)-(3), or due to a proposal for exclusion, such person shall immediately be removed from any work, assignment, responsibility, or involvement with Amedisys' business operations unless management can provide a satisfactory plan to ensure that the responsibilities of the potentially ineligible person have and shall not adversely affect the quality of care rendered to any patient or any claim submitted to a Federal health care program. Individuals who have been excluded, but subsequently complete their exclusionary period shall nonetheless be restricted from having direct responsibility over or involvement in the Company's dealings with Medicare or Medicaid unless management has detailed a satisfactory plan approved by the Chief Compliance Officer to ensure that such person's responsibilities shall not adversely affect quality of care or the propriety of billings to Federal health care programs.

Amedisys will notify the OIG of any violations of this section in accordance with the CIA.

## NOTIFICATIONS TO THE GOVERNMENT

Consistent with and in accordance with the terms of the CCH CIA, Amedisys will notify the OIG of:

(1) Any ongoing investigation or legal proceeding conducted or brought by a governmental entity or its agents alleging that Amedisys has committed a crime or engaged in fraudulent activities;

(2) Any substantial overpayments;

(3) Any matters that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to Federal health care programs for which penalties or exclusion may be authorized;

(4) Any employment of or contacting with ineligible persons;

(5) Any filing of a bankruptcy petition by Amedisys;

(6) Any sale of CCH hospice business units, or locations;

(7) The closure or change in location of any business unit;

(8) The purchase or establishment of a new CCH hospice business unit, or location.

Amedisys will also submit Annual Reports as required under the CIA, which will include a certification by the Chief Compliance Officer regarding the accuracy and truthfulness of the report and a statement of compliance with the CIA.

## OVERPAYMENTS

Amedisys will make a full refund and repayment of monies received for hospice services in excess of the amount due and payable within 60 days of identification. Remedial steps to correct the underlying problem and prevent its recurrence will be undertaken within 90 days after identification. The Company will notify the OIG of any substantial overpayment within 30 days of identification.

## OIG INSPECTION RIGHTS

The OIG is authorized to examine and requires copies of the books, records, and other documents and supporting materials of Amedisys for purposes of verifying our compliance with the CIA and our compliance with the requirements of Federal health care programs. Amedisys will provide all such materials to the OIG at all reasonable times for inspection, audit, or reproduction, and the government is permitted to interview any of our employees, contactors, or agents who consent to being interviewed. All documents and records relating to reimbursement from Federal health care programs and compliance with the CIA must be kept until January 30, 2021, or such longer time as may be required by law.

## PENALTIES FOR BREACH, SURVIVAL

The Company's failure to abide by the terms of the CIA may result in stipulated financial penalties and/or exclusion from Federal health care program participation. In the event any hospice business, business unit, or location is sold or transferred, the obligations of the CIA will

continue in full force and effect both as to the remaining Amedisys/CCH-owned operations and the divested business, business unit, or location.

## FOR ADDITIONAL INFORMATION

If you have any questions about the information provided in this Compliance Plan or any compliance-related policy and procedure of Amedisys, Inc., we have Compliance Department staff available to answer your questions or provide additional information to you.

To obtain additional information or for answers to any questions you may have, please contact our corporate headquarters at 225.292.2031. Ask to speak with the Amedisys'

- Chief Compliance Officer or

- VP Deputy Compliance Officer; or

- The Amedisys Compliance Hotline: **1.800.464.0020**



Amedisys Compliance Hotline
1.800.464.0020

| Policy: AA-004 | Effective Date: | 1/1/06 |
|---|---|---|
| Topic:<br>Election of Hospice Benefit | Date(s)<br>Revised: | 4/17; 12/18; 10/19, 9/24/20 |
| Applicable Service(s):<br> Hospice | Page: | Page 1 of 7 |

**Policy:**

The beneficiary/representative must sign and date an Election of Benefit statement to elect the Hospice Medicare Benefit. The election statement can be signed and dated no earlier than 14 days prior to the Start of Care but must be signed and dated no later than the Start of Care date. The Election of Benefit statement must again be signed if the beneficiary/representative is re-electing the Hospice Medicare Benefit after a discharge or revocation.

It is the responsibility of the hospice registered nurse or social worker to review the election of benefit with the patient and/or patient's representative and obtain necessary signatures. A verbal election of benefit is not allowed.

**Operational Guidelines:**
1. The Election Statement should include:

    a.) Identification of the Hospice that will be providing service

    b.) The effective date of the Hospice Medicare Benefit election must follow these guidelines.

    - The election date on the document may be the first day of hospice care.
    - The **beneficiary's/representative's signature date** can be earlier than the effective date (no earlier than 14 days).
    - **The effective date cannot be later than the date the hospice services began.**

    c.) A general overview of the Hospice Benefit to help the Hospice patient/representative understand specifics such as:

    - Loss of regular Medicare benefits related to the terminal illness
    - Palliative vs. Curative Treatment
    - The responsibility of the patient/representative/family to seek pre-approval from the Hospice regarding any treatments or services not included in the Plan of Care
    - Understanding that the patient/representative will assume responsibility for expenses incurred that are not listed in the Plan of Care
    - The responsibility of the patient/family for bills incurred for treatments/visits with physicians or facilities with which the Hospice does not have a contract

    d.) Identification of the patient's attending Physician and acknowledgement that the attending physician was chosen by the patient.

    e.) A duplicate copy is given to the patient or legal representative at the time of admission.

2. To provide full coverage transparency to hospice patients and their families to assist in making treatment decisions the Hospice should notify the patient/family of all Hospice Medicare Benefit covered/non-covered:
    a. Conditions,
    b. Items,
    c. services, and
    d. drugs



EXHIBIT
D-2

*Amedisys, Inc.*

**App. 269**

| Policy: AA-004 | Effective Date: | 1/1/06 |
|---|---|---|
| Topic: Election of Hospice Benefit | Date(s) Revised: | 4/17; 12/18; 10/19, 9/24/20 |
| Applicable Service(s): Hospice | Page: | Page 2 of 7 |

3. At election of benefit, the patient/representative MUST be provided an option to elect to receive or decline an election statement addendum "Patient Notification of Hospice Non-Covered Items, Services and Drugs":
   a. If requested at time of election, the addendum MUST be provided within 5 days after the election.
4. If election statement addendum "Patient Notification of Hospice Non-Covered Items, Services and Drugs" is requested any time during the course of care, it MUST be provided within 72 hours of the request.

5. The patient/representative must be informed of all contracted facilities.

| Policy: AA-004 | Effective Date: | 1/1/06 |
|---|---|---|
| Topic:<br>Election of Hospice Benefit | Date(s)<br>Revised: | 4/17; 12/18; 10/19, 9/24/20 |
| Applicable Service(s):<br> Hospice | Page: | Page 3 of 7 |

# State Specific Information

**California:**

N/A

| Policy: AA-004 | Effective Date: | 1/1/06 |
|---|---|---|
| Topic:<br>Election of Hospice Benefit | Date(s)<br>Revised: | 4/17; 12/18; 10/19, 9/24/20 |
| Applicable Service(s):<br> Hospice | Page: | Page 5 of 7 |

**Illinois:**

77 Ill. Adm. Code 280.2080 The hospice program must fully disclose in writing to any hospice patient, or to any hospice patient's family or representative, prior to the patient's admission, the hospice services available from the hospice program and the hospice services for which the hospice patient may be eligible under the patient's third-party payer plan (that is, Medicare, Medicaid, the Veterans Administration, private insurance or other plans). (Section 8(a-10) of the Act)

**Texas:**

TX Administrative Code Title 40 Part 1 Chapter 30 Subchapter B

Rule §30.10 Eligibility Requirements

(a) In order to be eligible to elect hospice care under Medicaid, an individual must:

  (1) be certified as Medicaid eligible by the Texas Department of Human Services (DHS) or the Social Security Administration (SSA);

  (2) be certified as being terminally ill in accordance with §30.14 of this title (relating to Certification of Terminal Illness); and

  (3) have an identified need documented on the comprehensive assessment for one or more of the following:

    (A) medical care;

    (B) skilled nursing care related to the management of pain and symptom control;

    (C) medical social services; or

    (D) emotional or spiritual care.

(b) If dually eligible, the recipient must elect the hospice benefit under both the Medicare and Medicaid programs.

RULE §30.12 Duration of Hospice Care Coverage: Election Periods

(a) Subject to the conditions set forth in this subchapter, an individual may elect to receive hospice care for a six-month period.

(b) The periods of care are six-month increments of time and may be elected consecutively or separately at different times.

Rule §30.16 Election of Hospice Care

(a) Filing an election statement. An individual who meets the eligibility requirement of §30.10 of this title (relating to Eligibility Requirements) may file an election statement with a particular hospice. If the individual is physically or mentally incapacitated, the individual's representative may file the election statement. If the recipient is dually eligible for Medicaid and Medicare, the individual must elect the Medicaid and Medicare hospice benefit at the same time.

(b) Content of election statement. The election statement must include the following:

  (1) identification of the particular hospice that will provide care to the individual;

  (2) the individual's or representative's acknowledgment that he has been given a full explanation of the palliative rather than curative nature of hospice care as it relates to the individual's terminal illness;

  (3) acknowledgment that certain Medicaid services, as set forth in subsection (d) of this section, are waived by the election;

  (4) the effective date of the election, which may be the first day of hospice care or a later date, but must be no earlier than the date of the election statement; and

  (5) the signature of the individual or representative.

(c) Duration of election. An election to receive hospice care will continue through the initial election period and through the subsequent election periods without a break in care as long as the individual:

  (1) remains in the care of a hospice; and

  (2) does not revoke the election under the provisions of §30.18 of this title (relating to Revoking the Election of Hospice Care).

(d) Waiver of other benefits. For the duration of an election of hospice care, an individual 21 years of age or older waives all rights to Medicaid payments for the following services:

  (1) hospice care provided by a hospice other than the hospice designated by the individual (unless provided under arrangements made by the designated hospice); and

  (2) any Medicaid services related to the treatment of the terminal condition for which hospice care was elected, or a related condition for which the hospice care was

| Policy: AA-004 | Effective Date: | 1/1/06 |
|---|---|---|
| Topic:<br>Election of Hospice Benefit | Date(s)<br>Revised: | 4/17; 12/18; 10/19, 9/24/20 |
| Applicable Service(s):<br> Hospice | Page: | Page 7 of 7 |

elected, or that are equivalent to hospice care except for services:

   (A) provided by the designated hospice;

   (B) provided by another hospice under arrangements made by the designated hospice; and

   (C) provided by the individual's attending physician if that physician is not an employee of the designated hospice or receiving compensation from the hospice for those services.

(e) Re-election of hospice benefits. If an election has been revoked in accordance with §30.18 of this title (relating to Revoking the Election of Hospice Care), the individual (or the individual's representative, if the individual is mentally or physically incapacitated) may at any time file an election in accordance with this section.

(f) Record maintenance. The hospice provider must retain copies of all election forms in the hospice records for the recipient and the recipient's nursing facility clinical record, or the intermediate care facility for persons with mental retardation or related conditions (ICF/MR-RC), if applicable.

| CMS Manual System | Department of Health & Human Services (DHHS) |
|---|---|
| Pub 100-02 Medicare Benefit Policy | Centers for Medicare & Medicaid Services (CMS) |
| Transmittal 209 | Date: May 8, 2015 |
| | Change Request 9114 |

**Transmittal 205, dated April 3, 2015, is being rescinded and replaced by Transmittal 209 to revise the effective date of the change and to clarify the types of information that the hospice should use to identify the attending physician or nurse practitioner on the election statement. All other information remains the same.**

**SUBJECT: Updates on Hospice Election Form, Revocation, and Attending Physician**

**I. SUMMARY OF CHANGES:** This instruction implements changes finalized in the FY 2015 hospice rule regarding hospice election, revocation and designation of attending physician.

**EFFECTIVE DATE: October 1, 2014**
*Unless otherwise specified, the effective date is the date of service.*
**IMPLEMENTATION DATE: May 4, 2015**

***Disclaimer for manual changes only: The revision date and transmittal number apply only to red italicized material. Any other material was previously published and remains unchanged. However, if this revision contains a table of contents, you will receive the new/revised information only, and not the entire table of contents.***

**II. CHANGES IN MANUAL INSTRUCTIONS:** (N/A if manual is not updated)
R=REVISED, N=NEW, D=DELETED

| R/N/D | CHAPTER / SECTION / SUBSECTION / TITLE |
|---|---|
| R | 9/Table of Contents |
| R | 9/20.2/Election, Revocation and Discharge |
| R | 9/20.2.1/Hospice Election |
| N | 9/20.2.1.1/Hospice Notice of Election |
| N | 9/20.2.2/Hospice Revocation |
| N | 9/20.2.3/Hospice Discharge |
| N | 9/20.2.4/Hospice Notice of Termination or Revocation |
| R | 9/40.1.3.1/Attending Physician Services |



EXHIBIT
D-3

**App. 276**

**III. FUNDING:**
**For Medicare Administrative Contractors (MACs):**
The Medicare Administrative Contractor is hereby advised that this constitutes technical direction as defined in your contract. CMS does not construe this as a change to the MAC Statement of Work. The contractor is not obligated to incur costs in excess of the amounts allotted in your contract unless and until specifically authorized by the Contracting Officer. If the contractor considers anything provided, as described above, to be outside the current scope of work, the contractor shall withhold performance on the part(s) in question and immediately notify the Contracting Officer, in writing or by e-mail, and request formal directions regarding continued performance requirements.

**IV. ATTACHMENTS:**

**Business Requirements**
**Manual Instruction**

# Attachment - Business Requirements

| Pub. 100-02 | Transmittal: 209 | Date: May 8, 2015 | Change Request: 9114 |
|---|---|---|---|

*Transmittal 205, dated April 3, 2015, is being rescinded and replaced by Transmittal 209 to revise the effective date of the change and to clarify the types of information that the hospice should use to identify the attending physician or nurse practitioner on the election statement.  All other information remains the same.*

**SUBJECT: Updates on Hospice Election Form, Revocation, and Attending Physician**

**EFFECTIVE DATE:  October 1, 2014**
*\*Unless otherwise specified, the effective date is the date of service.*
**IMPLEMENTATION DATE:  May 4, 2015**

## I.    GENERAL INFORMATION

**A.    Background:**  Upon electing hospice care, the beneficiary waives the right to Medicare payment for any Medicare services related to the terminal illness and related conditions during a hospice election, except when provided by, or under arrangement by, the designated hospice or individual's attending physician if he/she is not employed by the designated hospice (42 CFR 418.24(d)).  Prompt filing of the notice of election (NOE) with the Medicare contractor is required to properly enforce this waiver, and prevent inappropriate payments to non-hospice providers.  The effective date of hospice election is the same as the hospice admission date.

Upon discharge from hospice or revocation of hospice care, the beneficiary immediately resumes the Medicare coverage that had previously been waived by the hospice election.  As such, hospices should record the beneficiary's discharge or revocation in the claims processing system promptly.  Doing so protects the beneficiary from experiencing possible delays in accessing needed care.

Hospice beneficiaries have the right to choose their attending physician.  *Attending physician* means a—

(1)(i) Doctor of medicine or osteopathy legally authorized to practice medicine and surgery by the State in which he or she performs that function or action; or

(ii) Nurse practitioner who meets the training, education, and experience requirements as described in 42 CFR 410.75 (b).

(2) Is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care. (See 42 CFR 418.3)

**B.    Policy:**  Timely-filed hospice NOEs shall be filed within 5 calendar days after the hospice admission date.  A timely-filed NOE is one that is submitted to the Medicare contractor and accepted by the Medicare contractor within 5 calendar days after the hospice admission date.  While a timely-filed NOE is one that is submitted to and accepted by the Medicare contractor within 5 calendar days after the hospice election, posting to the CWF may not occur within that same time frame.  The date of posting to the CWF is not a reflection of whether the NOE is considered timely-filed.  In instances where a NOE is not timely-filed, Medicare shall not cover and pay for the days of hospice care from the hospice admission date to the date the NOE is submitted to, and accepted by, the Medicare contractor.  These days shall be a provider liability, and the provider shall not bill the beneficiary for them.

If a hospice fails to file a timely-filed NOE, it may request an exception which, if approved, waives the consequences of filing an NOE late. The four circumstances that may qualify the hospice for an exception to the consequences of filing the NOE more than 5 calendar days after the hospice admission date are as follows:

1. fires, floods, earthquakes, or other unusual events that inflict extensive damage to the hospice's ability to operate;

2. an event that produces a data filing problem due to a CMS or Medicare contractor systems issue that is beyond the control of the hospice;

3. a newly Medicare-certified hospice that is notified of that certification after the Medicare certification date, or is awaiting its user ID from its Medicare contractor; or,

4. other circumstances determined by the Medicare contractor or CMS to be beyond the control of the hospice.

Upon hospice election, the beneficiary must sign and date an election statement and the content of the election statement must fulfill the requirements at 42 CFR 418.24 (b). The election statement must include identification of the particular hospice and of the attending physician that will provide care to the individual. The individual or representative must acknowledge that the identified attending physician was his or her choice.

## II.   BUSINESS REQUIREMENTS TABLE

*"Shall" denotes a mandatory requirement, and "should" denotes an optional requirement.*

| Number | Requirement | Responsibility | | | | | | | | Other |
|--------|-------------|----------------|---|---|---|---|---|---|---|-------|
| | | A/B MAC | | | D M E | Shared-System Maintainers | | | | |
| | | A | B | H H H | M A C | F I S S | M C S | V M S | C W F | |
| 9114.1 | Medicare contractors shall be aware of the changes to Notice of Election timely filing requirements and designation of attending physician on the hospice election form as stated in the revised Pub. 100-02, Medicare Benefit Policy Manual, chapter 9, section 20.2 and 40.1.3.1. | | | X | | | | | | |

## III.    PROVIDER EDUCATION TABLE

| Number | Requirement | Responsibility | | | | |
|--------|-------------|:---:|:---:|:---:|:---:|:---:|
| | | A/B MAC | | | D M E M A C | C E D I |
| | | A | B | H H H | | |
| 9114.2 | MLN Article: A provider education article related to this instruction will be available at http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/ shortly after the CR is released. You will receive notification of the article release via the established "MLN Matters" listserv. Contractors shall post this article, or a direct link to this article, on their Web sites and include information about it in a listserv message within 5 business days after receipt of the notification from CMS announcing the availability of the article.  In addition, the provider education article shall be included in the contractor's next regularly scheduled bulletin. Contractors are free to supplement MLN Matters articles with localized information that would benefit their provider community in billing and administering the Medicare program correctly. | | | X | | |

## IV.    SUPPORTING INFORMATION

**Section A:  Recommendations and supporting information associated with listed requirements: N/A**

*"Should" denotes a recommendation.*

| X-Ref Requirement Number | Recommendations or other supporting information: |
|--------------------------|--------------------------------------------------|
| | |

**Section B:  All other recommendations and supporting information:** N/A

## V.    CONTACTS

**Pre-Implementation Contact(s):** Kelly Vontran, 410-786-0332 or kelly.vontran@cms.hhs.gov

**Post-Implementation Contact(s):** Contact your Contracting Officer's Representative (COR).

## VI.    FUNDING

**Section A: For Medicare Administrative Contractors (MACs):**
The Medicare Administrative Contractor is hereby advised that this constitutes technical direction as defined in your contract. CMS does not construe this as a change to the MAC Statement of Work.  The contractor is not obligated to incur costs in excess of the amounts allotted in your contract unless and until specifically authorized by the Contracting Officer.  If the contractor considers anything provided, as described above, to be outside the current scope of work, the contractor shall withhold performance on the part(s) in question and

immediately notify the Contracting Officer, in writing or by e-mail, and request formal directions regarding continued performance requirements.

**ATTACHMENTS: 0**

# Medicare Benefit Policy Manual
## Chapter 9 - Coverage of Hospice Services Under Hospital Insurance

**Table of Contents**
*(Rev. 209, Issued: 05-08-15)*

20.2 - Election, Revocation, and *Discharge*

      20.2.1 – Hospice *Election*

            *20.2.1.1 – Hospice Notice of Election*

      *20.2.2 - Hospice Revocation*

      *20.2.3 - Hospice Discharge*

      *20.2.4-Hospice Notice of Termination or Revocation*

## 20.2 - Election, Revocation, *and Discharge*
*(Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

## 20.2.1 – Hospice *Election*
*(Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

*Each hospice designs and prints its election statement. The election statement must include the following items of information:*

*Identification of the particular hospice that will provide care to the individual;*

*The individual's or representative's (as applicable) acknowledgment that the individual has been given a full understanding of hospice care, particularly the palliative rather than curative nature of treatment;*

*The individual's or representative's (as applicable) acknowledgment that the individual understands that certain Medicare services are waived by the election;*

*The effective date of the election, which may be the first day of hospice care or a later date, but may be no earlier than the date of the election statement. An individual may not designate an effective date that is retroactive;*

*The individual's designated attending physician (if any). Information identifying the attending physician recorded on the election statement should provide enough detail so that it is clear which physician or Nurse Practitioner (NP) was designated as the attending physician. This information should include, but is not limited to, the attending physician's full name, office address, NPI number, or any other detailed information to clearly identify the attending physician.*

*The individual's acknowledgment that the designated attending physician was the individual's or representative's choice.*

*The signature of the individual or representative.*

*An election to receive hospice care will be considered to continue through the initial election period and through the subsequent election periods without a break in care as long as the individual:*

*(1) Remains in the care of a hospice;*
*(2) Does not revoke the election; and*
*(3) Is not discharged from the hospice.*

*For Medicare payment purposes, an election for Medicare hospice care must be made on or after the date that the hospice provider is Medicare-certified. As with any election, the hospice must fulfill all other admission requirements, such as certification or recertification, any required face-to-face encounters, or Conditions of Participation (CoP) assessments. See also Pub. 100-04, Medicare Claims Processing Manual, chapter 11, section 20.1.1.*

*An individual may change, once in each election period, the designation of the particular hospice from which he or she elects to receive hospice care. The change of the designated hospice is not considered a revocation of the election, but is a transfer. To change the designation of hospice programs, the individual must file, with the hospice from which he or she has received care and with the newly designated hospice, a signed statement that includes the following information:*

- *the name of the hospice from which the individual has received care,*
- *the name of the hospice from which they plan to receive care, and*
- *the date the change is to be effective.*

*As described in Pub. 100-04, Medicare Claims Processing Manual, chapter 11, section 20.1.1, when a hospice patient transfers to a new hospice, the receiving hospice must file a new Notice of Election; however, the benefit period dates are unaffected. The receiving hospice must complete all assessments required by the hospice conditions of participation as described in 42 CFR 418.54. Because the benefit period does not change in a transfer situation, if the patient is in the third or later benefit period and transfers hospices, a face-to-face encounter is not required if the receiving hospice can verify that the originating hospice had the encounter.*

*A change of ownership of a hospice is not considered a change in the patient's designation of a hospice and requires no action on the patient's part.*

*Medicare beneficiaries enrolled in managed care plans may elect hospice benefits. Federal regulations require that the Medicare contractor assigned the hospice specialty workload maintain payment responsibility for hospice services and may pay for other claims if that contractor is the geographically assigned Medicare contractor for the managed care enrollees who elect hospice; for specifics, see regulations at 42 CFR 417, Subpart P, 417.585, Special Rules: Hospice Care (b), and 42 CFR 417.531 Hospice Care Services (b). Institutional claims for services not related to the terminal illness would otherwise be the responsibility of another geographically assigned Medicare contractor.*

*Managed care enrollees who have elected hospice may revoke hospice election at any time, but claims will continue to be paid by fee-for-service contractors as if the beneficiary were a fee-for-service beneficiary until the first day of the month following the month in which hospice was revoked. As specified above, by regulation, the duration of payment responsibility by fee-for-service contractors extends through the remainder of the month in which hospice is revoked by hospice beneficiaries.*

*See Pub. 100-04, Medicare Claims Processing Manual, Chapter 2, "Admission and Registration" and Chapter 11, "Processing Hospice Claims," for requirements for hospice reporting to the Medicare contractor.*

## 20.2.1.1 - Hospice Notice of Election
*(Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

*Upon electing the Medicare hospice benefit, the beneficiary waives the right to Medicare payment for any Medicare services related to the terminal illness and related conditions (i.e., the patient's prognosis) during a hospice election, except when provided by, or under arrangement by, the designated hospice or individual's attending physician if he or she is not employed by the designated hospice (42 CFR 418.24 (d)). Prompt filing of the hospice Notice of Election (NOE) with the Medicare contractor is required to properly enforce this waiver and prevent inappropriate payments to non-hospice providers. The effective date of hospice election is the same as the hospice admission date.*

*Timely-filed hospice NOEs shall be filed within 5 calendar days after the hospice admission date. A timely-filed NOE is one that is submitted to and accepted by the Medicare contractor within 5 calendar days after the hospice election. The practical meaning of 'submitted to and accepted by the Medicare contractor' is that the NOE was not returned to the provider for correction.*

*Example: The date of hospice election is October 1st. A timely-filed NOE would be submitted and accepted by the Medicare contractor on or before October 6th.*

*In instances where a NOE is not timely-filed, Medicare shall not cover and pay for the days of hospice care from the hospice admission date to the date the NOE is submitted to, and accepted by, the Medicare contractor. These days shall be provider liable, and the provider shall not bill the beneficiary for them.*

*Example:  The date of hospice election is October 1st. The NOE was not submitted and accepted by the Medicare contractor until October 10th.  Provider liable days would be October 1st through October 9th.*

*There may be some circumstances that may be beyond the control of the hospice where it may not be possible to timely-file the NOE within 5 calendar days after the effective date of election or timely-file the Notice of Termination or Revocation (NOTR) (see section 20.2.4 - Hospice Notice of Termination or Revocation) within 5 calendar days after the effective date of a beneficiary's discharge or revocation.  Therefore, the regulations do allow for exceptions.  There are four circumstances that may qualify the hospice for an exception to the consequences of filing the NOE more than 5 calendar days after the effective date of election.  These exceptional circumstances are as follows:*

*1.  Fires, floods, earthquakes, or other unusual events that inflict extensive damage to the hospice's ability to operate;*

*2.  An event that produces a data filing problem due to a CMS or Medicare contractor systems issue that is beyond the control of the hospice;*

*3.  A newly Medicare-certified hospice that is notified of certification after the Medicare certification date, or is awaiting its user ID from its Medicare contractor; or,*

*4.  Other circumstances determined by CMS to be beyond the control of the hospice.*

*If one of the four circumstances described above prevents a hospice from timely-filing its NOE, the hospice must document the circumstance to support a request for an exception, which would waive the consequences of filing the NOE late.  Using that documentation, the hospice's Medicare contractor will determine if a circumstance encountered by a hospice qualifies for an exception to the consequences for filing an NOE more than 5 calendar days after the effective date of election.  If the request for an exception is denied, the Medicare contractor will retain the decision of the denial.  Hospices retain their usual appeal rights on the claim for payment.*

*See Pub. 100-04, Medicare Claims Processing Manual, Chapter 11, "Processing Hospice Claims" for requirements for NOE submission, reporting provider-liable days, and qualifying circumstances for a request for exception.*

## 20.2.2 - Hospice Revocation
*(Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

*An individual or representative may revoke the election of hospice care at any time in writing; however a hospice cannot "revoke" a patient's election.  To revoke the election of hospice care, the individual must file a document with the hospice that includes:*

- *A signed statement that the individual revokes the election for Medicare coverage of hospice care for the remainder of that election period, and*

  *The effective date of that revocation.  An individual may not designate an effective date earlier than the date that the revocation is made.*

*Note that a verbal revocation of benefits is NOT acceptable. The individual forfeits hospice coverage for any remaining days in that election period.*

*Upon revoking the election of Medicare coverage of hospice care for a particular election period, the individual is no longer covered under the Medicare hospice benefit, and resumes Medicare coverage of the benefits waived when hospice care was elected. An individual may, at any time, elect to receive hospice coverage for any other hospice election periods that he or she is eligible to receive.*

### 20.2.3 - Hospice Discharge
*Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

*The hospice notifies the Medicare contractor of any discharge so that hospice services and billings are terminated as of that date. Upon discharge, the patient loses the remaining days in the benefit period. However, there is no increased cost to the beneficiary. General coverage under Medicare is reinstated at the time the patient revokes the benefit or is discharged.*

*Once a hospice chooses to admit a Medicare beneficiary, it may not automatically or routinely discharge the beneficiary at its discretion, even if the care promises to be costly or inconvenient, or the State allows for discharge under State requirements. The election of the hospice benefit is the beneficiary's choice rather than the hospice's choice, and the hospice cannot revoke the beneficiary's election. Neither should the hospice request or demand that the patient revoke his/her election.*

*Discharge from a hospice can occur as a result of one of the following:*

- *The beneficiary decides to revoke the hospice benefit;*

- *The beneficiary transfers to another hospice;*

- *The beneficiary dies;*

- *The beneficiary moves out of the geographic area that the hospice defines in its policies as its service area. Some examples of moving out of the hospice's service area include, but are not limited to, when a hospice patient moves to another part of the country or when a hospice patient leaves the area for a vacation. Another example would be when a hospice patient is receiving treatment for a condition unrelated to the terminal illness or related conditions in a facility with which the hospice does not have a contract, and the hospice is unable to access the patient to provide hospice services. In this example, Medicare's expectation is that the hospice provider would consider the amount of time the patient is in that facility and the effect on the plan of care before making a determination that discharging the patient from the hospice is appropriate;*

- *The beneficiary's condition improves and he/she is no longer considered terminally ill. In this situation, the hospice will be unable to recertify the patient. The beneficiary can ask the Quality Improvement Organization (QIO) for an expedited review of the discharge (see Pub. 100-04, chapter 30, section 260 for more information); or*

- *<u>Discharge for cause</u>: There may be extraordinary circumstances in which a hospice would be unable to continue to provide hospice care to a patient. These situations would include issues where patient safety or hospice staff safety is compromised. When a hospice determines, under a policy set by the hospice for the purpose of addressing discharge for cause, that the patient's (or other persons in the patient's home) behavior is disruptive, abusive, or uncooperative to the extent that delivery of care to the patient*

*or the ability of the hospice to operate effectively is seriously impaired, the hospice can consider discharge for cause.  The hospice must do the following before it seeks to discharge a patient for cause:*

- o *Advise the patient that a discharge for cause is being considered;*

- o *Make a serious effort to resolve the problem(s) presented by the patient's behavior or situation;*

- o *Ascertain that the patient's proposed discharge is not due to the patient's use of necessary hospice services; and*

- o *Document the problem(s) and efforts made to resolve the problem(s) and enter this documentation into the patient's medical records.*

*The hospice must notify the Medicare contractor and State Survey Agency of the circumstances surrounding the impending discharge.  The hospice may also need to make referrals to other relevant state/community agencies (i.e., Adult Protective Services) as appropriate.*

*Discharge order:  Prior to discharging a patient for any reason other than a patient revocation, transfer, or death, the hospice must obtain a written physician's discharge order from the hospice medical director.  If a patient has an attending physician involved in his or her care, this physician should be consulted before discharge and his or her review and decision included in the discharge note.*

*Effect of discharge:  An individual, upon discharge from the hospice during a particular election period for reasons other than immediate transfer to another hospice—*

- • *Is no longer covered under Medicare for hospice care;*
- • *Resumes Medicare coverage of the benefits waived; and*
- • *May at any time elect to receive hospice care if he or she is again eligible to receive the benefit.*

*Discharge planning:  The hospice must have in place a discharge planning process that takes into account the prospect that a patient's condition might stabilize or otherwise change such that the patient cannot continue to be certified as terminally ill.*

*The discharge planning process must include planning for any necessary family counseling, patient education, or other services before the patient is discharged because he or she is no longer terminally ill.*

*Once a patient is no longer considered terminally ill with a life expectancy of 6 months or less if the disease runs its normal course, Medicare coverage and payment for hospice care should cease.  Medicare does not expect that a discharge would be the result of a single moment that does not allow time for some post-discharge planning.  Rather, it would be expected that the hospice's interdisciplinary group is following the patient, and if there are indications of improvement in the individual's condition such that hospice may soon no longer be appropriate, then planning should begin.  If the patient seems to be stabilizing, and the disease progression has halted, then it could be the time to begin preparing the patient for alternative care.  Discharge planning should be a process, and planning should begin before the date of discharge.*

*In some cases, the hospice must provide Advanced Beneficiary Notification (ABN) or a Notice of Medicare Non-Coverage (NOMNC) to patients who are being discharged.  See Pub. 100-04, Medicare Claims Processing Manual, Chapter 30 "Financial Liability Protections", Section 50.15.3.1, for information on these requirements.*

## 20.2.4 - Hospice Notice of Termination or Revocation
*(Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

*Upon discharge or revocation of hospice care, the beneficiary immediately resumes the Medicare coverage that had previously been waived by the hospice election. As such, hospices should record the beneficiary's discharge or revocation in the claims processing system promptly.*

*If a hospice beneficiary is discharged alive or if a hospice beneficiary revokes the election of hospice care, the hospice shall submit a timely-filed Notice of Termination/Revocation (NOTR) unless the hospice has already filed a final claim. A timely-filed NOTR is a NOTR that is submitted to and accepted by the Medicare contractor within 5 calendar days after the effective date of discharge or revocation. Hospices continue to have 12 months from the date of service in which to file their claims.*

*See Pub. 100-04, Medicare Claims Processing Manual, Chapter 11, "Processing Hospice Claims" for requirements for NOTR submission.*

## 40.1.3.1 - Attending Physician Services
*Rev.209, Issued: 05-08-15, Effective: 10-01-14, Implementation: 05-04-15)*

The attending physician is a doctor of medicine or osteopathy or a nurse practitioner and is identified by the individual, at the time he or she elects to receive hospice care, as having the most significant role in the determination and delivery of the individual's medical care.

*The election statement must include the patient's choice of attending physician. The information identifying the attending physician should be recorded on the election statement in enough detail so that it is clear which physician or NP was designated as the attending physician. This information should include, but is not limited to, the attending physician's full name, office address, NPI number, or any other detailed information to clearly identify the attending physician. Hospices have the flexibility to include this information on their election statement in whatever format works best for them, provided the content requirements in 42 CFR 418.24(b) are met. The language on the election form should include an acknowledgement by the patient (or representative) that the designated attending physician was the patient's (or representative's) choice.*

*If a patient (or representative) wants to change his or her designated attending physician, he or she must follow a procedure similar to that which currently exists for changing the designated hospice. Specifically, the patient (or representative) must file a signed statement with the hospice that identifies the new attending physician in enough detail so that it is clear which physician or NP was designated as the new attending physician. This information should include, but is not limited to, the attending physician's full name, office address, NPI number, or any other detailed information to clearly identify the attending physician. The statement must include the date the change is to be effective, the date that the statement is signed, and the patient's (or representative's) signature, along with an acknowledgement that this change in the attending physician is the patient's (or representative's) choice. The effective date of the change in attending physician cannot be earlier than the date the statement is signed.*